Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR  97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

Byron C. Lichstein, OSB #214074
E-Mail: blichstein.lplaw@gmail.com
ATTORNEY BYRON LICHSTEIN
2852 Willamette St., #164
Eugene, OR 97405
Telephone: (503) 908-5942

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NIGEL BLISS and DAYNA BLISS, as individuals and as guardians *ad litem*, on behalf of J.B., a minor, and E.B., a minor, Plaintiffs, | Civil No. 3:23-cv-00650-HZ |
| v. | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| ADEBIMPE ADEWUSI, KEYVAN ABTIN, PATRICK BRAY, AUBREY FEAR, SHAWN GOODMAN, KATHRYN GREENE, BRADLEY LEIKEM, STOKELY RODRIGUEZ, LEGACY EMANUEL HOSPITAL & HEALTH CENTER DBA CARES NORTHWEST, LEGACY EMANUEL HOSPITAL & HEALTH CENTER DBA RANDALL CHILDREN'S HOSPITAL AT LEGACY, CLACKAMAS COUNTY SHERIFF'S OFFICE, CHILD EYE CARE ASSOCIATES LLC, CLACKAMAS COUNTY, and STATE OF OREGON by and through its agency DEPARTMENT OF HUMAN SERVICES and the CHILD PROTECTIVE SERVICES DIVISION thereof, | ***DEMAND FOR JURY TRIAL*** |
| Defendants. | |

Page 1– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

COMES NOW Plaintiffs Nigel Bliss and Dayna Bliss, as individuals and as guardians *ad litem* on behalf of J.B. and E.B., by and through their attorneys, Maloney Lauersdorf Reiner PC, and allege and claim as follows:

## I.  INTRODUCTION

1.      Nigel Bliss spent more than three years fighting to prove his innocence and keep his family together after he was wrongfully investigated, charged, and prosecuted for a crime that he did not commit—the alleged assault and criminal mistreatment of his daughter E.B.

2.      E.B. suffered from a medical condition that resulted in the sudden onset of seizures and intracranial and ocular complications.

3.      After Nigel and his wife, Dayna, sought emergency medical care for E.B., the Defendants turned the treating physicians against them, causing Nigel to be criminally charged, the family to be separated, and E.B. to suffer further medical complications as a result of medical neglect.

4.      Nigel Bliss was wrongfully investigated, charged, and prosecuted because the Defendants fabricated evidence that Nigel violently shook or struck E.B., and that E.B.'s condition was caused by "shaken baby syndrome" (interchangeably referred to as "shaken baby syndrome," "abusive head trauma," "inflicted injury," or "non-accidental trauma"), a debunked medical hypothesis that "child abuse pediatricians" and prominent hospitals in Oregon promote in order to secure millions of dollars in local, state, and federal funding.

5.      The Defendants fabricated evidence of abuse, suppressed exculpatory evidence, and otherwise violated the Blisses' rights under the United States constitution, the Oregon constitution, and the law.

6.      Despite the parents' innocence, Defendant State of Oregon by and through its agency Department of Human Services and the Child Protective Services Division thereof (DHS) seized E.B. without a warrant, fraudulently obtained custody of E.B. and J.B. and placed them into foster care, feigned an investigation into Dayna in order to maintain custody of E.B. and

MALONEY | LAUERSDORF | REINER ᴘᴄ
ᴀᴛᴛᴏʀɴᴇʏꜱ ᴀᴛ ʟᴀᴡ
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

J.B., and tried to keep Nigel from his children and turn his wife, Dayna, against him by forcing her to choose between her husband and her children.

7.      Defendant DHS threatened Dayna's relationship with her children by fabricating evidence of neglect, removing them from her care, and refusing to work toward reunification of the family unless and until Dayna agreed to collude with Defendant DHS and fabricate additional evidence of abuse that would support the criminal prosecution of her husband.

8.      After fighting for his innocence for more than three years, Nigel was proved innocent and the Clackamas County District Attorney's Office unilaterally dismissed all charges against him.

9.      Less than two weeks after the criminal case was closed, Defendant DHS relinquished custody of E.B. and J.B. and stipulated to the dismissal of its dependency petitions.

10.     Still, Nigel and Dayna were forced to continue to fight Defendant DHS for another year to remove their names from a child abuse registry.

11.     After three years of Defendant DHS interfering with and asserting control over their lives, and a fourth year of administrative appeals, Defendant DHS admitted that the original allegations of abuse and neglect were "unfounded," and disclosed for the first time that Defendant DHS knew all along that "there is no evidence the abuse occurred."

12.     Nigel and Dayna Bliss were fully exonerated of all of the false allegations made against them.

13.     The Bliss Family now brings this action to redress the devastating injuries that the Defendants caused them.

## II.  PARTIES

14.     Plaintiff Nigel Bliss is, and was at all times material and relevant to this action, an individual and resident of the states of Oregon and Washington.

15.     Plaintiff Dayna Bliss is, and was at all times material and relevant to this action, an individual and resident of the states of Oregon and Washington.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

16.     Plaintiff J.B. is, and was at all times material and relevant to this action, a minor individual and resident of the states of Oregon and Washington.  J.B. appears in this lawsuit through his parents, Nigel and Dayna Bliss, as his guardians ad litem.

17.     Plaintiff E.B. is, and was at all times material and relevant to this action, a minor individual and resident of the states of Oregon and Washington.  E.B. appears in this lawsuit through her parents, Nigel and Dayna Bliss, as her guardians ad litem.

18.     Defendants Adebimpe Adewusi and Stokely Rodriguez are, or were at all times material and relevant to this action, individuals employed by Legacy Emanuel Hospital & Health Center dba CARES Northwest (CARES Northwest) or Legacy Emanuel Hospital & Health Center dba Randall Children's Hospital (Randall Children's Hospital), as well as agents of Defendants CARES Northwest, Randall Children's Hospital, and Clackamas County including the Clackamas County Multidisciplinary Team (Clackamas County MDT) acting under color of law and within the scope of their agency.

19.     Defendant Keyvan Abtin is, or was at all times material and relevant to this action, an individual employed by Randall Children's Hospital and an agent of Defendant Randall Children's Hospital acting under color of law and within the scope of his agency.

20.     Defendant Shawn Goodman is, or was at all times material and relevant to this action, an individual employed by Child Eye Care Associates, LLC, and, upon information and belief, an agent of Defendants Child Eye Care Associates and Randall Children's Hospital acting under color of law and within the scope of her agency.

21.     Defendants Aubrey Fear and Kathryn Greene are, or were at all times material and relevant to this action, individuals employed by Defendant DHS and agents of Defendants DHS and Clackamas County including the Clackamas County MDT acting under color of law and within the scope of their agency.

22.     Defendants Patrick Bray and Bradley Leikem are, or were at all times material and relevant to this action, officers or agents of Defendant Clackamas County Sheriff's Office

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

and acting under color of law and within the scope of their agency for Defendants Clackamas County, including the Clackamas County Sheriff's Office and the Clackamas County MDT. Defendant Bray was also a final policymaker, or had been delegated such authority, by and for Defendant Clackamas County.  He is sued in his individual and official capacities.

23.     Defendant CARES Northwest is an Oregon corporation and is, or was at all times material and relevant to this action, the employer of Defendants Adewusi and Rodriguez.  At all times material and relevant to this action, Defendant CARES Northwest acted as an agent of Defendant Clackamas County including the Clackamas County MDT and was acting under color of law and within the scope of its agency.

24.     Defendant Randall Children's Hospital is an Oregon corporation and is, or was at all times material and relevant to this action, the employer of Defendants Abtin and Goodman and principal of Defendants Adewusi and Rodriguez.  At all times material and relevant to this action, Defendant Randall Children's Hospital acted as an agent of Defendant Clackamas County including the Clackamas County MDT and was acting under color of law and within the scope of its agency.

25.     Defendant Child Eye Care Associates, LLC, is an Oregon limited liability corporation and is, or was at all times material and relevant to this action, the employer of Defendant Goodman.  Upon information and belief, at all times material and relevant to this action, Defendant Child Eye Care Associates acted as an agent of Defendant Randall Children's Hospital and was acting under color of law and within the scope of its agency.

26.     Defendant Clackamas County, which includes the Clackamas County Sheriff's Office, the Clackamas County MDT, and their officers, employees, and agents, is an Oregon municipal corporation and is, or was at all times material and relevant to this action, the employer of Defendants Bray and Leikem, and a principal of Defendants Abtin, Adewusi, Fear, Greene, Goodman, Rodriguez, CARES Northwest, Randall Children's Hospital, and Child Eye

/ / /

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Care Associates.  Defendant Clackamas County is liable for the acts of the individuals acting within the scope of their employment or agency.

27.     Defendant DHS, is an agency of the State of Oregon and is, or was at all times material and relevant to this action, the employer of Defendants Fear and Greene.  Defendant DHS is liable for the acts of the individuals acting within the scope of their employment or agency for Defendant DHS.

28.     Defendants CARES Northwest, Randall Children's Hospital, Child Eye Care Associates, and Clackamas County (collectively, the "Entity Defendants") are responsible for the policies, practices, and customs of their respective officers, agents, and employees.

29.     Defendant DHS is responsible for the policies, practices, and customs of its respective officers, agents, and employees.

30.     Defendants Abtin, Adewusi, Goodman, CARES Northwest, Randall Children's Hospital, and Child Eye Care Associates will be collectively referred to as the "Hospital Defendants."

31.     Defendants Bray, Leikem, and Clackamas County, including the Clackamas County Sheriff's Office and the Clackamas County MDT, will be collectively referred to as the "County Defendants."

32.     Defendants Fear, Greene, and DHS will be collectively referred to as the "DHS Defendants."

### III.  JURISDICTION AND VENUE

33.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C §§ 1331 and 1343.

34.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

35.     Venue in this court is proper under 28 U.S.C. § 1391(b)(1)-(2) and LR 3-2(b) because the majority of Defendants reside or were incorporated in this judicial district, and the

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

acts, events, and omissions giving rise to the claims asserted herein occurred primarily within this district.

## IV.  FACTUAL ALLEGATIONS

**A.     Background**

36.     Nigel Bliss attended Oregon Institute of Technology ("OIT") while serving in the United States Marine Corps Reserves, and graduated with a degree in electrical engineering.

37.     Dayna Bliss attended OIT for pre-nursing studies, graduated from Oregon Health & Science University (OHSU) with a degree in nursing, and has worked in hospital units treating neurological conditions throughout her career as a nurse.

38.     Nigel and Dayna were married on August 2, 2014, in Silverton, Oregon.

39.     The couple's first child, J.B., was born on October 3, 2015.

40.     The couple bought their first home together in May of 2016.

41.     The couple's second child, E.B., was born on February 16, 2018.

42.     Nigel and Dayna both took extended paternity and maternity leave in order to bond with and care for both E.B. and J.B.

43.     Before the events giving rise to this lawsuit, J.B. and E.B. were both happy, healthy, and thriving, hitting all major milestones for normal growth and development, and receiving regularly scheduled wellness and other medical care from their pediatrician.

**B.     E.B.'s Medical History and Hospitalization**

44.     On May 24, 2018, E.B. began to experience vomiting after her feedings.

45.     This caused Nigel and Dayna concern, because E.B. had been breastfed from birth without complication, so they took E.B. to see her pediatrician on May 27, and again on May 29 when the vomiting persisted.  In between visits they also called the advice nurse, the pediatric nurse, and E.B.'s pediatric clinic multiple times about E.B.'s vomiting.

46.     On May 29, 2018, E.B. was seen at Randall Children's Hospital for an abdominal ultrasound to rule out pyloric stenosis (a narrowing of the opening between stomach and small

Page 7– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

intestine).  Imaging ruled out pyloric stenosis, and E.B.'s primary care pediatrician subsequently suggested gastroesophageal reflux disease as a potential cause of E.B.'s vomiting.

47.    E.B.'s vomiting, which appeared at times to be projectile vomiting, continued through June 5, 2018.

48.    At bedtime on the evening of June 7, 2018, E.B. began to show signs of discomfort, her eyes deviated to the right, and her body became rigid while being swaddled. When Nigel and Dayna unwrapped E.B.'s swaddle, Dayna recognized posturing movements consistent with a seizure; E.B.'s arms and legs were stiff, and her head and neck were arching backwards.

49.    Nigel immediately called 911, and both Nigel and Dayna spoke with the 911 operator.

50.    E.B.'s seizure lasted approximately ten minutes until EMS personnel arrived at the Bliss home and administered medication to stop the seizure.

51.    While EMS was tending to E.B., she suffered a second seizure that lasted approximately one and a half minutes.

52.    EMS did not note any concern for abuse or neglect, and did not record any bruises, abrasions, swelling, redness, grip marks, or cuts on E.B. before transporting her to the hospital.

53.    Dayna rode with E.B. to the emergency room where E.B. was admitted for testing.  After arranging childcare for J.B., Nigel rushed to meet Dayna and E.B. at the Randall Children's Hospital Emergency Department.

54.    At the time of E.B.'s admission to Randall Children's Hospital, Dayna was a registered nurse working at Legacy Meridian Park Medical Center, and she and Nigel trusted Legacy personnel with the care of their daughter.

/ / /

/ / /

Page 8– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**C.    E.B.'s First Two Days in the Hospital and the Diagnosis of BESS**

55.    When she arrived at Randall Children's Hospital, E.B. was neurologically stable, moving all of her extremities appropriately, and had a supple non-tender neck.

56.    At least three doctors, including a pediatrician, pediatric surgeon, and trauma surgeon, "took a history" and conducted physical examinations of E.B., and Nigel and Dayna consistently reported to doctors and staff E.B.'s history of vomiting and her sudden seizures.

57.    E.B. was seen or examined by more than seven doctors in the first 48 hours after her arrival at the hospital—along with several other doctors, nurses, and staff who also consulted on E.B.'s care—without a single report that E.B. had any bumps, bruises, contusions, abrasions, soft tissue swelling, cuts, fractures or broken bones, neck injury, spinal injury or misalignment, ligament injuries, or signs of trauma, including brain injury.

58.    Multiple doctors did, however, report on E.B.'s unusual head circumference, which had grown from the 55th percentile to the 97th percentile in the three months since her birth.

59.    Over the course of her hospitalization, E.B.'s treating doctors ordered blood tests, a head CT scan, a brain MRI, chest and abdomen x-rays, and an EEG.

60.    The CT scan revealed one small subdural hemorrhage over the right parietal lobe and a benign enlargement of extra-axial spaces over both frontal lobes.  The hospital radiologist reported no other hemorrhage, edema, mass effect, or midline shift that would suggest trauma to the brain.

61.    Nigel and Dayna were asked to report any history of bumps to E.B.'s head, no matter how small, and Nigel and Dayna reported every incident they could think of, including that E.B. had fallen off a couch and J.B. had thrown a toy car at E.B.  Nigel and Dayna also reported that E.B.'s step-grandmother accidentally bumped E.B.'s head into a sliding glass door the week prior while caring for her.

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

62.     Defendant Abtin and E.B.'s other treating doctors agreed that even minor incidents such as those as described by Nigel and Dayna could cause E.B.'s small right-sided acute subdural bleed in the setting of her large extra-axial fluid collections.  Defendant Abtin reported to Nigel and Dayna that, due to E.B.'s head circumference and fluid spaces, such small bleeds could even occur without corresponding trauma.

63.     Based on the CT scan, blood test results, and comprehensive history, Defendant Abtin diagnosed E.B. with benign enlargement of the subarachnoid spaces ("BESS")—a medical condition not caused by abuse—and reported that the condition caused "a small amount of acute blood which should be spontaneously resolving."  BESS is described in medical literature as a variation of normal development of the brain involving the transient accumulation of cerebrospinal fluid in the space between the growing skull and developing brain.

64.     Despite the diagnosis of a benign, non-abusive, and generally self-resolving condition, however, and based upon information and belief, the finding of a subdural hemorrhage on the CT scan triggered a hospital policy that required a mandatory report of a concern for abuse to DHS through the DHS child abuse reporting hotline.

65.     Based on information and belief, DHS notified law enforcement of the report for concern for child abuse in a process called "cross-reporting."

66.     Pursuant to a joint protocol mandated by the State of Oregon, the cross-report began the process of a joint criminal investigation by the "multidisciplinary team" consisting of police, DHS, and CARES Northwest.

**D.     The "Multidisciplinary Team"—a State-Mandated, State-Created, and State-Funded Team to Investigate and Prosecute Child Abuse**

67.     By statute, the State of Oregon establishes and maintains state-funded "multidisciplinary" teams to which it delegates its responsibility to investigate and prosecute child abuse.

/ / /

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

68.    The multidisciplinary teams are mandated, created, and controlled by statute pursuant to the State's authority to conduct criminal investigations and provide training and technical assistance for criminal investigations of alleged child abuse.

69.    By statute, the multidisciplinary teams are coordinated through each county's District Attorney's office and required by law to include law enforcement personnel, DHS child protective service workers, and a designated medical professional.

70.    The multidisciplinary team approach mandated by statute is the sole and exclusive manner in which the State of Oregon carries out all investigations of suspected child abuse and interviews of victims of suspected child abuse.

71.    The State of Oregon requires that the designated medical professional on the multidisciplinary team be trained to conduct a "child abuse assessment" as defined by state statute.

72.    The State of Oregon requires that the statutorily-mandated child abuse assessment include a "medical assessment," defined by statute as "the taking of a child's thorough medical history and a complete physical examination," which the State is required to do "for the purpose of determining whether or not a child has been abused."

73.    Because neither the police nor DHS employ in-house physicians, the State and counties delegate the statutorily-mandated child abuse assessment, including the medical assessment, to a designated "children's advocacy center" in each county.

74.    CARES Northwest is the designated medical professional for the Multnomah County multidisciplinary team and Washington County multidisciplinary team.

75.    Randall Children's Hospital is the designated medical professional for evening and weekend investigations by the Clackamas County multidisciplinary team.

76.    The State of Oregon also maintains five children's advocacy centers in Oregon to support child abuse investigations and prosecutions in each of five regions of the state, providing

/ / /



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

medical assessments, consultations, training, and technical assistance as part of the multidisciplinary team in each region.

77.     CARES Northwest is the designated regional service provider to which the State delegates its responsibility to conduct statutorily-mandated child abuse assessments and offer trainings and technical assistance as part of the multidisciplinary teams for Clackamas County, among others.

78.     CARES Northwest is a collaboration between four area hospitals (Randall Children's Hospital, OHSU Doernbecher Children's Hospital, Providence Children's Health, and Kaiser Permanente) and Multnomah and Washington counties.

79.     In an internal handbook, CARES Northwest represents that it "was the first program in Oregon to combine physicians, child interviewers, children's protective services, and law enforcement agencies together in a multidisciplinary team."

80.     CARES Northwest has what it calls a "working relationship" with Randall Emergency Department, but CARES Northwest is registered with the Oregon Secretary of State under a separate assumed business name and enjoys premises separate from Randall Children's Hospital.

81.     DHS and law enforcement personnel are stationed in the CARES Northwest office to ensure close collaboration.

82.     The Governing Board of CARES Northwest consists of six positions, two of which are reserved for representatives of the Multnomah County District Attorney's Office and Washington County District Attorney's Office.

83.     The Governing Board of CARES Northwest, including the prosecutors who sit on that Board, is responsible for all policy matters of CARES Northwest, including approval of annual capital and operating budgets; approval of strategic, marketing, and fundraising plans; and approval of major service changes.

/ / /



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

84.     By "memorandum of understanding" ("MOU") between the State, counties, and CARES Northwest, CARES is contracted to provide services that support and assist the county multidisciplinary teams investigating and prosecuting child abuse, and CARES Northwest is prohibited from using State funds to provide direct services to victims.

85.     The State of Oregon's handbook for funds given to child advocacy centers such as CARES Northwest provides that money from the State is to be used for the "investigation and assessment of child abuse allegations," and is "not intended to support ongoing or long-term treatment of individual victims."

86.     According to the MOU, CARES Northwest is required to provide certain "core services" on behalf of the State, including assistance with medical assessments in pursuit and support of criminal prosecutions and dependency proceedings, education, training, consultation, technical assistance, and referral services for county multidisciplinary child abuse teams in a designated region.

87.     CARES Northwest keeps its law enforcement and DHS partners up-to-date about the "menu of services" paid for by the State and available to the counties through regular phone, email, and in-person visits, along with an annual training calendar, quarterly newsletter, and monthly training announcements.

88.     To carry out its statutorily-mandated function of investigating and prosecuting alleged child abuse, the State of Oregon pays for that portion of CARES Northwest's operations that are allocated to conducting criminal investigations required of the State and delegated to CARES Northwest.

89.     The State of Oregon pays CARES Northwest's rent to maintain CARES Northwest's office space, and regularly provides additional funding for office improvements, which CARES Northwest represents in grant applications is necessary to complete statutorily-mandated child abuse investigations, including space reconfigurations to exam rooms, wall-mounted vitals stations in exam rooms, mobile treatment carts, and soundproofing.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

90.     The State of Oregon also pays for equipment, which CARES Northwest represents in grant applications is necessary to complete statutorily-mandated child abuse investigations, including cell phones and laptops for staff, medical supplies such as stethoscopes, and furniture.

91.     The State of Oregon also pays for the cost of information technology to support the collaboration between CARES Northwest and police and DHS, including specialized software that facilitates the electronic sharing of case-related videos, photos, and reports.

92.     The State of Oregon also pays salary expenses for those individuals who staff the investigation and prosecution of alleged child abuse cases, including child abuse pediatricians (such as Defendant Adewusi), social workers (such as Defendant Rodriguez), and "program specialists" who are responsible for coordinating the work with the county multidisciplinary teams.

93.     The State of Oregon also pays administrative overhead expenses incurred by Randall Children's Hospital to support the child abuse investigative function of CARES Northwest, including expenses for accounting, legal, and human resources.

94.     By statute, the State of Oregon is required to train CARES Northwest personnel who work as part of the multidisciplinary teams on risk assessment, the dynamics of child abuse, child sexual abuse and rape of children, and forensic interviewing.

95.     The State of Oregon pays to train CARES Northwest personnel who work as part of the multidisciplinary team by approving and funding travel to "child abuse" conferences within Oregon and out-of-state, allowing CARES Northwest staff to take advantage of government rates for lodging.

96.     Since at least 2013, CARES Northwest has partnered with the Clackamas County Sheriff's Office to present an annual Child Abuse Summit, a conference attended by law enforcement, DHS, and child abuse pediatricians nationwide.

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

97.    In order to secure continued access to State-sponsored funding and other resources, CARES Northwest represents to the State of Oregon that "[f]rom the outset of each case, we work closely and collaboratively with multiple agencies, including those of law enforcement, ODHS Child Protective Services, medical and mental health."

98.    CARES Northwest is a listed member of the county multidisciplinary teams, and the State of Oregon requires CARES Northwest to attend all multidisciplinary team meetings.

99.    The multidisciplinary team, including CARES Northwest, meets regularly, sometimes weekly or more, to determine how to proceed on open cases and investigations.

100.    Pursuant to its agreement with the State and counties, CARES Northwest is expected to have expertise sufficient to provide all designated core services, but, if CARES Northwest is unable to meet a request for core services because it lacks expertise, CARES Northwest is required to provide these services by entering into contracts, MOUs, or informal agreements with appropriate medical subspecialists.

101.    In order to secure continued access to state-sponsored funding and other resources, CARES Northwest represents to the State of Oregon that CARES Northwest's association to Randall Children's Hospital provides access to pediatric medical subspecialists necessary for comprehensive investigation of multidisciplinary team cases alleging child abuse.

102.    CARES Northwest, law enforcement, and DHS share a co-written, joint protocol that governs the work of each multidisciplinary team.

103.    The joint protocol includes a flow chart with steps that dictate each agency's role and responsibilities from the first report of a concern for child abuse all the way through prosecution.

104.    The State of Oregon controls the work of CARES Northwest through the joint protocol for each county.

105.    The joint protocol in each county requires that CARES Northwest and/or Randall Children's Hospital take specific steps to conduct the medical assessment required by statute.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

106.    Pursuant to the joint protocol, police and DHS delegate responsibility for initial interviews to CARES personnel to avoid duplication and secure statements for use by the multidisciplinary team as a whole.  In this case, DHS delegated its investigative authority to CARES Northwest.

107.    Members of the multidisciplinary team are also authorized to obtain and share criminal histories on any person in the household where a child may be placed.

108.    The degree of cooperation between police, DHS, and CARES Northwest goes beyond the existing co-located, multiagency service center.  CARES Northwest has represented to the State of Oregon its plans to embed intake counselors in each local DHS branch and/or pair intake counselors with child welfare branches for telephonic assistance.

109.    CARES Northwest represents to the State of Oregon that its work is intended to support "prosecution of offenders."

110.    The State of Oregon requires CARES Northwest to coordinate with police, DHS, and prosecutors to provide annual reports to justify continued funding by the State and counties.

111.    Internal multidisciplinary team documents record concern among CARES Northwest and its police, prosecution, and DHS partners over declining numbers of child abuse referrals, as well as strategies for increasing the numbers of referrals.

112.    Annual progress reports from police, DHS, and CARES Northwest include the number of "successful felony prosecutions" resulting from the efforts of multidisciplinary teams.

113.    CARES Northwest and its police, prosecution, and DHS partners document their "target" numbers of referrals to CARES Northwest.

114.    CARES Northwest funding from the State of Oregon is based upon CARES Northwest's self-reporting of child abuse diagnoses, and there is a direct correlation between the number of child abuse diagnoses and CARES Northwest's funding.

115.    Based upon information and belief, CARES Northwest and Randall Children's Hospital cooperate and act jointly with law enforcement and prosecutors to collect fines, fees,

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

and expert witness expenses from those that they accuse of child abuse, while also collecting fees from the health insurers of victims of suspected child abuse.

116.    The agreement between the State, counties, and CARES Northwest, and the reporting requirements, provide financial and other incentives for CARES Northwest personnel to make and perpetuate diagnoses of child abuse, even in the face of medical evidence to the contrary.

117.    As a result of the agreement between the State, counties, and CARES Northwest, and the reporting requirements, Randall Children's Hospital has adopted a policy that precludes its physicians from consulting for any defendant in a criminal case, and limits Randall Children's Hospital physicians to consulting exclusively for CARES Northwest and the Oregon Medical Board.

118.    Child abuse medical programs similar to CARES Northwest have been investigated for false allegations, overdiagnosis, and overstating their conclusions of child abuse that have resulted in wrongful prosecutions across the country and innocent parents losing custody of their children.

**E.    The Multidisciplinary Team in the Bliss Criminal and Dependency Cases**

119.    The multidisciplinary team that led the investigation into Nigel and Dayna Bliss included CARES Northwest, as the designated medical professional for Multnomah County and the regional service provider for Clackamas County, and Randall Children's Hospital as the after-hours designated medical professional for Clackamas County.

120.    CARES Northwest personnel leading the investigation into Nigel and Dayna Bliss included Adewusi, a "child abuse pediatrician" and the Medical Director of CARES Northwest, and Rodriguez, a "clinical social worker associate."

121.    The multidisciplinary team that led the investigation into Nigel and Dayna Bliss included Patrick Bray and Bradley Leikem, two detectives from the "Child Abuse Team" at the Clackamas County Sheriff's Office.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

122.    The multidisciplinary team that led the investigation into Nigel and Dayna Bliss included Aubrey Fear and Kathryn Greene, two DHS child protective services workers.

123.    Pursuant to the agreement between the State, counties, and CARES Northwest that CARES Northwest would provide medical subspecialists at Randall Children's Hospital to support the multidisciplinary team, CARES Northwest brought in Goodman, an ophthalmologist on the medical staff at Randall Children's Hospital, and Abtin, a neurosurgeon on the medical staff at Randall Children's Hospital.

124.    Adewusi told a nurse that she was bringing in "my ophthalmologist," Goodman.

125.    Based on information and belief, and pursuant to the terms of their employment at Randall Children's Hospital, Goodman and Abtin agreed to work with the multidisciplinary team to bolster the fabricated opinion of child abuse.

**E.    Fabricated Evidence of Abuse**

126.    As described in detail below, the multidisciplinary team fabricated evidence that Nigel abused E.B. by violently shaking her, that Nigel abused J.B. in some unspecified manner, and that Dayna turned a blind eye to the abuse.

**1.    No Evidence of Abuse**

127.    On June 8, 2018, the day after Nigel and Dayna rushed E.B. to the hospital, E.B. underwent an MRI to delineate the fluid around her brain and the small acute subdural hematoma.

128.    On Adewusi's orders, the multidisciplinary team subjected E.B. to a full-body, head-to-toe, radiological bone survey searching for evidence of broken bones and fractures.

129.    The bone survey was negative, i.e., head-to-toe X-rays of E.B. confirmed that there was no evidence of broken bones, fractures, previously broken bones or fractures, ligamentous injury, or other indicia of abuse.

130.    E.B.'s brain and neck MRI showed no evidence of skull fractures, soft tissue swelling, ligamentous injury, or neck injury.  Again, the hospital radiologist reported no other

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

intracerebral hemorrhage, edema, mass effect, or midline shift that would suggest traumatic injury to the brain.

131.    Abtin, however, wrongly reported the extra-axial fluid around E.B.'s brain as "all blood," labeled it a bilateral (both sides of the brain) chronic subdural hematoma, and told Nigel and Dayna that surgery was medically necessary to drain the extra-axial fluid.

132.    Abtin did not inform Nigel or Dayna that a reasonable alternative to surgery was to simply monitor the condition.

133.    E.B.'s surgery confirmed that the fluid around E.B.'s brain was not "all blood," but largely a collection of cerebrospinal fluid, which is routinely diagnosed as a benign extra-axial fluid collection, as initially suggested by the CT scan results.

### 2.    Fabricated and Suppressed Evidence from Improper Interrogations

134.    While E.B. was still in surgery, Adewusi, Rodriguez, Bray, Leikem, and Fear met together to conduct a "CARES NW Inpatient Consultation," further the criminal investigation of Nigel and Dayna Bliss, and to discuss, agree upon, and begin to implement a joint strategy for taking custody of E.B. and J.B., for convincing the juvenile court to exercise its jurisdiction, and for ultimately prosecuting Nigel Bliss for the alleged abuse of E.B.

135.    In furtherance of the agreed-upon strategy, Adewusi, Rodriguez, Bray, Leikem, and Fear set up a base of operations in a hospital conference room down the hall from where Nigel and Dayna stayed while in the hospital caring for E.B., where these Defendants met and discussed strategy, coordinated the interrogations of Nigel and Dayna, and compared notes.

136.    Fear reported that she met with Bray, Leikem, Adewusi, and Rodriguez "to gather information for criminal investigation."

137.    Adewusi, Rodriguez, Bray, Leikem, and Fear all took an active role in the investigation, and all acts and investigation undertaken by these Defendants were done in furtherance of the agreed-upon strategy.

/ / /

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

138.    At all times relevant and material, Adewusi and Rodriguez suppressed evidence that they were, in fact, members of the law enforcement team that was surreptitiously investigating Nigel and Dayna.

139.    Adewusi and Rodriguez conducted interrogations of Nigel and Dayna by pretending to be part of E.B.'s treating team and representing themselves as such, despite knowing that they were conducting a criminal and dependency investigation of Nigel and Dayna in concert with Bray, Leikem, Fear, Clackamas County, and DHS.

140.    At no time prior to or during their interrogations of Nigel and Dayna did Adewusi or Rodriguez inform Nigel or Dayna that Adewusi was a doctor or "child abuse pediatrician," or that Rodriguez was a social worker in training.

141.    At no time prior to or during their interrogations of Nigel and Dayna did Adewusi or Rodriguez inform Nigel or Dayna that they were conducting a forensic medical and psycho-social assessment on E.B. and the family, or that the results would be shared with law enforcement and DHS for purposes of initiating dependency proceedings and a criminal prosecution of Nigel.

142.    At no time prior to or during their interrogations of Nigel and Dayna did Adewusi and Rodriguez inform Nigel or Dayna that they had the right to remain silent, or that declining to participate in the interrogation would not affect E.B.'s treatment or care.

143.    Adewusi and Rodriguez used the interrogations of Nigel and Dayna as a pretext to fabricate evidence to support allegations of child abuse.

144.    Adewusi and Rodriguez fabricated statements and falsely attributed those statements to Nigel and Dayna for the purpose of creating a motive or motives for child abuse, including the following:

     a.    that E.B. was "frustrating" to care for;

     b.    that Nigel was "not as involved with [E.B.]";

     c.    that Dayna would lose patience with E.B. and "would sometimes hand off [E.B.]

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

to father saying 'Ahh!  I can't do it anymore'"; and

     d.   that Nigel felt that E.B. "does not like him."

145.    Adewusi and Rodriguez also fabricated evidence of "opportunity" to commit the alleged abuse, including falsely reporting that Nigel had been left alone with E.B. for fifteen to twenty minutes before E.B. experienced her first seizure.

146.    After Adewusi and Rodriguez finished their pretext interrogation of Nigel and Dayna, Defendants Bray and Leikem debriefed with Adewusi and Rodriguez and used the information fabricated by Adewusi and Rodriguez to conduct follow-up interrogations.

147.    Prior to and during their interrogation of Nigel, Defendants Bray and Leikem told Nigel that he did not need an attorney, that he would never be arrested, and that E.B. would only get the medical care she needed if Nigel or Dayna confessed to abusing E.B.

148.    Bray and Leikem attempted to coerce Nigel into confessing to a crime that he did not commit by telling him that Abtin had disavowed his preliminary diagnosis of BESS; by telling him that "medical people" had definitively determined that E.B. was physically abused and that her condition was caused by "violent shaking," and that E.B.'s abuser would have to know the precise event that caused E.B.'s condition; by telling him that E.B.'s abuser could not be anyone other than Nigel or Dayna; and by suggesting that Nigel's only two options were to implicate Dayna or confess to abusing E.B. himself.

149.    Nigel maintained his innocence throughout the interrogations and refused to lie to implicate Dayna.

150.    Bray and Leikem falsely reported statements that Nigel made during their interrogation, and took other statements out of context, to fabricate evidence that Nigel suffered from post-traumatic stress disorder, that he "generally, would go through the roof" upon hearing loud noises, and that Nigel and Dayna would get frustrated when E.B. would not sleep and was fussy "well over the normal."

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

151.     Bray and Leikem also attempted to coerce Dayna into implicating Nigel by forcing her to sit for interrogation while she was distraught and had already been awake for over 36 hours, even though she asked to schedule the interrogation for another time.

152.     Dayna maintained her innocence throughout the interrogations and refused to lie to implicate Nigel.

153.     At all times relevant and material, Adewusi, Rodriguez, Bray, and Liekem suppressed evidence of their misconduct during the interrogations, including the fact that they falsely reported and fabricated statements from the interrogations.

### 3.     Fabricated and Suppressed Medical Evidence

154.     Adewusi and Goodman fabricated a medical "diagnosis" of physical abuse, reporting that E.B. had been "shaken aggressively" and that she had been "shaken on at least 2 separate occasions."

155.     Adewusi reported that E.B.'s clinical findings "are consistent with abusive head trauma, a type of physical child abuse."

156.     During a multidisciplinary team meeting related to E.B., Adewusi explained in a PowerPoint presentation that "abusive head trauma" actually "goes by many other names: inflicted traumatic brain injury, shaken impact syndrome, shaken baby syndrome" and that "all these names mean the same thing: - injury to an infant or toddler's brain as a result of child abuse."

157.     The term "shaken baby syndrome" is used less frequently today because scientific research has debunked the notion that shaking alone can cause the head trauma seen in previous cases of alleged shaken baby syndrome, especially without causing other catastrophic injuries to the neck, shoulders, and chest.  Terms such as "non-accidental injury" and "non-accidental trauma" are now preferred because they express a conclusion of child abuse without specifying a mechanism of injury.

/ / /



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

158.    The diagnosis—whether termed shaken baby syndrome or one of the alternate terms—rests on three key findings called the "triad": (1) blood in the subdural area around the brain (subdural hemorrhage), (2) bleeding within the retina (retinal hemorrhages), and (3) encephalopathy (brain swelling).In support of her fabricated diagnosis, and for purposes of obtaining dependency jurisdiction over E.B. and J.B. and bringing about the criminal prosecution of Nigel, Defendant Adewusi fabricated additional evidence and falsely reported:

     a.   that clinical findings established with 100% certainty that E.B.'s condition was caused by abusive head trauma;

     b.   that all other potential causes or explanations for E.B.'s condition, including BESS, had been considered and rejected as possible causes;

     c.   that Defendant Abtin had disavowed his preliminary medical diagnosis of BESS/BEAFI;

     d.   that E.B.'s condition could only have been caused by forceful acceleration-deceleration and rotational forces;

     e.   that E.B.'s clinical findings conclusively established that her condition was caused by an acute incident of abuse that occurred immediately before E.B.'s seizure;

     f.   that the clinical findings established, again with 100% certainty, that the person who abused E.B. "knows they did it;" and

     g.   that the only possible non-abusive cause for E.B.'s clinical findings would be a severe motor vehicle accident.

159.    At the time that Adewusi fabricated the diagnosis of abuse, Adewusi knew or should have known that the test results and other clinical findings, reported history, and Abtin's surgery proved that E.B. was suffering from complications of BESS, a medical condition not caused by abuse.

/ / /

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

160.    Adewusi fabricated additional evidence by ordering blood tests that were incomplete and inadequate to rule out medical causes for E.B.'s symptoms, and which were not outcome determinative of her opinion of abuse, in order to falsely suggest to police, DHS, and prosecutors that she had conducted a comprehensive medical evaluation of E.B.

161.    Adewusi fabricated additional evidence by falsely reporting that E.B. had no leukocytosis despite lab reports that confirmed E.B.'s high white blood cell count; that E.B. had an abrasion to her left eye despite multiple exams by other doctors confirming no such abrasion; that E.B. had lesions on her body, even though Adewusi knew that the redness she observed was caused by surgical tape and devices being placed on and removed from E.B.'s body during medical treatment after E.B. was admitted to Randall Children's Hospital; and that E.B. had a risk of long term neurologic deficits despite the specialists' reports of benign findings that would resolve.

162.    Because evidence of the triad was necessary to convince a prosecutor or court that E.B. had been abused, and required clinical findings related to the eyes and brain, Adewusi and CARES NW recruited Goodman, an ophthalmologist on the medical staff at Randall Children's Hospital, who agreed to work with Adewusi and the multidisciplinary team pursuant to the agreement between the State, County, and CARES Northwest to provide medical subspecialists from Randall Children's Hospital to support the team.

163.    Adewusi and CARES NW recruited Goodman because she was a well-known proponent of the debunked "shaken baby syndrome" or "abusive head trauma" hypothesis.

164.    According to Goodman's sworn testimony in other cases alleging child abuse, Goodman is called into cases alleging child abuse two to four times per year.

165.    The State of Oregon delegates to Goodman the authority to conduct the portion of the statutorily-mandated medical assessment that requires an ophthalmologic evaluation to diagnose abusive head trauma based on shaking.

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

166.    Goodman worked with Adewusi to fabricate evidence, including a report of observing retinal hemorrhages that were "most consistent with non-accidental trauma" based upon shaking.

167.    Goodman reported that E.B. had widespread retinal hemorrhaging in multiple layers of her right eye and no hemorrhaging in her left eye.  Goodman did not take any photographs of the alleged retinal hemorrhaging, even though Goodman knew or should have known that such photographs would have contained exculpatory evidence.

168.    Goodman also fabricated evidence to support Adewusi's diagnosis of child abuse by reporting that the only possible non-abusive cause for E.B.'s ophthalmologic findings would be "severe known accidental trauma."

169.    At the time of her exam, Goodman knew or should have known about non-abusive causes for unilateral (as opposed to bilateral) retinal hemorrhaging, including increased intracranial pressure from extra-axial fluid collections, laying on one's side during a seizure, and recent neurosurgery—all of which applied to E.B.

170.    Goodman fabricated additional evidence to support Adewusi's diagnosis of child abuse by intentionally withholding information and omitting any mention of the many non-abusive causes of unilateral retinal hemorrhaging, and falsely reported that the presence of unilateral retinal hemorrhaging did not make the diagnosis of abuse less likely.

171.    Adewusi and CARES NW also recruited Abtin, a neurosurgeon on the medical staff at Randall Children's Hospital, to work with Adewusi and the multidisciplinary team pursuant to the agreement between the State, County, and CARES Northwest to provide medical subspecialists from Randall Children's Hospital to support the team.

172.    Adewusi fabricated evidence that E.B. was suffering from brain swelling—one of the key clinical findings propping up the debunked shaken baby syndrome diagnosis.

/ / /

/ / /

Page 25– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

173.    When Nigel and Dayna told Adewusi that Abtin diagnosed E.B.'s brain as "expanding nicely" after being compressed due to intracranial pressure, Adewusi persuaded Abtin to change his opinion to match her own.

174.    Based on information and belief, Abtin agreed to conduct an evaluation for the multidisciplinary team, revise his prior opinion, and fabricate his medical records to support the false diagnosis of abusive head trauma based on shaking.

175.    Abtin, Adewusi, and Goodman suppressed evidence of their false medical reporting.

176.    Adewusi and Goodman were aware of and further withheld evidence that "shaken baby syndrome" had been questioned around the world; that medical studies proved that shaking could not result in head injuries without neck injuries; that unilateral retinal hemorrhages are rare and not likely to be caused by shaking; and that doctors had discovered many medical conditions, including BESS, that produce the same clinical findings identified upon examination of E.B.

**4.    Additional Evidence Fabricated and Suppressed to Bolster Abuse Allegations**

177.    Greene fabricated evidence that multiple doctors, including the neurologist and primary care pediatrician, had concluded that there is no medical cause that would explain E.B.'s medical findings.

178.    Adewusi, Rodriguez, Bray, Leikem, Fear, and Greene fabricated additional evidence that Nigel had abused E.B. by violently shaking or striking his daughter.

179.    Adewusi, Rodriguez, Bray, Leikem, Fear, and Greene fabricated evidence that E.B. had suffered two abusive "shaking" events, one in May before the vomiting episodes started and one in June immediately before E.B.'s first seizure.

180.    Adewusi, Bray, Fear, Greene, and Leikem fabricated evidence to suggest that Nigel was a criminal with violent tendencies.

/ / /



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

181.    Adewusi fabricated evidence that Nigel had a prior arrest for running from police, which she falsely reported to other medical providers by making reference to it in E.B.'s medical records.

182.    Fear fabricated evidence that Nigel had post-traumatic stress disorder from his military service in Afghanistan that was so severe that he required special classes to return to civilian life.

183.    Bray and Leikem fabricated evidence that Nigel had post-traumatic stress disorder, which would make him more likely to snap and abuse his children.

184.    Adewusi, Rodriguez, Bray, Leikem, and Fear fabricated evidence that Nigel and Dayna were attempting to blame E.B.'s medical condition on their son, J.B.

185.    Fear fabricated evidence that Nigel was conducting internet research to explain away or find excuses for E.B.'s medical condition.

186.    Abtin, Adewusi, Goodman, and Rodriguez suppressed evidence of their involvement as members of the multidisciplinary law enforcement team.

187.    Bray and Leikem fabricated evidence that Dayna called 911 after E.B.'s first seizure, suggesting that Nigel made no effort to help his daughter and had a guilty state of mind, despite a 911 recording that proved that it was Nigel who called 911 and both Nigel and Dayna who spoke with the 911 operator.

188.    Bray and Leikem fabricated evidence to obtain a search warrant, maliciously representing that Nigel was not involved in E.B.'s care, that he lied about obtaining care at a veteran's center, and that Dayna blamed E.B.'s condition on Nigel rocking her back and forth too hard.

189.    Abtin, Adewusi, Rodriguez, Bray, Leikem, Fear, Greene, and Goodman submitted the fabricated evidence to the prosecution and the courts to obtain search warrants, pursue criminal charges, and secure custody of the children in dependency proceedings.

/ / /

MALONEY | LAUERSDORF | REINER ᴘᴄ
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Abtin, Adewusi, Rodriguez, Bray, Leikem, Fear, Greene, and Goodman suppressed and withheld from the prosecution and the courts the exculpatory evidence that proved that E.B. was suffering from a well-known and benign medical condition.

**F.      E.B.'s Treatment and Care After the Fabricated Allegations of Abuse**

190.    After Abtin, Adewusi, Rodriguez, Bray, Leikem, Fear, and Goodman began to fabricate evidence of abuse, E.B.'s treatment and care changed.

191.    Hospital physicians and nurses refused to keep Nigel and Dayna informed about E.B.'s condition or prognosis, directing Nigel and Dayna to Adewusi, Rodriguez, and CARES Northwest.

192.    Goodman failed to conduct testing to determine why E.B. had retinal hemorrhages in one eye but not the other, and failed to schedule appropriate follow up care or monitor E.B.'s eye for potential vitrectomy.

193.    A later eye examination revealed a "residual" vitreous hemorrhage, which led to complications with E.B.'s vision because it had not been monitored or treated appropriately due to Goodman's misconduct.

194.    Adewusi, Rodriguez, Bray, Leikem, Fear, Goodman, and Abtin led E.B.'s treatment team to believe that her clinical findings were the result of abuse and could not be the result of a medical issue that needed further exploration and monitoring to prevent additional complications.

**G.      Unlawful Seizure of E.B. and J.B.**

195.    Based upon the fabricated evidence, less than 24 hours after E.B. was admitted to Randall Children's Hospital, Fear seized E.B. without a court order, without exigent circumstances, without consent, and with lesser intrusive alternatives available.

196.    Fear denied Nigel and Dayna full access to their daughter while she was in the hospital, insisting that they could only be present with E.B. while under DHS-approved supervision, which unreasonably restricted and interfered with their ability for medical decision-

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

making and to care for and comfort three-month-old E.B. while she underwent invasive testing and medical procedures.

197.    After Fear took custody of E.B., Fear fabricated evidence that J.B. was in danger of abuse as well, despite no evidence of injury, neglect, or imminent threat or danger to J.B.

198.    Based on the fabricated evidence, Fear unreasonably interfered with J.B.'s relationship with Nigel and Dayna by implementing a safety plan that prevented any and all unsupervised contact with his parents.

**H.    E.B. and J.B. Placed in Foster Care**

199.    Based on the fabricated evidence above, the court granted temporary custody of E.B. and J.B. to DHS.

200.    Fear then fabricated evidence to prevent an in-home placement with Nigel and Dayna, forcing the children into foster care in order to create leverage against Nigel to falsely confess and Dayna to implicate her husband.

201.    On the day the court granted temporary custody to DHS, E.B. was ready for discharge from the hospital.

202.    Fear, however, left E.B. in the hospital for two additional days while the Defendants contemplated foster care placements for E.B. and J.B.

203.    Adewusi, Rodriguez, and Fear prevented Nigel and Dayna's access to E.B. from the hours of 10:00 p.m. to 5:00 a.m. so that these Defendants could test whether E.B. would take a bottle, because if E.B. would take a bottle rather than insist on breastfeeding, the Defendants could increase their leverage by further restricting Dayna's access to E.B. in foster care.

204.    Defendants knew that E.B. was strictly breastfed since birth and refused to take a bottle. Despite knowledge of E.B.'s feeding needs, upon discharge, DHS and Fear placed E.B. in foster care one-hour away from her parents.

205.    While in foster care, DHS and Fear refused E.B. access to food by limiting Dayna's visitation for breastfeeding. These Defendants limited breastfeeding visits to only four

Page 29– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

times per day, despite the knowledge that E.B. was, in the past, feeding every 2 ½--3 hours.  The limited feeding scheduling meant that E.B. had to go for stretches of 7-8 hours each day without food.

206.    E.B. stopped gaining weight while her body was in a critical stage of development and healing after the seizures and unnecessary surgery.

207.    Nigel and Dayna were desperate to help their daughter and slept in their cars or lived in motels to be close-by their children when they were in foster care.

**I.    Unwarranted and Invasive Examinations of E.B.**

208.    After E.B.'s discharge from the hospital, Nigel and Dayna continued to advocate for their daughter's healthcare, and she returned to Randall Children's Hospital and her regular pediatrician multiple times for follow-up care.

209.    DHS required that E.B. be accompanied by a DHS caseworker for each medical appointment.

210.    Under DHS care, E.B. was subjected to additional traumatic examinations intended solely for forensic purposes without parental consent, exigent circumstances, or a court order.

211.    For example, Adewusi conducted a full body physical examination of E.B., including her anogenital region, and took photographs of E.B. to share with law enforcement.

212.    Adewusi ordered a second full body x-ray, exposing E.B. to high and potentially harmful levels of radiation.  The x-rays were, again, entirely normal with no indications of existing fractures, healing fractures, or other evidence of trauma.

213.    Adewusi and Fear also enlisted a general surgeon to conduct an unnecessary vaginal examination of E.B. solely for investigative purposes, in the absence of any exigent circumstances, and without any just cause or medical basis for doing so.

/ / /

/ / /

**J.      E.B.'s Repeat Bleeds in Foster Care and Second Hospitalization**

214.    While E.B. was in foster care and under DHS custody, E.B. again began to experience episodes of vomiting.  A new MRI revealed a repeat of the collection of fluid around E.B.'s brain, which Abtin reported to be worse than at the time of E.B.'s first MRI.

215.    Abtin again diagnosed E.B. with BESS complicated by repeat bleeds, but, at the same time, left in place his prior false reports of findings caused by child abuse.

216.    Abtin admitted E.B. to the hospital for a second unnecessary surgery to evacuate the fluids around her brain.

217.    Fear and DHS continued to restrict Nigel's and Dayna's access to and contact with E.B. during her hospitalization and second surgery.

218.    Defendants knew or should have known that the new collection of fluid could not be the result of abuse by Nigel or Dayna because E.B. was not living with Nigel or Dayna, and all of Nigel's and Dayna's contact with E.B. was supervised by DHS and its designees, but Defendants made no attempt to find an explanation for the fluid and made no effort to re-assess the dependency proceedings that were based on the fabricated diagnosis of abuse.

219.    Adewusi and Fear fabricated additional evidence that E.B.'s clinical findings were again "diagnostic of abusive head trauma" by Nigel or Dayna.

220.    Fear fabricated evidence that the new collection of fluid around E.B.'s brain was a consequence of E.B.'s original, allegedly abusive injury.

221.    Fear fabricated evidence that Nigel and Dayna were not willing to work with DHS to determine the cause of E.B.'s medical condition.

222.    Fear submitted the fabricated evidence to the court for the purpose of maintaining custody and control over Nigel, Dayna, E.B. and J.B.

223.    Fear and Abtin intentionally withheld from the court Abtin's opinion of BESS and that the second subdural bleed occurred while E.B. was in foster care.

/ / /



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**K.      The Dependency Proceedings as Leverage for Criminal Prosecution**

224.     While Nigel and Dayna were desperately trying to determine the cause of E.B.'s medical condition, the Defendants were still trying to effect criminal charges of abuse.

225.     Because Dayna would not accept the Defendants' fabricated "diagnosis" of abuse, the Defendants punished her.

226.     Fear, Greene, and DHS told the juvenile dependency court that both parents were under criminal investigation and law enforcement could not eliminate Dayna as the alleged abuser.

227.     Defendants used the dependency proceedings to manipulate Dayna, attempt to turn her against Nigel, and try to force her to choose between her marriage and her children.

228.     Fear fabricated evidence that Dayna was a danger to E.B. and J.B. because she was unwilling to agree that Nigel had abused E.B.

229.     Fear refused to work with Nigel and Dayna to create a "safety plan" as a less-restrictive alternative to taking E.B. and J.B. into DHS custody, and Fear and Greene subsequently refused to work toward family reunification, unless and until either Nigel or Dayna confessed to abusing E.B.

230.     Fear fabricated evidence that there was no "Safety Service Provider" (SSP) available for an in-home plan as a less-restrictive alternative to removing E.B. and J.B. from their home.

231.     Greene fabricated evidence that the home was not a safe environment.

232.     Fear and Greene fabricated evidence that foster care was the least restrictive setting for E.B. and J.B., forcing the children to be placed and remain in foster care away from their parents.

233.     Greene fabricated evidence that J.B. had "serious physical injuries or serious physical symptoms from abuse or neglect."

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

234.    DHS fabricated a "founded" disposition of abuse based on the fabricated evidence described above and Fear's false reports that Nigel physically abused E.B. and that Nigel and Dayna neglected E.B. and J.B.

235.    Ultimately, the dependency court took jurisdiction and issued its disposition, awarding legal custody of E.B. and J.B. to DHS.

236.    DHS then instituted an "in-home plan" to allow Dayna and Nigel to live with E.B. and J.B. under the constant supervision of a DHS-approved SSP, while DHS maintained legal custody and guardianship of the children.

237.    The DHS placement plan required "line of sight supervision," which meant that the SSP had to be able to see E.B. and J.B. at all times when they were having contact with Nigel and Dayna, even while at home, and even while the parents took their children to the bathroom, changed their clothes, and while Dayna breast fed E.B.

238.    Under the DHS plan, the Bliss Family was subjected to announced and unannounced home visits by DHS, scheduled and unscheduled DHS-contact with Nigel and Dayna, monthly DHS-contact with E.B. and J.B. in the home and in the community, and regular DHS review.

239.    Nigel and Dayna followed every DHS order, met every requirement, and continued to be respectful and courteous to DHS staff despite the strain on their relationships with each other and their children.

240.    Still, the Defendants continued to harass the family and control every aspect of their lives, refusing to let Dayna fully care for and parent her children unless she turned on her husband, and restricting Nigel's ability to be with, care for, and help his wife and children.

241.    Because Nigel would not admit to abusing his children, and because Dayna would not accuse Nigel of abusing their children, DHS fabricated evidence that E.B. and J.B. were at imminent risk of abuse absent juvenile court jurisdiction and DHS involvement.

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

242.    Adewusi, Greene, and DHS also tried to refuse E.B. further medical care that would protect her from additional seizures and other complications.

243.    For example, when Nigel and Dayna tried to take E.B. to an outside hospital (OHSU) for genetic testing, Adewusi interfered by attacking the other doctors' evaluations of E.B. and insisting that additional testing was unnecessary despite a referral from E.B.'s primary care pediatrician.  Adewusi, Greene, and DHS conspired to halt the additional testing and obstructed other efforts to find alternative explanations for E.B.'s condition.

**L.    Indictment and Arrest of Nigel Bliss for a Crime that Never Occurred**

244.    Just days after the OHSU visit, and based on the fabricated evidence above, Nigel Bliss was indicted and charged with assault in the first degree, criminal mistreatment in the first degree, and assault in the third degree for allegedly abusing E.B.

245.    In an effort to further separate Nigel from Dayna and their children, Greene fabricated evidence by falsely reporting to the prosecutor that Nigel and Dayna had taken E.B. to her medical appointment at OHSU without notice or supervision, in defiance of the DHS safety plan.  As a result, the prosecutor asked the court to refuse Nigel's request to remain in the home based on the alleged defiance of the DHS safety plan.

246.    Based upon Defendants' fabricated evidence, the court refused Nigel's request to remain in the home, and the family was forced to be separated and subjected to supervised visitation and DHS interference for more than two additional years.

247.    Nigel remained under orders to have no contact with the residence.  He was also prohibited from attending any medical appointments for E.B. or J.B., and his contact with his children was limited to fully supervised visits of one hour at a DHS office just a few times per week, monitored through a one-way mirror.

248.    After months of strict supervision and requests from the parents, Nigel was finally allowed to talk to J.B. by phone or video chat.  He was not, however, allowed any phone or video contact with E.B.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

249.    As a result of J.B.'s separation from his father, J.B. began to express confusion and anger, and, at the age of three, started counseling sessions with a therapist.

**M.    Three Years of Criminal and Dependency Proceedings**

250.    From June 2018 through July 2021, based on the fabricated evidence described above and the suppression of exculpatory evidence described above, the Bliss family lived fragmented lives, with Dayna under constant threat of having the children removed by DHS and Nigel under constant threat of criminal conviction and imprisonment.

251.    The Defendants went to extreme lengths to continue dependency proceedings and maintain custody of E.B. and J.B., and their corresponding control over every aspect of the Blisses' lives, in an effort to leverage a criminal conviction of Nigel.  For example, in 2020, Dayna and the children were residing, with DHS approval, in a safe and stable home with the children's grandparents in the state of Washington, but when Washington's Department of Children, Youth, and Families (DCYF) questioned DHS's continuing involvement, Defendants fabricated evidence and submitted it to DCYF in an effort to convince DCYF to reject the placement of the children in Washington and force Dayna to move the children into an Oregon motel where DHS could maintain custody, supervision, and control over the family.  Based upon Defendants' fabricated evidence, DCYF rejected placement and refused to supervise the children in Washington.  The Bliss family was forced to appeal that ruling, and the ruling was finally overturned by the Oregon Court of Appeals in 2021.

252.    Nigel Bliss was deprived of his liberty as a result of DHS's orders removing him from his home, separating him from his family, and forcing him to visit his children at DHS facilities.

253.    Dayna Bliss was deprived of her relationship with her husband, and E.B. and J.B. were deprived of their relationship with their father.

254.    Just shortly before Nigel's criminal trial was scheduled to begin, Defendant Abtin finally admitted to the prosecutor that he could not diagnose or support a diagnosis of "abusive

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

head trauma" based on E.B.'s clinical findings, because they were consistent with and could be explained by a non-abusive condition: BESS.

255.    The prosecutor unilaterally moved to dismiss the criminal charges, representing to the court that "a reasonable finder of fact would not be able to find [Nigel Bliss] guilty beyond a reasonable doubt."

256.    On July 30, 2021, the court dismissed the criminal charges against Nigel.

257.    Less than two weeks later on August 11, 2021, DHS agreed to dismiss the juvenile dependency case and return legal and physical custody of E.B. and J.B. to Nigel and Dayna.

258.    Nonetheless, in a final effort to control Nigel and Dayna, and impair their long-term relationships with E.B. and J.B., DHS refused to drop its "founded" disposition of abuse, thereby ensuring that Nigel and Dayna would continue to be identified as child abusers and listed on a central abuse registry.

259.    On July 21, 2022, after multiple appeals and almost one year after dismissal of the criminal charges and its dependency petition, DHS admitted that there was no reasonable cause to believe that either Nigel or Dayna posed any threat to E.B. or J.B., or that either was responsible for any physical harm to or neglect of E.B.  DHS disclosed that the allegations of abuse and neglect were in fact "unfounded," and disclosed for the first time that Defendants knew all along that "there is no evidence the abuse occurred."

**N.    Damages**

260.    The Defendants' deliberate dissemination of fabricated and false information to medical personnel, DHS, prosecuting attorneys, and the courts resulted in Nigel, Dayna, and their children being subjected to public humiliation, embarrassment, and harassment.

261.    Nigel was forced out of his home and separated from his family for over two years based upon fabricated evidence and false reporting of a crime that he did not commit—a crime that never even occurred.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

262.    Nigel was wrongfully charged and prosecuted when his son, J.B., was only three years old and his daughter, E.B., was only one year old, causing him to miss out on the highlights of parenting young children, such as bedtime stories, making breakfast together, and watching cartoons in pajamas on weekends.

263.    As a result of the wrongful charges, Nigel was forced to miss work without pay and exhaust his vacation and sick leave.

264.    As a result of the dependency proceedings, Dayna was forced to miss work and take mental health leave.

265.    Nigel and Dayna lost their home, savings, and financial security as a result of the medical expenses, legal bills, and unpredictable living arrangements necessary to try to protect their children and keep their family together.

266.    Defendants' misconduct caused and continues to cause Nigel, Dayna, J.B., and E.B. extreme psychological pain and suffering, humiliation, constant fear, anxiety, depression, despair, and other physical and psychological effects.

267.    Defendants' misconduct further caused and continues to cause Nigel and Dayna's loss of reputation in the community.

268.    Defendants' misconduct further caused E.B. and J.B. the loss of care, comfort, consortium, love, and emotional support from their parents, and continues to cause the children separation anxiety and feelings of instability and insecurity, including an inability to fully and unconditionally bond with their parents.

## V.  CONSPIRACY

269.    Defendants conspired under federal and state law to pursue criminal charges against Nigel for a crime that he did not commit and, in the process, unreasonably interfered with Nigel and Dayna's custody of E.B. and J.B.

270.    Defendants reached an agreement between and among themselves to frame Nigel for E.B.'s medical condition and thereby deprive Nigel of his constitutional rights, as alleged

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

above.  This agreement was first reached when the Defendants began implicating Nigel and remained in place throughout all periods of the investigation, criminal proceedings, and dependency proceedings.

271.    As part of their agreement to frame Nigel, Defendants reached an agreement to implicate Dayna and commence dependency proceedings against Dayna in an effort to further their conspiracy against Nigel.

272.    The circumstances indicate that there was a meeting of the minds among the Defendants.  The Defendants were part of a state-funded and county-operated multidisciplinary team, a team created for the sole purpose of pursuing child abuse prosecutions.  As part of that team, the Defendants knew that state funding for the team is dependent upon the number of successful prosecutions, which created an incentive to fabricate a perceived need for more services by "finding" and alleging more instances of child abuse.  The Defendants also knew, and feared, that retracting a diagnosis of child abuse, or acknowledging a mistake, would undermine the multidisciplinary team's role and reputation, which created an incentive to insist that the diagnosis is correct despite medical evidence to the contrary.

273.    Defendants Bray, Leikem, Adewusi, Rodriguez and Fear met together in a room in the secured Pediatric Intensive Care Unit at Randall Children's Hospital for more than six hours on June 8, 2018, and mutually agreed during that meeting to work as a team, collaborate on strategy, share information, and act jointly with the shared goals of taking custody of E.B. and J.B., convincing the juvenile court to exercise its jurisdiction, and prosecuting Nigel and Dayna Bliss for the alleged abuse of E.B..

274.    Pursuant to their agreement, Defendants Bray, Leikem, Adewusi, Rodriguez and Fear did not seek out exculpatory evidence, instead leaving assessments for medical causes to other health care providers.

275.    The acts described above, including fabricating evidence, false reporting, withholding or discarding exculpatory evidence, and coercing witnesses, are unlikely to have

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

been undertaken without an agreement because multiple individuals were involved in those acts of misconduct.

276.     The circumstances also indicate that there was a meeting of the minds between all of the Defendants.  The evidence reveals a pattern whereby, when the Defendants were faced with obstacles in their pursuit of criminal charges or dependency proceedings due to the absence of evidence to support the theory of abuse, the Defendants would meet and fabricate the evidence necessary to overcome the hurdle.  For example:

    a.  The Defendants intended to seek a search warrant for Nigel and Dayna's cell phones, laptops, and other electronic devices, but the Defendants lacked evidence to support the search.  The Defendants met to discuss the type of evidence needed to support a search warrant, and Fear then fabricated notes indicating that Nigel was conducting internet research to explain away or find excuses for E.B.'s medical condition.  Bray used the notes to support his search warrant.

    b.  The Defendants intended to seek a confession from Nigel due to the lack of physical evidence to support the theory of abuse.  When Nigel would not confess and the Defendants needed leverage against him, Defendant Adewusi interrupted Nigel's interrogation to report to Bray and Leikem that Goodman would say that E.B. had been violently shaken and that the doctors could identify Nigel as the perpetrator.  Bray and Leikem then used the fabricated evidence from the doctors to ratchet up pressure on Nigel in an attempt to force a confession.

    c.  The Defendants intended to reduce the amount of time that Dayna had access to E.B. while she was in DHS custody in order to force Dayna to turn on Nigel, but the Defendants could not reduce Dayna's time with E.B. because Dayna was still breastfeeding.  The Defendants met to discuss strategies to reduce Dayna's time with E.B.  The Defendants then fabricated a rule to prevent Nigel and Dayna from staying with E.B. in the hospital overnight in order to force E.B. to start bottle

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

feeding so she could be separated from Dayna for longer periods of time.

d.  When Dayna refused during interrogation to implicate Nigel, the Defendants devised a plan to separate Dayna from both of her children, but the Defendants did not have a basis to remove J.B. from Dayna's custody.  Fear fabricated a report that J.B. had been physically abused, and Greene later recorded the same fabrication in her written reports.  The Defendants never examined J.B., but relied on the fabricated report to remove both children from Dayna's custody.  Fear and Greene then made it a condition of family reunification that Dayna and Nigel provide an explanation for E.B.'s medical condition that would "match the diagnoses by CARES NW and other medical professionals."

e.  After Dayna was allowed to stay in the home with E.B. and J.B., the Defendants wanted to keep Nigel away from the home in order to coerce a false confession.  All SSPs, however, were reporting that Nigel and Dayna were following the DHS-ordered safety plan without risk of harm.  Based on information and belief, the Defendants met in preparation for a hearing on Nigel's request to remain in the home, and Greene subsequently made a false report to the prosecutor that Nigel and Dayna had defied the DHS safety plan by taking E.B. to a medical appointment at OHSU without notice or supervision.

f.  Adewusi, Rodriguez, Bray, Leikem, and Fear needed to bolster the diagnosis of abuse by making it seem like the only possible explanation for E.B.'s symptoms, so they recruited Goodman and Abtin to create or change their opinions in a way that would support the exclusive diagnosis of abuse.

277.  The facts show that the Defendants shared a common objective to support and maintain an accusation of child abuse and common knowledge of facts and circumstances that they communicated to each other.  The facts also show the Defendants engaged in joint action in pursuit of that common objective.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

278.    The acts described above are unlikely to have been undertaken without an agreement because each of the overlapping individuals knew about exculpatory evidence that had been suppressed and evidence that had been fabricated to falsely allege abuse and suggest Nigel's guilt.  For example:

    a.   Abtin, Adewusi, and Goodman knew about the exculpatory evidence of a benign medical condition, but they suppressed evidence of the benign condition and falsely reported or vouched for a "diagnosis" that the cause of E.B.'s condition was "100% abuse" and could not be caused by a medical condition.

    b.   Abtin originally reported E.B.'s benign condition, but, once Adewusi and Goodman fabricated the diagnosis of abuse, Abtin modified his written reports to say that the cause was abuse while continuing to verbally report to Nigel and Dayna that the cause was BESS.

    c.   Fear knew that Dayna is a trained and experienced nurse who would necessarily be skeptical of a diagnosis of abuse that was not consistent with the medical evidence, but, after hearing from Adewusi and Goodman, Defendant Fear fabricated evidence to suggest that Dayna was a danger to her son because she would not admit to criminal conduct by Nigel.

    d.   Adewusi and Goodman knew that the presence of unilateral retinal hemorrhages suggested causes other than abuse, but reported only one possible cause of the hemorrhages—physical abuse.

    e.   Rodriguez knew that Nigel and Dayna made exculpatory statements during their interviews, but, through his meetings with Adewusi, Bray, Fear, and Leikem, suppressed those exculpatory statements to suggest that Nigel and Dayna could not explain their allegedly criminal behavior.

    f.   Bray and Leikem discovered exculpatory evidence through witness interviews and fabricated reports to cover it up.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

279.    Defendants took one or more unlawful overt steps in furtherance of the conspiracy by fabricating evidence as alleged above; suppressing, tampering with, or destroying material exculpatory and impeachment evidence as alleged above; manipulating witnesses as alleged above; commencing dependency proceedings as alleged above; and concealing their misconduct, all in violation of the Blisses' constitutional rights.

280.    Defendants collectively agreed to use the dependency proceedings, and the threat of a permanent loss of custody, to try to force Nigel to confess to a crime that he did not commit and try to force Dayna to incriminate her husband.  The sole reason for the dependency proceedings, and the need for a confession, was because Defendants knew that the medical evidence did not support the false diagnosis of abuse.

## VI.  POLICIES AND PRACTICES THAT WERE THE MOVING FORCE BEHIND THE CONSTITUTIONAL VIOLATIONS

281.    Defendants' violations of the constitutional rights of Nigel, Dayna, E.B., and J.B. were not mere accidents or anomalies, but, instead, were caused by the policies, practices, or customs of the Entity Defendants, including those identified below.

### A.    CARES Northwest

282.    CARES Northwest has a policy, practice, or custom of authorizing its personnel to report that an infant suffered "shaken baby syndrome" (interchangeably referred to as "abusive head trauma," "inflicted injury," or "non-accidental trauma") based on a subdural hemorrhage despite the absence of evidence necessary to make such a finding.

283.    CARES Northwest has a policy, practice, or custom of authorizing its personnel to report that an infant suffered shaken baby syndrome based on retinal hemorrhage despite the absence of evidence necessary to make such a finding.

284.    CARES Northwest has a policy, practice, or custom of authorizing its personnel to report that the only explanation for an infant presenting with subdural hemorrhage and retinal

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

hemorrhage could be shaken baby syndrome, despite medical evidence and scientific literature directly to the contrary.

285.    CARES Northwest has a policy, practice, or custom of refusing to perform tests to rule out alternate causes of subdural hemorrhage and retinal hemorrhage in infants.

286.    CARES Northwest has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or to treat non-abusive explanations for a child's medical symptoms or condition as implausible.

287.    CARES Northwest has a policy, practice, or custom of depriving infants of their rights to informed consent and to have medical decisions made by their parents.

288.    CARES Northwest has a policy, practice, or custom of reliance on child abuse pediatricians with no specialized training in radiology, neuroradiology, neurology, neurosurgery, or ophthalmology to diagnose infants presenting with subdural hemorrhage and retinal hemorrhage.

289.    CARES Northwest failed to adopt adequate procedural safeguards to guard against fabricated evidence and the suppression of favorable evidence, including failing to adopt:

   a.   a policy requiring child abuse pediatricians to consider "mimics" of shaken baby syndrome and alternate hypotheses before reporting a diagnosis;

   b.   a policy requiring child abuse pediatricians to document in writing their consultations with specialists in radiology, neuroradiology, neurology, neurosurgery, and ophthalmology before reporting a diagnosis;

   c.   a policy preventing child abuse pediatricians from overstating the significance of particular medical findings;

   d.   a policy preventing child abuse pediatricians from reporting conclusions beyond the scope of their expertise, including by identifying an alleged perpetrator;

   e.   a policy requiring child abuse pediatricians to remain aware of current medical research surrounding the ongoing medical debate about the scientific validity of

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the shaken baby syndrome hypothesis, including literature proving that certain

assumptions that form the basis for the hypothesis have been discredited;

f.   a policy requiring child abuse pediatricians to disclose the true limits of their

opinions, including the possibility that it may not be possible to determine the

cause of a child's clinical findings;

g.   a policy requiring personnel to avoid fabricating evidence; or

h.   a policy requiring personnel to disclose favorable evidence in compliance with

*Brady* and Oregon's discovery statutes.

290.    CARES Northwest failed to train and supervise Adewusi and Rodriguez to

thoroughly consider, identify, and test for medical causes of clinical findings that may mimic

those seen in abuse cases, to prevent the fabrication of evidence, to prevent coercive interviews

and interrogations, to insist on science-based medicine, and to ensure the disclosure of favorable

evidence in compliance with *Brady* and Oregon's discovery statutes, including the true limits of

their opinions.

291.    CARES Northwest was on actual or constructive notice that its omissions would

likely result in a constitutional violation based on the following non-exclusive facts:

a.   In 2001, in *Sistrunk v. Armenakis*, a three-judge panel of the Ninth Circuit found

that a CARES Northwest physician fabricated the supposedly scientific study on

which she relied to support an opinion of abuse.  The three-judge panel found that

the CARES Northwest physician testified "falsely" and the dissent concluded that

she "lied."  The Ninth Circuit reviewed the case *en banc* and, although the panel

did not conclude that the physician lied, the panel agreed that she "overstated the

results of the study on which she relied" and her trial testimony "contained a

number of inaccurate statements."

b.   In 2009, the American Academy of Pediatrics ("AAP"), of which Adewusi

(Medical Director for CARES Northwest) has been a member since 2008, issued

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

a policy statement providing that "[p]ediatricians also have a responsibility to consider alternative hypotheses when presented with a patient with findings suggestive of [abusive head trauma]." In 2020, the AAP revised its policy statement to make abundantly clear that mimics of abusive head trauma are "increasingly" recognized.

c. In 2012, in *State v. Sanchez-Alfonso*, the Oregon Supreme Court reversed a criminal conviction after it found that a CARES Northwest child abuse pediatrician testified to an opinion purporting to identify the perpetrator of child abuse when that opinion was not the product of methods that were generally accepted, consistent with recognized safeguards to increase diagnostic accuracy, or supported by literature in the field.

d. CARES Northwest training requests and records submitted to the Oregon Department of Justice reveal that prosecutors regularly conduct presentations to the multidisciplinary team, including CARES Northwest, about cases decided by the appellate courts involving testimony by CARES Northwest personnel.

e. CARES Northwest training requests and records submitted to the Oregon Department of Justice reveal that, since at least 2013, CARES Northwest personnel have been attending "child abuse" conferences that focus exclusively on advocating for the shaken baby syndrome hypothesis and avoiding the implications of newer scientific literature, which refutes the hypothesis and confirms the increasing number of conditions that mimic shaken baby syndrome and can lead to misdiagnosis and false testimony.

f. In 2015, the AAP issued its "Policy of the AAP Committee on Child Abuse and Neglect," which cautions pediatricians about conditions that may be confused with abusive head trauma and urges consultations with specialists in pediatric radiology, neurology, orthopedics, surgery, and other specialties. The policy

Page 45– FIRST AMENDED COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

further cautions physicians against overstating the significance of particular medical findings and against offering an opinion identifying the alleged perpetrator of child abuse or the assumed details of an allegedly abusive event.

g.   In 2018, Rodriguez was not a licensed clinical social worker, but, instead, a clinical social work associate—a certification that requires by law that all work be conducted under an approved plan of practice and supervision.

h.   Adewusi, Medical Director for CARES Northwest, co-wrote the National Standards for Accreditation for Children's Advocacy Centers, a publication by the National Children's Alliance, which includes some of the very policies alleged above that were missing from CARES Northwest's practice.  CARES Northwest purports to have been accredited by the National Children's Alliance since 2002.

292.    Despite the notice to CARES Northwest, the entity refused to implement adequate training or supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

293.    The violations of constitutional rights by Adewusi and Rodriguez were approved of and ratified by CARES Northwest.  Adewusi is the Medical Director for CARES Northwest, a policymaker, and her actions, and those of Rodriguez, went through the process of "peer review" within CARES Northwest.

**B.    Randall Children's Hospital**

294.    Randall Children's Hospital has a policy, practice, or custom of authorizing its personnel to report that an infant suffered "shaken baby syndrome" (interchangeably referred to as "abusive head trauma," "inflicted injury," or "non-accidental trauma") based on a subdural hemorrhage despite the absence of evidence necessary to make such a finding.

295.    Randall Children's Hospital has a policy, practice, or custom of authorizing its personnel to report that an infant suffered shaken baby syndrome based on retinal hemorrhage despite the absence of evidence necessary to make such a finding.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

296.    Randall Children's Hospital has a policy, practice, or custom of authorizing its personnel to report that shaken baby syndrome is the only explanation for an infant presenting with subdural hemorrhage and retinal hemorrhage despite medical evidence and scientific literature directly to the contrary.

297.    Randall Children's Hospital has a policy, practice, or custom of refusing to perform tests to rule out alternate causes of subdural hemorrhage and retinal hemorrhage in infants.

298.    Randall Children's Hospital has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or treating non-abusive explanations for a child's medical symptoms or condition as implausible.

299.    Randall Children's Hospital has a policy, practice, or custom of depriving infants of their rights to informed consent and to have medical decisions made by their parents.

300.    Randall Children's Hospital has a policy, practice, or custom of reliance on child abuse pediatricians with no specialized training in radiology, neuroradiology, neurology, neurosurgery, or ophthalmology to diagnose infants presenting with subdural hemorrhage and retinal hemorrhage.

301.    Randall Children's Hospital has a policy, practice, or custom that precludes its physicians from consulting on cases for individuals accused of crime and requires that its physicians only consult on cases presented by CARES Northwest or the Oregon Medical Board.

302.    Randall Children's Hospital failed to adopt adequate procedural safeguards to guard against fabricated evidence and the suppression of favorable evidence, including by failing to adopt:

    a.    a policy requiring physicians to consider "mimics" of shaken baby syndrome and alternate hypotheses before reporting a diagnosis;

    b.    a policy requiring physicians to document in writing their consultations with specialists in radiology, neuroradiology, neurology, neurosurgery, and

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

ophthalmology before reporting a diagnosis;

c.  a policy preventing physicians from overstating the significance of particular medical findings;

d.  a policy preventing physicians from reporting conclusions beyond the scope of their expertise, including by identifying an alleged perpetrator;

e.  a policy requiring physicians to remain informed of current medical research surrounding the ongoing medical debate about the scientific validity of the shaken baby syndrome hypothesis, including literature proving that certain assumptions that form the basis for the hypothesis have been discredited and debunked;

f.  a policy requiring physicians to disclose the true limits of their opinions, including the reality that it may not be possible to determine the cause of a child's clinical findings;

g.  a policy requiring personnel to avoid fabricating evidence; or

h.  a policy requiring personnel to disclose favorable evidence in compliance with *Brady* and Oregon's discovery statutes.

303.   Randall Children's Hospital failed to train and supervise Abtin and Goodman to thoroughly consider, identify, and test for medical causes of clinical findings that may mimic those seen in abuse, to prevent the fabrication of evidence, to insist on science-based medicine, and to ensure the disclosure of favorable evidence in compliance with Brady and Oregon's discovery statutes, including the true limits of their opinions.

304.   Randall Children's Hospital was on actual or constructive notice that its omissions would likely result in a constitutional violation based on the allegations set forth in paragraph 292 above and the following non-exclusive facts:

a.  In 2003, Goodman testified in support of an abusive head trauma diagnosis that resulted in the wrongful conviction of Heidi Fero.  The conviction resulted in years of appellate proceedings and a split decision from the Washington Supreme

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Court after extensive challenges based on new scientific evidence related to the reliability of the diagnosis. The Washington Supreme Court's written ruling characterized Goodman's testimony from 2003 as "acknowledging an ongoing debate in the medical community over whether retinal hemorrhages were really conclusive signs of child abuse since there is no evidence to support that conclusion."

b.  Despite the prior testimony recognizing the debate in the medical community, Goodman continued to testify to conclusions that were not supported by the science, including in 2016 when she testified in a criminal trial that retinal hemorrhages were "100 percent consistent with trauma," an overstatement that was then reported in the media.

c.  In 2006, Abtin allegedly misinterpreted radiological findings on a patient, resulting in paraplegia.

d.  In 2011, Goodman conducted an operation on a four-year-old child during which she operated on the wrong eye and then, without notifying the child's parents, quickly operated on the correct eye to try to cover her mistake. The operation was conducted at Legacy Emanuel Medical Center in Portland, and Legacy conducted an investigation and admitted the events in the media.

305.  Despite the notice to Randall Children's Hospital, the entity refused to implement adequate training or supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

306.  The violations of constitutional rights by Abtin and Goodman were approved of and ratified by Randall Children's Hospital. Goodman is a member of Randall's Performance Improvement and Patient Safety ("PIPS") Committee, represents herself under oath as a member of Randall's "medical staff," and reports herself to the Oregon Medical Board as practicing at

/ / /


MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Randall's.  In addition, in 2018, Randall's listed Goodman and Child Eye Care as its pediatric ophthalmology subspecialists.

## C.    Child Eye Care

307.    Child Eye Care has a policy, practice, or custom of authorizing its personnel to report that an infant suffered "shaken baby syndrome" (interchangeably referred to as "abusive head trauma," "inflicted injury," or "non-accidental trauma") based on retinal hemorrhages despite the absence of evidence necessary to make such a finding.

308.    Child Eye Care has a policy, practice, or custom of authorizing its personnel to report that shaken baby syndrome is the only explanation for an infant presenting with retinal hemorrhages despite medical evidence and scientific literature directly to the contrary.

309.    Child Eye Care has a policy, practice, or custom of refusing to perform tests to rule out alternate causes of retinal hemorrhage in infants.

310.    Child Eye Care has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or treating non-abusive explanations for a child's medical symptoms or condition as implausible.

311.    Child Eye Care has a policy, practice, or custom of depriving infants of their rights to informed consent and to have medical decisions made by their parents.

312.    Child Eye Care failed to adopt adequate procedural safeguards to guard against fabricated evidence and the suppression of favorable evidence, including by failing to adopt:

    a.    a policy requiring ophthalmologists to consider "mimics" of shaken baby syndrome and alternate hypotheses before reporting a diagnosis;

    b.    a policy requiring ophthalmologists to document in writing their consultations with specialists in radiology, neuroradiology, neurology, and neurosurgery before reporting a diagnosis;

    c.    a policy preventing ophthalmologists from overstating the significance of particular medical findings;

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

d.   a policy preventing ophthalmologists from reporting conclusions beyond the scope of their expertise, including identifying the alleged etiology of retinal hemorrhages;

e.   a policy requiring ophthalmologists to remain informed of current medical research surrounding the ongoing medical debate about the scientific validity of the shaken baby syndrome hypothesis, including literature proving that certain assumptions that form the basis for the hypothesis have been discredited;

f.   a policy requiring ophthalmologists to disclose the true limits of their opinions, including the reality that it may not be possible to determine the cause of a child's clinical findings;

g.   a policy requiring ophthalmologists to avoid fabricating evidence; or

h.   a policy requiring ophthalmologists to disclose favorable evidence in compliance with *Brady* and Oregon's discovery statutes.

313.   Child Eye Care failed to train and supervise Goodman to thoroughly consider, identify, and test for medical causes of clinical findings that may mimic those seen in abuse, to prevent the fabrication of evidence, to insist on science-based medicine, and to ensure the disclosure of favorable evidence in compliance with *Brady* and Oregon's discovery statutes, including the limits of her opinions.

314.   Child Eye Care was on actual or constructive notice that its omissions would likely result in a constitutional violation based on the following non-exclusive facts:

a.   In 2003, Goodman testified in support of an abusive head trauma diagnosis that resulted in the wrongful conviction of Heidi Fero.  The conviction resulted in years of appellate proceedings and a split decision from the Washington Supreme Court after extensive challenges based on new scientific evidence related to the reliability of the diagnosis.  The Washington Supreme Court's written ruling characterized Goodman's testimony from 2003 as "acknowledging an ongoing

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

debate in the medical community over whether retinal hemorrhages were really conclusive signs of child abuse since there is no evidence to support that conclusion."

b.  Despite the prior testimony recognizing the debate in the medical community, Goodman continued to testify to conclusions that were not supported by the science, including in 2016 when she testified in a criminal trial that retinal hemorrhages were "100 percent consistent with trauma," an overstatement that was then reported in the media.

c.  In 2011, Goodman conducted an operation on a four-year-old child during which she operated on the wrong eye and then, without notifying the child's parents, quickly operated on the correct eye to try to cover her mistake.  The operation was conducted at Legacy Emanuel Medical Center in Portland, and Legacy conducted an investigation and admitted the events in the media.

d.  Goodman has used her affiliation to Randall Children's Hospital interchangeably with her affiliation to Child Eye Care where it bolsters her credibility, signing reports as an ophthalmologist for Child Eye Care while also testifying in court that she is on the "medical staff" at Randall Children's Hospital.

315.    Despite the notice to Child Eye Care, the entity refused to implement adequate training or supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

316.    The violations of constitutional rights by Goodman were approved of and ratified by Child Eye Care.  Since at least 2002, Child Eye Care was listed with the Oregon Secretary of State as a single-member limited liability corporation solely owned and controlled by Goodman.

**D.    Clackamas County**

317.    Clackamas County has a policy, practice, or custom of reliance on child abuse pediatricians and ophthalmologists who have a vested interest in advancing child abuse

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

investigations and diagnosing "shaken baby syndrome" (interchangeably referred to as "abusive head trauma," "inflicted injury," or "non-accidental trauma") without consulting specialists trained in radiology, neuroradiology, neurology, or neurosurgery.

318.    Clackamas County has a policy, practice, or custom of staffing child abuse investigations with detectives who have no specialized training to understand medical evidence, evaluate or question the tactics or conclusions of child abuse pediatricians, or identify avenues for further investigation.

319.    Clackamas County has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or treating non-abusive explanations for a child's medical symptoms or condition as implausible.

320.    Clackamas County failed to adopt adequate procedural safeguards to guard against fabricated evidence and the suppression of favorable evidence, including by failing to adopt:

    a.    a policy requiring detectives to question the medical providers about "mimics" of shaken baby syndrome and alternate hypotheses for a child's clinical findings or medical condition;

    b.    a policy requiring detectives to document in writing their consultations with specialists in radiology, neuroradiology, neurology, neurosurgery, and ophthalmology;

    c.    a policy requiring detectives to remain informed of current medical research surrounding the ongoing medical debate about the scientific validity of the shaken baby syndrome hypothesis, including literature proving that certain assumptions that form the basis for the hypothesis have been discredited;

    d.    a policy requiring detectives to avoid fabricating evidence; or

    e.    a policy requiring detectives to disclose favorable evidence in compliance with *Brady* and Oregon's discovery statutes.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

321.    Clackamas County failed to train and supervise Bray and Leikem to thoroughly review medical reports, to properly interview all medical specialists involved, to prevent the fabrication of evidence, to prevent coercive interviews and interrogations, and to ensure the disclosure of favorable evidence in compliance with Brady and Oregon's discovery statutes.

322.    Clackamas County was on actual or constructive notice that its omissions would likely result in a constitutional violation based on the following non-exclusive facts:

   a.   In 2015, Bray and Clackamas County were sued for malicious prosecution after Bray arrested an individual for sexual abuse without any physical evidence and the prosecutor later dismissed the charges.

   b.   In 2018, Clackamas County commissioned an independent report from OIR Group to review its policies and practices after a detective (Jeffrey Green) pled guilty to two counts of official misconduct.  Green was found to have failed to investigate more than 50 cases assigned to him, including cases alleging rape and child abuse.  The investigation disclosed that, in some instances, Green fabricated evidence in order to close a case without further investigation and an undersheriff attempted to hide damaging information about Green from the district attorney.  A subsequent investigation disclosed that the Clackamas County Sergeant (Matt Swanson) who blew the whistle on Green was subjected to harassment and retaliation in response.  Swanson filed suit after supervisors attempted to force him to revise his initial complaint so that it "would be less easily tracked."  When Swanson refused, he alleged that the supervisors created poor evaluations based on false information.  OIR issued a 64-page report outlining its findings and 51 recommendations, including recommendations to "devise protocols accompanied with training to ensure that its detectives recognize the importance of informing prosecutors of all that is included in the investigative file and to provide any requested information."

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

c. Clackamas County published a *Brady* policy for the first time in 2020.

323.    Despite the notice to Clackamas County, the entity refused to implement adequate training or supervision or other programs to prevent violations of due process, exhibiting deliberate indifference to such violations.

324.    The violations of constitutional rights by Bray and Leikem were approved of and ratified by Clackamas County.  During the time of E.B.'s hospitalization, Bray was the Acting Sergeant for the Child Abuse Team at the Clackamas County Sheriff's Office.

**E.    DHS**

325.    DHS has a policy, practice, or custom of reliance on child abuse pediatricians and ophthalmologists who have a vested interest in advancing child abuse investigations and diagnosing "shaken baby syndrome" (interchangeably referred to as "abusive head trauma," "inflicted injury," or "non-accidental trauma") without consulting specialists trained in radiology, neuroradiology, neurology, or neurosurgery.

326.    DHS has a policy, practice, or custom of staffing child abuse investigations with caseworkers who have no specialized training to understand medical evidence, evaluate or question the tactics or conclusions of child abuse pediatricians, or identify avenues for further investigation.

327.    DHS has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or treating non-abusive explanations for a child's medical symptoms or condition as implausible.

328.    DHS failed to adopt adequate procedural safeguards to guard against fabricated evidence and the suppression of favorable evidence, including by failing to adopt:

a. a policy requiring caseworkers to question the medical providers about "mimics" of shaken baby syndrome and alternate hypotheses;

b. a policy requiring caseworkers to document in writing their consultations with specialists in radiology, neuroradiology, neurology, neurosurgery, and

MALONEY | LAUERSDORF | REINER ꜱᴄ
ᴀᴛᴛᴏʀɴᴇʏꜱ ᴀᴛ ʟᴀᴡ
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

ophthalmology;

c.   a policy requiring caseworkers to remain informed of current medical research surrounding the ongoing medical debate about the scientific validity of the shaken baby syndrome hypothesis, including literature proving that certain assumptions that form the basis for the hypothesis have been discredited;

d.   a policy requiring that caseworkers have reasonable and articulable evidence to show a child is in immediate danger of suffering severe bodily injury or death in the time it would take to obtain a warrant, and that there is no lesser intrusive alternate means of averting that specific injury;

e.   a policy requiring that caseworkers assess each parent separately to identify reasonable and articulable evidence sufficient to justify removal;

f.   a policy requiring that caseworkers avoid fabricating evidence; or

g.   a policy requiring that caseworkers disclose favorable evidence in compliance with *Brady* and Oregon's discovery statutes.

329.    DHS failed to train and supervise Fear and Greene to thoroughly review medical reports, to properly interview all medical specialists involved, to prevent the fabrication of evidence, to prevent coercive interviews and interrogations, to identify reasonable and articulable evidence to show a child is in immediate danger of suffering severe bodily injury or death in the time it would take to obtain a warrant and there is no lesser intrusive alternate means of averting that specific injury, to assess each parent separately to identify reasonable and articulable evidence sufficient to justify removal, and to ensure the disclosure of favorable evidence in compliance with Brady and Oregon's discovery statutes.

330.    DHS was on actual or constructive notice that its omissions would likely result in a constitutional violation based on the following non-exclusive facts:

a.   In 2016, Public Knowledge LLC published a report recommending, among other things, that DHS adopt data-driven decision making and increase staffing

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

resources for Child Protective Services.

    b.   In January 2018, the Oregon Secretary of State published an audit of DHS identifying "chronic understaffing, overwhelming workloads, high turnover, and a large proportion of inexperienced staff in need of better training, supervision, and guidance."

    c.   In January 2018, DHS published a response to the audit and the 2016 report, and generally agreed with the recommendations.

331.   Despite the notice to DHS, the agency refused to implement adequate training or supervision or other programs to prevent violations of due process.

**E.    Joint Policies of Entity Defendants**

332.   CARES Northwest, Randall Children's Hospital, Child Eye Care, Clackamas County, and DHS have a policy, practice, or custom to keep confidential all information and records acquired by the multidisciplinary team in violation of Brady and Oregon's criminal discovery statutes.

## VII.  FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983

### (Count 1 – Violation of First and Fourteenth Amendment Rights of Nigel Bliss by All Defendants except Defendant DHS)

333.   Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 332 in their entirety.

334.   As alleged above, the Defendants, while acting individually, jointly, or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Nigel of his constitutional rights under the First and Fourteenth Amendments, including his rights to familial association, privacy in his familial associations, and due process.

335.   In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Nigel, his attorneys, and prosecutors, among

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

others, thereby misleading and misdirecting the criminal prosecution and dependency proceedings against Nigel.

336.    In addition, as described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated reports and other evidence falsely implicating Nigel, obtained charges against Nigel and pursued a conviction using that false evidence, pursued dependency proceedings using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Nigel in grand jury proceedings and dependency proceedings.

337.    In addition, Defendants extracted or concocted fabricated statements from witnesses by using coercive means, and despite knowledge of Nigel's innocence, which Defendants used to incriminate Nigel before and during the criminal proceedings and the dependency proceedings.

338.    In addition, based on information and belief, Defendants concealed and fabricated additional evidence that is not yet known to Nigel.

339.    In addition, as described more fully above, Defendants Bray and Leikem intentionally or recklessly failed to investigate, thereby shocking the conscience, including by attempting to coerce or threaten Nigel to falsely confess, purposely ignoring evidence of Nigel's innocence, and exerting pressure on Dayna and others to implicate Nigel in the face of contrary evidence.

340.    Defendants' misconduct described in this count resulted in Nigel's unjust and wrongful criminal prosecution, unjust and wrongful dependency proceedings, deprived him of his liberty, caused witnesses to provide false and involuntary statements that were used to incriminate him and jeopardize his parental rights, and denied him his constitutional rights as guaranteed by the First and Fourteenth Amendments.  Absent this misconduct, Nigel's prosecution and dependency proceedings could not, and would not, have been pursued.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

341.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Nigel's clear innocence.

342.    As a result of Defendants' misconduct described in this count, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

343.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

**(Count 2 – Malicious Prosecution of Nigel Bliss by All Defendants except Defendant DHS)**

344.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 343 in their entirety.

345.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Nigel of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings, including criminal and dependency proceedings, against Nigel without any probable cause for doing so and in spite of the fact that they knew Nigel was innocent, in violation of his rights secured by the Fourteenth Amendment.

346.    In so doing, Defendants caused Nigel to be deprived of his liberty, separated from his family, and improperly subjected to judicial proceedings for which there was no probable cause or reasonable basis for the court to exercise its jurisdiction.

347.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with malice.

348.    As a result of Defendants' misconduct described in this count, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

349.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

**(Count 3 – Failure of All Defendants except Defendant DHS to Disclose Exculpatory Information in Favor of Nigel Bliss)**

350.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 349 in their entirety.

351.    Defendants failed to disclose exculpatory evidence, which affected the outcome of judicial proceedings, including but not limited to grand jury proceedings, the indictment of Nigel Bliss, the issuance of a warrant for the arrest of Nigel Bliss, the arraignment of Nigel Bliss, and subsequent bail and pre-trial release hearings, discovery hearings, status hearings, and hearings on requested continuances and the forced waiver of Nigel Bliss's right to speedy trial in the criminal prosecution of Nigel Bliss, and all judicial proceedings in the dependency action against Nigel Bliss, in violation of his Fourteenth Amendment right to due process.

352.    As alleged above, Defendants failed to disclose, among other things, material evidence, including, but not limited to: evidence of E.B.'s benign medical condition, evidence that undermined the "shaken baby" diagnosis of abuse, evidence that J.B. was not harmed or in danger of being harmed, evidence that they had used the dependency proceedings to leverage criminal charges, evidence of their own misconduct, evidence that would impeach or impact their credibility, exculpatory medical evidence, and the fact that they had fabricated reports and witness statements.

353.    Defendants knew that there was no credible evidence supporting the allegation that Nigel caused E.B.'s medical condition.  Had they disclosed this exculpatory evidence, the evidence would have proven Nigel's innocence, cast doubt on the entire investigation, prosecution, and dependency proceeding, and led to a different outcome in all of the judicial proceedings involving Nigel Bliss.

/ / /

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

354.    Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and Nigel's rights, and with deliberate indifference to Nigel's clearly established constitutional rights.

355.    As a result of Defendants' misconduct described in this count, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

356.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

**(Count 4 – Destruction of Exculpatory Evidence by All Defendants except Defendant DHS)**

357.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 356 in their entirety.

358.    Defendants suppressed, destroyed, or caused to be destroyed exculpatory and materially-favorable evidence, including, but not limited to, medical evidence of the benign cause of E.B.'s condition, evidence that J.B. was not harmed and not in danger of harm, reports of exculpatory witness statements, notes, communications, audio/visual recordings, evidence that Nigel could not have committed the crime because no crime occurred, and evidence bearing upon the credibility of the medical and police investigation and the investigators, including the doctors involved.

359.    As a result of these violations, Nigel was investigated, indicted, prosecuted, and punished through judicial proceedings for alleged abuse and a crime that never occurred and of which he is innocent.

360.    These Defendants were acting under color of law and within the scope of employment when they took these actions.

361.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**(Count 5 – Violation of Dayna Bliss's Fourteenth Amendment by All Defendants except Defendant DHS)**

362.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 361 in their entirety.

363.    As alleged above, Defendants, while acting individually, jointly, or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Dayna of her constitutional rights under the Fourteenth Amendment, including her right to due process.

364.    In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Dayna, her attorneys, and the courts, among others, thereby misleading and misdirecting judicial proceedings against Dayna.

365.    In addition, as described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated reports and other evidence falsely implicating Dayna, pursued dependency proceedings using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Dayna in dependency proceedings.

366.    In addition, Defendants extracted and concocted fabricated statements from witnesses by using coercive means, and despite knowledge of Dayna's innocence, which Defendants used to incriminate Dayna before and during the dependency proceedings.

367.    In addition, based on information and belief, Defendants concealed and fabricated additional evidence that is not yet known to Dayna.

368.    Defendants' misconduct described in this count resulted in Dayna's unjust and wrongful dependency proceedings, caused witnesses to provide false and involuntary statements that were used to incriminate her and jeopardize her parental rights, and denied her constitutional rights as guaranteed by the Fourteenth Amendment.  Absent this misconduct, the dependency proceedings against Dayna could not, and would not, have been pursued.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

369.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Dayna's clear innocence.

370.    As a result of Defendants' misconduct described in this count, Dayna suffered loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

371.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

**(Count 6 – Violation of the First, Fourth, and Fourteenth Amendment Rights of E.B. and J.B. by All Defendants except Defendant DHS)**

372.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 371 in their entirety.

373.    As alleged above, the Defendants, while acting individually, jointly, or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived E.B. and J.B. of their constitutional rights under the First, Fourth, and Fourteenth Amendments, including their rights to familial association, privacy, and due process.

374.    In the manner described more fully above, Defendants Fear and DHS seized E.B. and J.B. without a court order or exigent circumstances.

375.    In the manner described more fully above, Defendants Fear, Greene, and DHS continued to detain E.B. and J.B. unreasonably, when they knew or should have known that DHS's dependency petition and the related dependency proceedings were without merit.

376.    In addition, as described more fully above, the Defendants fabricated evidence to obtain and maintain legal custody of E.B. and J.B.

377.    In addition, as described more fully above, the Defendants interfered in the constitutional rights of E.B. and J.B. to companionship, society, and comfort with their parents, Nigel and Dayna.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

378.     In addition, as described more fully above, Adewusi, Fear, and Greene caused E.B. to be subjected to unwarranted medical examinations without parental consent or a court order.

379.     In addition, as described more fully above, Adewusi, Rodriguez, Fear, Greene, and Goodman deprived E.B. of her rights to informed consent for medical care and treatment, including medical exams and assessments, and to have medical decisions made by her parents.

380.     Defendants' misconduct described in this count resulted in E.B. and J.B.'s unlawful seizure and continued removal from their home, and denied them their constitutional rights as guaranteed by the First, Fourth, and Fourteenth Amendments.  Absent this misconduct, E.B. and J.B. would not have been seized and separated from their parents.

381.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth.

382.     As a result of the Defendants' misconduct, E.B. and J.B. were deprived of the care, comfort, consortium, love, and emotional support of their parents during and after the period of time while they were separated.

383.     As a result of the Defendants' misconduct, E.B. and J.B. suffered and continue to suffer great mental anguish, loss of familial association, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### (Count 7 – Failure of Defendants Abtin, Goodman, Greene, Leikem, and Rodriguez to Intervene)

384.     Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 383 in their entirety.

385.     In the manner described above, and during the constitutional violations described above, the following Defendants stood by without intervening to prevent the violation of the Blisses' constitutional rights, even though they had the duty and the opportunity to do so:

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

a. Defendant Abtin failed to intervene to prevent Adewusi and Goodman from fabricating evidence of abuse and suppressing favorable evidence of a benign medical condition in violation of the 14th Amendment;

b. Defendant Goodman failed to intervene to prevent Adewusi from fabricating evidence of abuse and suppressing favorable evidence of a benign medical condition in violation of the 14th Amendment;

c. Defendant Rodriguez failed to intervene to prevent Adewusi from fabricating statements allegedly made by Nigel and Dayna during interrogations in violation of the 14th Amendment;

d. Defendant Greene failed to intervene to prevent Defendant Fear from fabricating evidence that there was no SSP available for an in-home plan and thus foster care was the least restrictive placement in violation of the 14th Amendment; and

e. Defendant Leikem failed to intervene to prevent Defendant Bray from fabricating statements allegedly made by Nigel and Dayna during interrogations in violation of the 14th Amendment.

386.    These Defendants had a duty and reasonable opportunity to prevent this harm to the Blisses, but they failed to do so.

387.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to the Blisses' constitutional rights.

388.    As a result of these Defendants' failure to intervene to prevent the violation of Nigel's constitutional rights, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

389.    As a result of Defendants' failure to intervene to prevent the violation of Dayna's constitutional rights, Dayna suffered loss of familial association, great mental anguish,

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

390.    As a result of the Defendants' failure to intervene to prevent the violation of E.B. and J.B's constitutional rights, E.B. and J.B. suffered great mental anguish, loss of familial association, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

391.    Defendants' misconduct described in this count was undertaken pursuant to the policies, practices, and customs of the Entity Defendants as more fully described herein.

**(Count 8 – Unconstitutional Policies, Practices, and
Customs of the Entity Defendants except Defendant DHS)**

392.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 391 in their entirety.

393.    Plaintiffs' injuries were caused by the policies, practices, and customs of the Entity Defendants as described above, as well as by the actions of policy-making officials for the Entity Defendants.

394.    At all times relevant and material to this action, and for a period of time before and after, the Entity Defendants failed to promulgate proper or adequate rules, regulations, policies, and procedures, including as described above.

395.    At all times relevant and material to this action, and for a period of time before and after, the Entity Defendants failed to promulgate proper or adequate rules, regulations, policies, and procedures, including as described above..

396.    Officers, agents, and employees of the Entity Defendants committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

397.    Had officers, agents, and employees of the Entity Defendants promulgated appropriate rules, regulations, policies, and procedures, then the violation of the Blisses' constitutional rights would have been prevented.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

398.    In addition, at all times relevant and material to this action, and for a period of time before, the Entity Defendants were on notice of practices and customs by their respective officers, agents, and employees pursuant to which individuals suspected of criminal activity, like Nigel Bliss, were routinely deprived of exculpatory evidence, falsely charged, defamed, and subjected to the fabrication of evidence, wrongful prosecution, and dependency proceedings, as described above.

399.    These practices and customs, individually or together, were allowed to flourish because the leaders, supervisors, and policymakers of the Entity Defendants directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting the Blisses.

400.    The above practices and customs, so well settled as to constitute de facto policies of the Entity Defendants, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

401.    In addition, the misconduct described in this count was undertaken pursuant to the Entity Defendants' policies and practices in that the constitutional violations committed against the Blisses were committed with the knowledge or approval of persons with final policymaking authority for the Entity Defendants, or were actually committed by persons with such final policymaking authority.

402.    The Blisses' injuries were directly and proximately caused by officers, agents, and employees of the Entity Defendants, including but not limited to Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## VIII.  SECOND CLAIM FOR RELIEF

### (State Law – Malicious Prosecution of Nigel Bliss by All Defendants)

403.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 402 in their entirety.

404.    By letters dated January 21, 2022, Plaintiffs provided notice to the Defendants of their state law claims as required by ORS 30.275.

405.    Based on the misconduct alleged above, the Defendants caused Nigel Bliss to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Nigel's favor in a manner indicative of his innocence.

406.    As alleged above, the Defendants accused Nigel of criminal activity knowing those accusations to be without genuine probable cause, and they presented fabricated evidence and made false statements to prosecutors and grand jurors with the intent of exerting influence to institute and continue judicial proceedings against Nigel.

407.    The proceedings lacked probable cause because they were based on fabricated evidence as alleged above and were made without regard to exculpatory evidence that had been deliberately withheld and suppressed as alleged above.

408.    The Defendants' statements about Nigel's alleged culpability were made with knowledge that the statements were false and perjured.

409.    The misconduct alleged above was undertaken with malice, willfulness, or reckless indifference.

410.    The Entity Defendants are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability or respondeat superior.

/ / /

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

411.    As a result of the misconduct of the Defendants, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

412.    As a result of the misconduct of the Defendants, Dayna and Nigel both suffered a loss of consortium.

## IX.  THIRD CLAIM FOR RELIEF

### (State Law – Wrongful Initiation of Judicial Proceedings against Nigel and Dayna Bliss by All Defendants)

413.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 412 in their entirety.

414.    Based on the misconduct alleged above, Defendants caused Nigel and Dayna Bliss to be improperly subjected to dependency proceedings in which there was no reasonable basis for the court to exercise its jurisdiction, because there was no neglect or threat of harm to E.B. or J.B.  These dependency proceedings were instituted in the absence of probable cause and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in favor of Nigel and Dayna.

415.    As alleged above, Defendants accused Nigel and Dayna of wrongful conduct knowing those accusations to be without genuine probable cause, and they made false statements and presented fabricated evidence to Defendant DHS and judicial officers with the intent of exerting influence to institute and continue dependency proceedings against Nigel and Dayna.

416.    The proceedings lacked probable cause because they were based on fabricated evidence as alleged above and were made without regard to exculpatory evidence that had been deliberately withheld and suppressed as alleged above.

417.    Defendants' statements about Nigel and Dayna's alleged culpability were made with knowledge that the statements were false and perjured.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

418.    The misconduct alleged above was undertaken with malice.

419.    The Entity Defendants are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability or respondeat superior.

420.    As a result of the misconduct of the Defendants, Nigel and Dayna suffered loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

421.    As a result of the misconduct of the Defendants, J.B. and E.B. suffered a loss of consortium.

## X.  FOURTH CLAIM FOR RELIEF

### (State Law – Medical Malpractice by Defendants Adewusi, Goodman, CARES Northwest, Randall Children's Hospital, and Child Eye Care Associates)

422.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 421 in their entirety.

423.    Adewusi and Goodman knew or reasonably should have known that they were diagnosing or providing treatment to E.B. and, as such, owed a duty to E.B.

424.    Adewusi and Goodman breached that duty when they misdiagnosed E.B. with "shaken baby syndrome," also known as "abusive head trauma" and "non-accidental trauma."

425.    Adewusi and Goodman knew or should have known that E.B. was suffering from complications related to BESS.

426.    Adewusi and Goodman knew or should have known that their fabricated diagnosis of shaken baby syndrome would result in an incomplete differential diagnosis that failed to consider the actual medical causes of E.B.'s clinical findings and that failing to reach a correct diagnosis would lead to further medical problems and emotional trauma caused by family separation.

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

427.    Adewusi and Goodman specifically failed to consult appropriate specialists, including a neuroradiologist, to properly workup a differential diagnosis that included medical causes of the subdural hemorrhage and retinal hemorrhages, and would have alerted Adewusi and Goodman to the need for medical intervention to prevent E.B. from suffering long-term vision complications and the psychological consequences of early separation from her parents.

428.    As a result of the misconduct of Adewusi and Goodman, E.B. was taken from her parents, subjected to unnecessary medical interventions, and denied proper treatment and care, including treatment for retinal hemorrhages that worsened into a vitreous hemorrhage leading to long-term complications for E.B.'s vision.

429.    The misconduct of Adewusi and Goodman in fabricating an abuse diagnosis was a but-for cause of physical and emotional harm because DHS relied on the diagnosis as the sole and exclusive basis for taking custody of E.B., removing E.B. and J.B. from their parents, and initiating dependency proceedings.

430.    CARES Northwest, Randall Children's Hospital, and Child Eye Care Associates are responsible for the misconduct of their respective agents and employees who acted as alleged above under a theory of vicarious liability or respondeat superior.

431.    As a result of the misconduct of these Defendants, E.B. suffered loss of vision, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## XI.  FIFTH CLAIM FOR RELIEF

### (State Law – Negligent Training and Supervision against the Entity Defendants)

432.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 431 in their entirety.

433.    Clackamas County, DHS, CARES Northwest, Randall Children's Hospital, and Child Eye Care had a duty to properly train and supervise their respective agents and employees

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

as a result of their roles on the multidisciplinary team and the "special relationship" between government officers and citizens that gives the officers actual or apparent authority over citizens or the power to affect their interests.

434.    Clackamas County, DHS, CARES Northwest, Randall Children's Hospital, and Child Eye Care had a further duty to properly train and supervise its agents and employees as a result of their obligation to hold inviolate the 14th Amendment due process right for parents to make decisions regarding the care and upbringing of their children.

435.    DHS had a further duty to properly train and supervise its agents and employees as a result of its role as court-appointed guardian for E.B. and J.B.

436.    DHS had a further duty to properly train and supervise its agents and employees as a result of its special relationship with Nigel, Dayna, E.B. and J.B. as "clients" as defined by OAR 413-010-0000(14), the requirement that DHS work toward reunification as required by OAR 413-010-0180(1)(g), and the State's public policy to guard the liberty interest of parents protected by the Fourteenth Amendment as articulated in ORS 419B.090(4).

437.    CARES Northwest, Randall Children's Hospital, and Child Eye Care had a further duty to properly train and supervise their respective agents and employees as a result of E.B.'s status as a patient.

438.    Clackamas County, DHS, CARES Northwest, Randall Children's Hospital, and Child Eye Care breached their duty to train and supervise their respective agents and employees by creating the policies, practices, and customs alleged in paragraphs 283-289, 295-302, 308-312, 318-320, 326-328, and 333 that resulted in the misconduct alleged above related to the handling of evidence in the criminal and dependency investigations.

439.    Clackamas County, DHS, CARES Northwest, Randall Children's Hospital, and Child Eye Care breached their duty to train and supervise their respective agents and employees by failing to create the policies, practices, and customs alleged in paragraphs 290, 303, 313, 321,

/ / /



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

and 329 above to prohibit the misconduct alleged above related to the handling of evidence in the criminal and dependency investigations.

440.    Clackamas County, DHS, CARES Northwest, Randall Children's Hospital, and Child Eye Care breached their duty to train and supervise their respective agents and employees as alleged in paragraphs 291-293, 304-306, 314-316, 322-324, and 330-332 above to prohibit the misconduct alleged above related to the handling of evidence in the criminal and dependency investigations.

441.    As a result of the Entity Defendants' negligence, the individual Defendants violated the Blisses' constitutional rights by committing the misconduct alleged above related to the handling of evidence in the criminal and dependency investigations.

442.    As a result of the negligent training and supervision by the Entity Defendants, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

443.    As a result of the negligent training and supervision by the Entity Defendants, Dayna suffered loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

444.    As a result of the misconduct of the Defendants, E.B. and J.B. suffered great mental anguish, loss of familial association, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## XII.  SIXTH CLAIM FOR RELIEF

### (State Law – Intentional Infliction of Emotional Distress by All Defendants)

445.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 444 in their entirety.

/ / /

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

446.    The acts and misconduct of the Defendants as alleged above were extreme and outrageous.  The Defendants instituted and continued criminal proceedings against Nigel based on fabricated evidence.  The Defendants also instituted and continued dependency proceedings against Nigel and Dayna for the sham purpose of furthering the criminal proceedings and attempting to coerce Dayna into lying about Nigel in order to save her children.

447.    The actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their actions would cause, severe emotional distress to the Bliss family as alleged above.

448.    The cumulative effect of the wrongful behavior throughout the criminal and dependency proceedings culminated in Dayna taking forced mental health leave from work in June 2021 and sham judicial proceedings that continued until they were finally terminated in favor of Nigel and Dayna in July 2021 and August 2022 as alleged above.

449.    As a direct and proximate result of the actions by the Defendants, the Bliss family has suffered and continues to suffer physical sickness and severe emotional distress.

450.    As a result of the misconduct by the Defendants, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

451.    As a result of the misconduct by the Defendants, Dayna suffered loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

452.    As a result of the misconduct of the Defendants, E.B. and J.B. suffered great mental anguish, loss of familial association, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

/ / /

/ / /

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## XIII.  SEVENTH CLAIM FOR RELIEF

### (State Law – Tortious Interference with Familial Relationships by All Defendants)

453.    Plaintiffs incorporate by reference herein the allegations set forth above in paragraphs 1 through 452 in their entirety.

454.    Plaintiffs Nigel and Dayna had a right to maintain a parental custodial relationship with E.B. and J.B.

455.    Defendants intentionally interfered with Plaintiffs' custodial relationships by conspiring to remove E.B. and J.B. from Nigel and Dayna, by conspiring to criminally prosecute Nigel for a crime that they knew he did not commit, and by otherwise preventing Nigel and Dayna from exercising their custodial rights.

456.    The interference by Defendants caused harm to Nigel and Dayna's custodial relationship with E.B. and J.B.

457.    As a result of the misconduct by Defendants, Nigel suffered loss of liberty, loss of familial association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

458.    As a result of the misconduct by Defendants, Dayna suffered loss of familiar association, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## XIV.  JURY DEMAND

Plaintiffs request a trial by jury of twelve.

## XV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    Judgment against Defendants and in favor of Plaintiffs on all claims for relief stated herein;

2.    An award of Plaintiffs' economic and non-economic damages;

3.    An award of punitive damages;

MALONEY | LAUERSDORF | REINER<sub>PC</sub>
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

4.      An award of Plaintiffs' costs and attorney fees in this action pursuant to 42 U.S.C. § 1988(b); and

5.      Such other relief as the Court finds just and equitable.

DATED:  November 10, 2023

| MALONEY LAUERSDORF REINER PC | ATTORNEY BYRON LICHSTEIN |
|---|---|
| By /s/Janis C. Puracal<br>Janis C. Puracal, OSB #132288<br>E-Mail:  jcp@mlrlegalteam.com<br>Andrew C. Lauersdorf, OSB #980739<br>E-Mail:  acl@mlrlegalteam.com<br><br>Attorneys for Plaintiffs | By /s/Byron C. Lichstein<br>Byron C. Lichstein, OSB #214074<br>E-Mail: blichstein.lplaw@gmail.com<br><br>Attorneys for Plaintiffs |

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417