IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NIGEL BLISS and DAYNA BLISS, as
individuals and as guardians *ad litem*, on
behalf of J.B., a minor, and E.B., a minor,

                Plaintiffs,

      v.

ADEBIMPE ADEWUSI, KEYVAN
ABTIN, PATRICK BRAY, AUBREY
FEAR, SHAWN GOODMAN, KATHRYN
GREENE, BRADLEY LEIKEM,
STOKELY RODRIGUEZ, LEGACY
EMANUEL HOSPITAL & HEALTH
CENTER DBA CARES NORTHWEST,
LEGACY EMANUEL HOSPITAL &
HEALTH CENTER DBA RANDALL
CHILDREN'S HOSPITAL AT LEGACY,
CLACKAMAS COUNTY SHERIFF'S
OFFICE, CHILD EYE CARE
ASSOCIATES LLC, CLACKAMAS
COUNTY, and STATE OF OREGON by
and through its agency DEPARTMENT
OF HUMAN SERVICES and the CHILD
PROTECTIVE SERVICES DIVISION
thereof,

                Defendants.

No. 3:23-cv-00650-HZ

OPINION & ORDER

Andrew C. Lauersdorf
Janis C. Puracal
Maloney Lauersdorf & Reiner, PC
1111 E Burnside St, Ste 300
Portland, OR 97214

Byron C. Lichstein
7 Marlboro Ln
Eugene, OR 97405

Attorneys for Plaintiffs

Misha Isaak
Michael Paul Rubin
Stoel Rives LLP
760 SW 9th Ave, Ste 3000
Portland, OR 97205

Scott C. Ciecko
Clackamas County Counsel
Public Services Bldg
2051 Kaen Rd
Oregon City, OR 97045

Dirk L. Pierson
Oregon Department of Justice
Trial Division, Torts Section
1162 Court St NE
Salem, OR 97301

Troy S. Bundy
Taylor B. Lewis
Hart Wagner, LLP
1000 SW Broadway, Ste 2000
Portland, OR 97205

Attorneys for Defendants

HERNÁNDEZ, District Judge:

Before the Court are three motions to dismiss Plaintiffs' First Amended Complaint

("FAC") against the four groups of Defendants in this case. The State Defendants answered the

FAC. ECF 71. The County Defendants, Hospital Defendants, and Eye Care Defendants

(collectively, the Moving Defendants) move to dismiss most of the claims against them. ECF 74, 79, 80. For the following reasons, the Court grants the Motions in part and denies them in part.

## BACKGROUND

Plaintiffs bring federal and state-law claims against Defendants, alleging that Defendants instigated an unfounded criminal prosecution of Plaintiff Nigel Bliss for child abuse and wrongfully initiated custody proceedings with respect to Nigel and Dayna Bliss's two children, E.B. and J.B. In its previous Opinion and Order ruling on the first round of motions to dismiss in this case, the Court discussed the facts at length. Op. & Ord. 3-11, ECF 68. The Court will not repeat them here but will address Plaintiffs' new factual allegations as appropriate when evaluating the sufficiency of Plaintiffs' claims. In its prior Opinion and Order, the Court granted in part and denied in part the Moving Defendants' motions to dismiss, and gave Plaintiffs leave to amend many of the dismissed claims. Plaintiffs filed the FAC. ECF 69. The Moving Defendants again challenge most of the claims against them. The Court took the Motions under advisement on February 5, 2024.

## STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his or her "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual

allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint must state a plausible claim for relief and contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## DISCUSSION

The Court addresses each Motion in turn and concludes that each should be granted in part and denied in part. This Opinion and Order relies on and incorporates the legal standards from the Court's previous Opinion and Order, supplementing them as necessary.

## I.    County Defendants' Motion to Dismiss

County Defendants—Defendants Bray, Leikem, and Clackamas County—challenge Plaintiffs' allegations and the sufficiency of the pleadings. County Def. Mot., ECF 74.

### A.    Incorporation by Reference

County Defendants argue that three items should be incorporated into the FAC by reference: (1) transcripts of the interrogations of Nigel and Dayna Bliss by Defendants Bray and Leikem; (2) Defendant Bray's affidavit in support of a search warrant, which Plaintiffs allege contains fabricated evidence; and (3) the audio recording of the 911 call made on June 8, 2018.

County Def. Mot. 6. They argue that these documents disprove many of the allegations in the FAC. *Id.* at 7-13.

 Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). However, a court "may consider evidence on which the complaint 'necessarily relies' if (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). In contrast, the "mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). And a document that "merely creates a defense to the well-pled allegations in the complaint" generally should not be incorporated by reference because it "did not necessarily form the basis of the complaint." *Khoja*, 899 F.3d at 1002.

 Defendants have not met the standard for incorporation by reference for the transcripts or the recording. Plaintiffs dispute the authenticity of the interrogation transcripts. Pl. Resp. 3, ECF 86. They state that "the transcripts diverge from the audio recordings in ways that are material to Plaintiffs' claims." *Id.* Plaintiffs also dispute the authenticity of the 911 recording attached to the motion, asserting that it "is missing the first four minutes from the 911 call." *Id.* at 4. Because Plaintiffs dispute the authenticity of these two items, the Court will not incorporate them by reference and will not rely on them in evaluating the sufficiency of Plaintiffs' claims. County Defendants argue that Plaintiffs' challenge to the authenticity is too conclusory. County Def. Reply 2, ECF 99. The Court will not require Plaintiffs to present detailed evidence contesting the

authenticity of the documents. They have stated the basis for their dispute. The Court will not

incorporate these documents.

As for Defendant Bray's affidavit, Plaintiffs state that they "dispute the authenticity of

the contents of the affidavit for a search warrant." Pl. Resp. 4. They note that the FAC alleges

that the contents of the affidavit are false. *Id.* (citing FAC ¶¶ 188, 276(a)). The FAC does refer to

the affidavit and it is central to Plaintiffs' claims, and Plaintiffs do not dispute the authenticity of

the copy attached to Defendants' Motion. The Court therefore incorporates the affidavit but does

not assume that its contents are true. *See Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the

truth of an incorporated document if such assumptions only serve to dispute facts stated in a

well-pleaded complaint."). Thus, to the extent that County Defendants' Motion relies on the

contents of the evidence they sought to incorporate, the motion is denied.

B.    Fabrication Claims

County Defendants argue that "[d]espite plaintiffs' use of numerous different labels for

their §1983 claims against the County Defendants, the factual allegations make clear that

plaintiffs' claims are for judicial deception or fabrication." County Def. Mot. 13. The Court

already discussed the bases of Plaintiffs' claims at length in its previous Opinion and Order and

will not repeat that discussion here. Plaintiffs do bring claims for fabrication of evidence under §

1983. FAC ¶¶ 336-338, 365-367, 376.

> To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that
> (1) the defendant official deliberately fabricated evidence and (2) the deliberate
> fabrication caused the plaintiff's deprivation of liberty. To establish the second
> element of causation, the plaintiff must show that (a) the act was the cause in fact
> of the deprivation of liberty, meaning that the injury would not have occurred in
> the absence of the conduct; and (b) the act was the "proximate cause" or "legal
> cause" of the injury, meaning that the injury is of a type that a reasonable person
> would see as a likely result of the conduct in question.

*Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citations omitted). Direct evidence of fabrication, such as misquoting witnesses, suffices to state a claim. *Id.* at 798-99. Absent direct evidence of fabrication, Plaintiffs must point to evidence that either (1) Defendants continued the investigation of Plaintiffs although they knew or should have known that Plaintiffs were innocent, or (2) "Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 799 (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)). Under the latter standard, the coercive techniques must be ones that "shock[] the conscience." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (internal quotations omitted). In *Gantt*, the Ninth Circuit held that a jury could conclude the standard was met where the individual testified that detectives interrogated him when "he had been awake for approximately two days straight on a crack binge" and threatened to charge him with murder if he did not provide the information sought. *Id.* at 708.

The FAC adequately alleges fabrication claims against County Defendants based on both direct and circumstantial evidence. It alleges that Defendants Bray and Leikem "falsely reported statements that Nigel made during their interrogation[.]" FAC ¶¶ 150, 188. It also alleges that Defendants Bray and Leikem told Nigel "that E.B. would only get the medical care she needed if Nigel or Dayna confessed to abusing E.B." FAC ¶ 147. Consistent with *Gantt*, a jury could conclude that this interrogation technique was sufficiently coercive that Defendants Bray and Leikem knew or should have known that it would yield false information. According to the FAC, Nigel and Dayna Bliss had rushed their injured baby to the hospital and were in the middle of seeking treatment for her. In that context, a threat to withhold medical treatment for the child could reasonably be viewed as coercive toward the parent. Likewise, the FAC alleges that

Defendants Bray and Leikem interrogated Dayna "while she was distraught and had already been awake for over 36 hours, even though she asked to schedule the interrogation for another time." FAC ¶ 151. This conduct, in the context of Dayna's known fear for the health of her child, could reasonably be viewed as coercive.

County Defendants argue that the coercion allegations are insufficient because the FAC alleges that Nigel and Dayna did not confess. County Def. Mot. 17 (citing FAC ¶¶ 149, 152). Plaintiffs respond that while they did not give a full confession, the FAC alleges that Defendants Bray and Leikem coerced statements from them and "twisted" them to support allegations that Nigel abused E.B. Pl. Resp. 15 (citing FAC ¶¶ 150, 183, 184, 188). Plaintiffs have made sufficient allegations of coercion.

Plaintiffs adequately allege that County Defendants' fabrications caused their injuries. "[A] § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018). Plaintiffs allege that there was no evidence of abuse. FAC ¶¶ 127-133. They allege that Defendants Bray and Leikem, acting with other Defendants, fabricated evidence indicating that Nigel Bliss abused E.B. *Id.* ¶¶ 150, 178-180, 183-184, 187-188. While County Defendants argue that they made mere errors, omissions, or misstatements, County Def. Mot. 14-15, that is not what Plaintiffs allege. And Plaintiffs allege that Defendants Bray and Leikem submitted the evidence to obtain search warrants, pursue criminal charges, and obtain custody of the children in dependency proceedings. FAC ¶ 189. Plaintiffs allege that Nigel Bliss was charged with child abuse. *Id.* ¶ 244. They allege that dependency proceedings were started against both Nigel and Dayna based on the criminal

investigation. *Id.* ¶ 226. Plaintiffs have adequately alleged their fabrication claims against the County Defendants.

County Defendants also argue that Plaintiffs' claims against them fail because they fail to plausibly allege that County Defendants lacked probable cause. County Def. Mot. 17-18. County Defendants argue that they reasonably relied on medical professionals who stated that E.B. had been abused. *Id.* at 18. Plaintiffs counter that a lack of probable cause is not necessarily an element of a fabrication claim under the Fourteenth Amendment. Pl. Resp. 15. They are correct. *See Spencer*, 857 F.3d at 801-02 (holding that plaintiffs need not prove a lack of probable cause for a fabrication claim under the Fourteenth Amendment). But even if lack of probable cause is required here because Plaintiffs challenge the affidavit supporting the search warrant, *see id.* at 802, County Defendants' argument still fails. Plaintiffs allege that the County Defendants deliberately fabricated evidence of abuse alongside medical professionals. They do not allege that County Defendants innocently relied on the erroneous opinions of medical professionals. And they allege that the evidence of abuse was all fabricated.

Next, County Defendants challenge some of Plaintiffs' factual allegations as irrelevant to their claims. County Def. Mot. 19-20. They argue that Plaintiffs' allegations of meetings and sharing information do not show a constitutional violation. *Id.* at 19. Plaintiffs explain that this evidence is relevant to show a meeting of the minds for their conspiracy allegations. Pl. Resp. 17. They are correct. Next, County Defendants argue that it is immaterial whether Nigel or Dayna was the one who spoke to the 911 dispatcher. County Def. Mot. 19-20. Plaintiffs correctly state that if Nigel called 911, that tends to make it less likely that he had just abused his daughter. Pl. Resp. 18. Last, County Defendants argue that the allegation that they "suppressed evidence of their misconduct during the interrogations" is "pure bootstrapping" and "redundant of other

allegations." County Def. Mot. 20. The Court agrees with Plaintiffs that "there is nothing unusual or inappropriate about alleging a defendant first committed misconduct and then suppressed evidence of that misconduct." Pl. Resp. 18-19.

Finally, County Defendants argue that they are entitled to qualified immunity on the fabrication claims. County Def. Mot. 20-21. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted). "To determine whether [an officer] violated clearly established law, we look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (internal quotation marks and citation omitted). And while there need not be a case directly on point, "existing precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504, (2019) (internal quotation marks and citation omitted). The facts are to be viewed in the light most favorable to the nonmoving party in determining whether qualified immunity applies. *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019).

County Defendants are not entitled to qualified immunity at this stage of the case. They rely on their own characterization of their conduct as reliance on the opinions of doctors and "minor misstatements about evidence on ancillary issues." County Def. Mot. 21. The FAC does not allege reliance on doctors or minor misstatements; it alleges that County Defendants deliberately fabricated evidence of abuse and used it to pursue a criminal prosecution. It is clearly established, based on the fabrication cases the Court discussed above, that this conduct is

unconstitutional. The Court agrees with Plaintiffs that this is not an appropriate case to address qualified immunity at the pleading stage. Pl. Resp. 20-21.

C.    Failure to Intervene Claim

County Defendants argue that the FAC does not state a failure to intervene claim against Defendant Leikem. County Def. Mot. 24-25. The Court previously dismissed the claim because Plaintiffs failed to explain which Defendant had a duty to intervene to prevent which constitutional violation. Op. & Ord. 47-48. The FAC alleges that "Defendant Leikem failed to intervene to prevent Defendant Bray from fabricating statements allegedly made by Nigel and Dayna during interrogations in violation of the 14th Amendment." FAC ¶ 385(e). The FAC alleges that Defendants Bray and Leikem debriefed with Defendants Adewusi and Rodriguez and then conducted interrogations of Nigel and Dayna together. *Id.* ¶¶ 146-152. It alleges that Defendants Bray and Leikem falsely reported statements from their interrogation of Nigel. *Id.* ¶ 150. Although County Defendants argue that the FAC fails to plead that Defendant Leikem had a realistic opportunity to intervene, County Def. Reply 10-11, the circumstances alleged plausibly include such an opportunity. The claim may proceed.

D.    *Monell* Claims

County Defendants argue that Plaintiffs have failed to state a *Monell* claim against the County. County Def. Mot. 22-24. The Court previously dismissed Plaintiffs' *Monell* claims because they did not specify which policies pertained to which Entity Defendant or provide adequate factual allegations supporting the alleged policies, practices, or customs. Op. & Ord. 50-53.

First, County Defendants argue that the *Monell* claim fails because Plaintiffs have failed to allege an underlying constitutional violation by an individual officer. County Def. Mot. 22.

They are mistaken. Plaintiffs have alleged fabrication claims against Defendants Bray and

Leikem. However, as discussed further below, some if not all of Plaintiffs' *Brady* claims fail.

The Ninth Circuit has rejected the view that *Monell* liability always requires a predicate

constitutional violation by an individual officer. *Richards v. Cnty. of San Bernardino*, 39 F.4th

562, 574 (9th Cir. 2022). County Defendants acknowledge *Richards* but state that Plaintiffs have

not shown how the County could have violated their rights absent a constitutional violation by

Defendants Bray or Leikem. County Def. Reply 6-7. Plaintiffs have not shown how a claim

based on lack of a *Brady* policy could be viable without an underlying *Brady* claim.

Next, County Defendants argue that Plaintiffs' alleged policies are contrary to law.

County Def. Mot. 22. Plaintiffs allege:

> Clackamas County has a policy, practice, or custom of reliance on child abuse
> pediatricians and ophthalmologists who have a vested interest in advancing child
> abuse investigations and diagnosing "shaken baby syndrome" (interchangeably
> referred to as "abusive head trauma," "inflicted injury," or "non-accidental
> trauma") without consulting specialists trained in radiology, neuroradiology,
> neurology, or neurosurgery.

FAC ¶ 317. Plaintiffs also allege that "Clackamas County has a policy, practice, or custom of

staffing child abuse investigations with detectives who have no specialized training to understand

medical evidence, evaluate or question the tactics or conclusions of child abuse pediatricians, or

identify avenues for further investigation." *Id.* ¶ 318.

County Defendants argue that these alleged policies or practices "are contrary to case law

. . . indicating that the Constitution does not require law enforcement to be medical experts and

expressly allows them [to] rely on doctor's medical opinions and other trustworthy sources."

County Def. Mot. 22 (citing *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) and *Mueller v.

Auker*, 700 F.3d 1180 (9th Cir. 2012)). In *O'Doan*, the Ninth Circuit held that a suspect's

hospital discharge papers did not conclusively establish that the suspect had suffered a seizure, and stated:

> Police officers are not medical doctors. And the Constitution does not require that officers consult with expert witnesses before making an arrest. No clearly established law required the officers here to treat an emergency room diagnosis as conclusive of a lack of criminality, especially when the suspect had engaged in facially unlawful conduct.

991 F.3d at 1042. In *Mueller*, the Ninth Circuit held that a police officer was not in a position to second-guess a doctor's medical judgment given the emergency he faced. 700 F.3d at 1188.

County Defendants' argument has merit as to the alleged policy regarding reliance on child abuse pediatricians without consulting specialists. *See* FAC ¶ 317. *O'Doan* provides that police officers are not required to consult with expert witnesses before making an arrest. Thus, Plaintiffs cannot succeed on a theory that Clackamas County had a policy or practice of failing to consult with certain specialized medical providers before finding probable cause of child abuse. The Court dismisses Plaintiffs' *Monell* claim based on this alleged policy or practice.

County Defendants' argument has some merit as to the alleged policy regarding a lack of training to understand medical evidence, evaluate or question the tactics of child abuse pediatricians, or identify avenues for further investigation. *See* FAC ¶ 318. To the extent Plaintiffs wish to argue that police officers must have extensive training in understanding medical evidence, *O'Doan* undermines that notion. But the claim might be viable if Plaintiffs can prove that Clackamas County provided constitutionally inadequate training on conducting child abuse investigations. *See, e.g.*, *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933, 966-67 (C.D. Cal. 2018) (city's failure to train police officers on interviewing suspected child abuse victims at school amounted to a constitutional violation attributable to the municipality).

Plaintiffs also allege that "Clackamas County has a policy, practice, or custom of ignoring or rejecting non-abusive explanations for medical symptoms and conditions, or treating non-abusive explanations for a child's medical symptoms or condition as implausible." FAC ¶ 319. County Defendants argue that "[t]his allegation is contrary to constitutional case law indicating probable cause does not require law enforcement to disprove every non-criminal explanation for conduct that otherwise appears to be criminal." County Def. Mot. 22-23 (citing *O'Doan*). While County Defendants' statement of the law is correct, Plaintiffs are not alleging that the County routinely fails to disprove non-criminal explanations; they are alleging that the County has a policy or practice of deliberately disregarding evidence that undermines probable cause. Police officers "may not disregard facts tending to dissipate probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (internal quotations omitted).

County Defendants also argue that "plaintiffs allege a lack of procedural safeguards that are largely redundant to other allegations against the County." County Def. Mot. 23 (citing FAC ¶ 320(a)-(e)). Plaintiffs allege that the County failed to adopt certain procedural safeguards to prevent fabrication and suppression of evidence. FAC ¶ 320(a)-(e). These allegations are not redundant. The Court dismissed Plaintiffs' *Monell* claim in part because the claim was vague. Plaintiffs repleaded their claim to add detail as directed by the Court. Because County Defendants raise no other challenge to these allegations, the Court will not address them further.

County Defendants challenge Plaintiffs' *Monell* claim to the extent it is based on a failure to train and supervise Defendants Bray and Leikem. County Def. Mot. 23. Plaintiffs allege:

> Clackamas County failed to train and supervise Bray and Leikem to thoroughly review medical reports, to properly interview all medical specialists involved, to prevent the fabrication of evidence, to prevent coercive interviews and interrogations, and to ensure the disclosure of favorable evidence in compliance with Brady and Oregon's discovery statutes.

FAC ¶ 321.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

> To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees.

*Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021). To show deliberate indifference, the plaintiff must allege that the entity's policymakers had "actual or constructive notice that a particular omission in their training program causes [entity] employees to violate citizens' constitutional rights[.]" *Connick*, 563 U.S. at 61. In general, a single incident of unlawful conduct does not state a claim for municipal liability. *Benavidez*, 993 F.3d at 1154.

Plaintiffs rely on three factual allegations to support the allegation that the County had notice of the constitutional violations. FAC ¶ 322(a)-(c). First, they allege that "[i]n 2015, Bray and Clackamas County were sued for malicious prosecution after Bray arrested an individual for sexual abuse without any physical evidence and the prosecutor later dismissed the charges. *Id.* ¶ 322(a). Second, they allege that in 2018, the County commissioned a review of its policies and practices after a detective who is not party to this case pleaded guilty to official misconduct. *Id.* ¶ 322(b). The investigation disclosed that this detective had fabricated evidence in more than 50 cases. *Id.* The final report recommended that the County implement new protocols and training about providing evidence to prosecutors. *Id.* Third, Plaintiffs allege that "Clackamas County published a *Brady* policy for the first time in 2020." *Id.* ¶ 322(c).

County Defendants argue that Plaintiffs' failure-to-train theory is conclusory and insufficiently supported. County Def. Mot. 23. They argue that the County did not have notice that the omissions caused violations of constitutional rights. *Id.* They challenge Plaintiffs' characterization of the case against Defendant Bray and ask the Court to take judicial notice of the summary judgment disposition in favor of Defendant Bray. *Id.* They assert that the 2018 report did not concern Defendants Bray and Leikem. *Id.* at 23-24. And they state that "Plaintiffs fail to explain, and it remains unclear, how the alleged failure to publish a *Brady* policy is relevant to the alleged failure to train or supervise the detectives on the investigation of child abuse cases." *Id.* at 24.

Plaintiffs argue that the Court should not take judicial notice of the 2015 records to show the truth of the assertions in the records. Pl. Resp. 23. They argue that the prior complaint was relevant because it could put the County on notice of possible constitutional violations. *Id.* at 24. As for the 2018 report, Plaintiffs assert that it does not matter whether Defendants Bray and Leikem were mentioned because the report showed a pattern of similar constitutional violations to those alleged here. *Id.* Finally, they state that "it is self-evident that the absence of a *Brady* policy at the time of the events in this case is relevant to whether the County Defendants were adequately training and supervising their employees." *Id.* at 25.

The Court partially agrees with Plaintiffs. The FAC adequately pleads that the County was on notice of the possibility of violations of *Brady* and fabrication of evidence, which supports Plaintiffs' *Monell* claim to the extent the policies alleged involve *Brady* obligations or fabrication of evidence. *See* FAC ¶ 320(d), (e). They have alleged a pattern of incidents involving fabrication of evidence during criminal investigations. And given the fundamental importance of *Brady* obligations in the context of police work, a jury could reasonably conclude

that it was self-evident that a *Brady* policy was necessary. However, as discussed below, Nigel

Bliss's *Brady* claims fail as a matter of law. The Court therefore dismisses the *Monell* claim as

brought by Nigel to the extent it relies on lack of a *Brady* policy. There are serious questions

about whether Dayna Bliss's *Brady* claims are viable, but because the parties have not

substantively addressed the issue, the Court declines to dismiss the claim as brought by Dayna.

Plaintiffs have not alleged that the County was on notice that its failure to enact policies

about questioning medical providers, requiring documentation of consultations with medical

providers in writing, or requiring detectives to be informed about the validity of the shaken baby

hypothesis would lead to the constitutional violations alleged. *See* FAC ¶ 320(a), (b), (c). The

Court dismisses the *Monell* claim against the County on a theory of omission to the extent it

relies on those policies. In sum, the Court grants in part and denies in part County Defendants'

Motion to Dismiss.

## II.    Hospital Defendants' Motion to Dismiss

The Hospital Defendants—Defendants Adewusi, Rodriguez, Abtin, and Legacy Emanuel

Hospital & Health Center (doing business as CARES Northwest and Randall Children's Hospital

("RCH"))—challenge the adequacy of the allegations against them for Plaintiffs' § 1983 claims

and some of the state-law claims. Hospital Def. Mot., ECF 79.

### A.    Section 1983 Claims

#### i.    State Action

The Court previously laid out the standards for proving state action under the three

relevant tests: public function, joint action, and governmental nexus. Op. & Ord. 34-39. The

Court previously held that Plaintiffs failed to allege that the Hospital Defendants were state

actors, except for Defendant Adewusi when she ordered a custodial forensic medical

examination of E.B. *Id.* at 40. Hospital Defendants argue that the FAC still falls short under all three tests. Hospital Def. Mot. 14-23. The Court concludes that Plaintiffs have plausibly alleged that Hospital Defendants were state actors under the governmental nexus test. *See* Op. & Ord. 39 (providing legal standard).

The FAC alleges that an Oregon statute "establishes and maintains state-funded 'multidisciplinary' teams to which it delegates its responsibility to investigate and prosecute child abuse." FAC ¶ 67. It alleges that the teams are coordinated through a county's district attorney's office and are "required by law to include law enforcement personnel, DHS child protective service workers, and a designated medical professional." *Id.* ¶ 69. It alleges that such teams are "the sole and exclusive manner in which the State of Oregon carries out all investigations of suspected child abuse and interviews of victims of suspected child abuse." *Id.* ¶ 70. The FAC alleges that "[t]he State of Oregon requires that the designated medical professional on the multidisciplinary team be trained to conduct a 'child abuse assessment' as defined by state statute." *Id.* ¶ 71. The statute defines a child abuse assessment. *Id.* ¶ 72. "CARES Northwest is the designated medical professional for the Multnomah County multidisciplinary team and Washington County multidisciplinary team" and "Randall Children's Hospital is the designated medical professional for evening and weekend investigations by the Clackamas County multidisciplinary team." *Id.* ¶¶ 74-75. Defendant CARES is a collaboration between four hospitals, including Defendant RCH. *Id.* ¶ 78.

The FAC alleges that "DHS and law enforcement personnel are stationed in the CARES Northwest office to ensure close collaboration." *Id.* ¶ 81. It alleges that "[t]he Governing Board of CARES Northwest consists of six positions, two of which are reserved for representatives of the Multnomah County District Attorney's Office and Washington County District Attorney's

Office." *Id.* ¶ 82. It alleges that two prosecutors sit on this Board, and that the Board "is responsible for all policy matters of CARES Northwest." *Id.* ¶ 83. It alleges that the State, counties, and CARES have a memorandum of understanding in which CARES provides medical assessments in pursuit of criminal prosecutions and dependency proceedings. *Id.* ¶¶ 84, 86. It alleges that CARES provides updates to law enforcement and DHS "through regular phone, email, and in-person visits, along with an annual training calendar, quarterly newsletter, and monthly training announcements." *Id.* ¶ 87. It alleges that the county multidisciplinary team, of which CARES is a member, "meets regularly, sometimes weekly or more, to determine how to proceed [o]n open cases and investigations." *Id.* ¶ 99. CARES has partnered with the Clackamas County Sheriff's Office "[s]ince at least 2013" to present an annual Child Abuse Summit. *Id.* ¶ 96.

The FAC alleges that the State pays CARES Northwest's rent for its office space and funding for office improvements and equipment. *Id.* ¶¶ 89-91. The FAC alleges that the State also pays salaries for individuals who work on the investigation of child abuse cases and administrative overhead expenses incurred by Defendant RCH to support investigations. *Id.* ¶¶ 92-93. It alleges that the State pays to train CARES Northwest personnel. *Id.* ¶¶ 94-95. It alleges that "[t]he State of Oregon requires CARES Northwest to coordinate with police, DHS, and prosecutors to provide annual reports to justify continued funding by the State and counties." *Id.* ¶ 110.

The FAC alleges that "CARES Northwest, law enforcement, and DHS share a co-written, joint protocol that governs the work of each multidisciplinary team." *Id.* ¶ 102. It alleges that this protocol "requires that CARES Northwest and/or Randall Children's Hospital take specific steps

to conduct the medical assessment required by statute." *Id.* ¶ 105. It alleges that the protocol gives CARES personnel the responsibility to conduct initial interviews. *Id.* ¶ 106.

The Court previously held that Plaintiffs failed to meet the nexus test because they did not show a sufficiently close relationship between most of the Hospital Defendants and the State or County Defendants. Op. & Ord. 39-40. The new allegations in the FAC remedy this defect. The FAC alleges that an Oregon statute mandates the creation and makeup of multidisciplinary child abuse investigation teams and sets parameters on the medical professional's actions. It alleges that two out of six positions on the governing board of Defendant CARES Northwest are held by prosecutors. It alleges that this board meets regularly to review cases. It alleges that CARES makes regular reports to law enforcement about its activities. It alleges that a memorandum of understanding and a joint protocol specify the relationship between the parties and dictate how medical professionals conduct medical examinations and assist with investigations. It alleges that the State is heavily involved in the training and funding of Defendant CARES and determines the resources available to it. The FAC plausibly alleges a pervasive entanglement between Defendants CARES and RCH and the State and County, or that government officials have provided sufficient encouragement or exercised sufficient control that the actions of Defendants CARES and RCH and their employees must be deemed those of the State. As to Defendant RCH, this is true only to the extent that Defendant RCH acts pursuant to its role with Defendant CARES. *See* FAC ¶ 78 (alleging that Defendant CARES is a collaboration of four hospitals, including Defendant RCH).

In arguing otherwise, Hospital Defendants downplay Plaintiffs' allegations, characterizing them as allegations that Defendant CARES acts pursuant to a government contract, receives public funding, and follows state-established procedures. Hospital Def. Mot.

19-21. The FAC alleges more than merely acting pursuant to a government contract. It alleges that the way the work was carried out was heavily regulated by the State, and that government officials exercise control over Defendant CARES through decisionmaking in the governing board, funding decisions, and the actual conduct of child abuse investigations. Other courts have found state action on similar facts. *See Gokor v. Schlievert*, 335 F. Supp. 3d 972, 983-84 (N.D. Ohio 2018) (collecting cases).

Hospital Defendants argue that *Gokor* does not apply because the physician in that case was performing child abuse evaluations ordered by the state, whereas here Plaintiffs allege medical procedures other than a state-mandated child abuse examination. Hospital Def. Reply 25, ECF 100. The FAC alleges that Defendant CARES is a designated regional service provider for child abuse investigations and prosecutions. FAC ¶¶ 76-77. It alleges that Defendant RCH is the designated medical professional for evening and weekend investigations. *Id.* ¶ 75. The reasonable inference to draw from the FAC is that Defendant CARES' purpose is to assist in the investigation and prosecution of child abuse, much like the physician in *Gokor*. To the extent Defendant RCH was acting as the designated medical professional, it too was similarly situated to the physician in *Gokor*.

Hospital Defendants argue that the minority presence of public officials on Defendant CARES' board of directors is insufficient to show state action. Hospital Def. Reply 15-16. They rely on several out-of-circuit cases. First is *Johnson v. Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 802 (W.D. Tenn. 2022) (quoting *Cox ex rel. Dermitt v. Liberty Healthcare Corp.*, 622 F. Supp. 2d 487, 494-95 (E.D. Ky. 2008)). *Johnson* and *Cox* provide that certain factors on their own cannot establish state action: extensive state regulation, public funding of nearly all of the private actor's activities, the minority presence of public officials on the private actor's decision-making

board, and the use of public services by private actors. *Id.* The Court agrees that any one of those factors alone is insufficient. Here, however, Plaintiffs have alleged extensive state regulation and cooperation, extensive public funding, and the minority presence of public officials on the board. The Court agrees with *Cox* that these factors should be considered in combination. 622 F. Supp. 2d at 494. And as *Cox* indicates, the evidence of nexus to the government should relate to the challenged conduct. *Id.* Plaintiffs have alleged a relationship between the government nexus and Hospital Defendants' conduct.

The other cases on which Defendants rely are *Ashby v. Econ. Opportunity Comm'n of Nassau Cnty.*, 351 F. Supp. 2d 27, 29 (E.D.N.Y. 2004) and *Archer v. Econ. Opportunity Comm'n of Nassau Cnty.*, 30 F. Supp. 2d 600, 605-06 (E.D.N.Y. 1998). In *Ashby*, the district court appeared to evaluate each category of evidence of state action under a different test. 351 F. Supp. 2d at 29. *Archer* is similar. The Court does not find that analysis convincing. All evidence should be evaluated together to determine whether there is sufficient entanglement between the government and the private entity. The minority presence of public officials on the board of Defendant CARES is relevant along with the other evidence of entanglement.

Finally, the Court notes that Hospital Defendants take issue with Plaintiffs' use of the word "delegated" in the FAC, arguing that the word is a legal conclusion not entitled to be taken as true. Hospital Def. Mot. 22. Hospital Defendants also dispute Plaintiffs' characterization of the relevant Oregon statutes, O.R.S. 418.746 and O.R.S. 418.747. *Id.* at 22-23. They point out that the district attorney in each county is responsible for developing the multidisciplinary teams. *Id.* at 23 (citing O.R.S. 418.746). And they state that funding for the teams is provided through an account separate from the state's general fund. *Id.* (citing O.R.S. 418.747). Hospital Defendants assert that the statutes "do not use the term 'delegate' or even suggest a delegation of

duty from the State of Oregon to any private actor." *Id.* The Court's summary of Plaintiffs' allegations includes only one use of "delegated," demonstrating that the allegations do not hinge on the use of this word. Hospital Defendants' focus on the word "delegate" ignores the factual allegations in the FAC, which show a significant degree of cooperation and control plausibly alleging that Defendant CARES and Defendant RCH were entangled with the State. To the extent Defendants Adewusi, Rodriguez, and Abtin acted in furtherance of the abuse investigation, they too are plausibly alleged to be state actors.[1] Plaintiffs have plausibly alleged that the Hospital Defendants were state actors. Because Plaintiffs satisfy the governmental nexus test, the Court need not address the public function or joint action tests. The Court notes, however, that Plaintiffs have also satisfied the joint action test because they have plausibly alleged a conspiracy, as discussed below.

        ii.    *Monell* Claims

The Court previously dismissed Plaintiffs' *Monell* claims because they failed to clarify which entities had which policies and because they failed to allege facts supporting the policies. Op. & Ord. 51-52. Plaintiffs once again allege theories of affirmative policies and practices, practices of omission (including failure to train), and ratification. FAC ¶¶ 282-306. Hospital Defendants argue that Plaintiffs' renewed *Monell* claims against them fail because they are unsupported by factual allegations. Hospital Def. Mot. 3-4. In the FAC, Plaintiffs specify the policies or practices applicable to Defendants CARES and RCH. FAC ¶¶ 282-290, 294-303. Plaintiffs also provide allegations supporting a finding that Defendants CARES and RCH were

---

[1] Defendant Abtin's initial examination of E.B. and diagnosis of BESS, for instance, would not be state action because the FAC alleges that he agreed to work with the multidisciplinary team after that examination, and there is no other evidence that he was a state actor when he performed that examination.

on notice, as required for policies of omission and failure to train. *Id.* ¶¶ 291, 304. The Court therefore assesses the sufficiency of these allegations.

a.    Affirmative Policy, Practice, or Custom

Plaintiffs allege that Defendant CARES had several policies or practices, including a policy or practice "of authorizing its personnel to report that an infant suffered 'shaken baby syndrome' (interchangeably referred to as 'abusive head trauma,' 'inflicted injury,' or 'non-accidental trauma') based on a subdural hemorrhage despite the absence of evidence necessary to make such a finding," and a policy or practice "of depriving infants of their rights to informed consent and to have medical decisions made by their parents." FAC ¶¶ 282, 287. Hospital Defendants argue that Plaintiffs' new allegations "simply rebrand individual events that occurred as 'policies' that exist" and provide no factual support that a policy or practice existed. Hospital Def. Mot. 4. Plaintiffs counter that while a practice or custom cannot be inferred from a single incident, a policy can. Pl. Resp. 3-4, ECF 87.

Defendants rely on *Augustus v. Cnty. of L.A.*, No. 20-11255, 2023 WL 2799117, at *5 (C.D. Cal. Mar. 24, 2023). In *Augustus*, the district court held that the plaintiffs had failed to plead that Los Angeles County had "a policy and custom to defraud the legal system as a pretext to seize children, thereby enriching themselves." *Id.* The district court noted that "[n]owhere do Plaintiffs plead the origin of the alleged policy, the exact parameters of the policy, whether or how the policy is officially sanctioned by individuals in positions of authority, whether the policy is written or unwritten, how the policy is promulgated or maintained, or other *facts* tending to show" that the policy existed. *Id.* Plaintiffs assert that they do not need "to plead the origin of the policy, the exact parameters of the policy, whether or how the policy is sanctioned, whether the policy is written or unwritten, and how the policy is promulgated or maintained[.]"

Pl. Resp. 6. Hospital Defendants agree that Plaintiffs need not plead all of these facts, but argue that Plaintiffs have pleaded no facts supporting the existence of formal policies. Hospital Def. Reply 4.

District courts have not reached consensus on the level of specificity required to plead a *Monell* claim. *Compare Augustus*, 2023 WL 2799117, at *5, *with Powell v. Hawaii*, No. CV 23-00005 JAO-RT, 2023 WL 4405638, at *7 (D. Haw. July 7, 2023) ("Plaintiff need not exhaustively detail the County's alleged policies at the pleadings, but he must plausibly illustrate that policies or customs of some sort exist.") (internal quotations omitted). Some district courts require less detailed pleadings because "discovery is often necessary to identify the precise details related to such a cause of action." *Hernandez v. San Bernardino Cnty.*, No. EDCV221101JGBSPX, 2023 WL 3432205, at *7 (C.D. Cal. Apr. 13, 2023). Even under the less detailed standard, the plaintiff must plead "(i) why [he or she] thinks a policy exists—alleging specific facts; and (ii) what [he or she] thinks the policy is. The Court will then decide whether (i) plausibly suggests (ii)." *Powell*, 2023 WL 4405638, at *7 (internal quotations omitted).

Plaintiffs argue that they allege sufficient facts supporting the existence of a policy. Pl. Resp. 4-5. They point out that the FAC alleges that Defendant RCH called the child abuse reporting hotline after E.B. was diagnosed with a benign medical condition. *Id.* at 5 (citing FAC ¶¶ 63-64). The also rely on their allegations of the close relationship between Defendants CARES and RCH and the State. *Id.* They assert that the allegations of joint protocols with law enforcement, target numbers of cases reporting abuse, and a prohibition on doctors consulting for individuals accused of abuse "tend to support the inference that CARES Northwest and Randall Children's Hospital have policies that allow its doctors to offer false evidence of abuse by shaking in criminal prosecutions and dependency proceedings, omit exculpatory evidence to the

contrary, and withhold information on potential causes that do not involve abuse." *Id.* at 5-6 (citing FAC ¶¶ 102-105, 111-115, 117).

Plaintiffs state that in the alternative, they have pleaded a practice or custom. *Id.* at 7. They point to allegations of financial incentives for personnel with Defendant CARES "to make and perpetuate diagnoses of child abuse, even in the face of medical evidence to the contrary." *Id.* (quoting FAC ¶ 116). They also note that the FAC mentions two appellate court decisions "involving CARES Northwest personnel who testified contrary to medical fact in order to support a prosecution." *Id.* (citing FAC ¶¶ 291(a) and (c)). The FAC also alleges that at least since 2013, personnel with Defendant CARES have been attending "conferences that focus exclusively on advocating for the shaken baby syndrome hypothesis and avoiding the implications of newer scientific literature, which refutes the hypothesis and confirms the increasing number of conditions that mimic shaken baby syndrome and can lead to misdiagnosis and false testimony." FAC ¶ 291(e).

The Court cannot reasonably infer the existence of a formal policy from Plaintiffs' allegations. Hospital Defendants correctly state that Plaintiffs have not made factual allegations supporting the existence of a policy. Hospital Def. Reply 3. Rather, Plaintiffs state that something occurred and label it a policy. *See id.* It is undisputed that Defendant RCH is a mandatory reporter of suspected child abuse, so calling the child abuse hotline does not tend to support the existence of any policies. And it is not plausible to infer that because Hospital Defendants collaborate with the State and various counties on prosecutions, they have formal policies promoting misconduct in the course of those investigations. The Court therefore considers whether the FAC adequately alleges a custom or practice.

The Ninth Circuit has held that a single incident generally cannot establish a custom or practice. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021). Plaintiffs cite two cases in support of their allegations. *See* FAC ¶ 291(a), (c). First is *Sistrunk v. Armenakis*, in which, according to the FAC, "a three-judge panel of the Ninth Circuit found that a CARES Northwest physician fabricated the supposedly scientific study on which she relied to support an opinion of abuse." FAC ¶ 291(a). Reviewing the case en banc, the Ninth Circuit found that the physician overstated the results of a study she relied on and made inaccurate statements in her testimony. *Id.* The study at issue addressed the reliability of testimony from children who alleged that they were victims of sexual abuse. 292 F.3d 669, 674 (9th Cir. 2002). The doctor's testimony overstated the conclusions of the study, but the Ninth Circuit held that it was not clear that the doctor lied. *Id.* at 674-75. The other case on which Plaintiffs rely is *State v. Sanchez-Alfonso*, 352 Or. 790, 293 P.3d 1011 (2012). In *Sanchez-Alfonso*, a doctor with CARES testified that the child's injuries were caused by abuse and that the defendant caused the abuse. 352 Or. at 792. The Oregon Supreme Court held that the doctor did not establish that she was qualified to opine on who caused the abuse. *Id.* at 801.

The two cases, which involve different issues, are separated by ten years, and occurred years before the conduct alleged here, are not enough to plausibly allege that Defendant CARES had the customs or practices alleged. They cannot reasonably be viewed as anything other than isolated incidents. Hospital Defendants also correctly state that Plaintiffs misrepresent their own pleadings in arguing that they have pleaded a widespread practice or custom. Hospital Def. Reply 5. Plaintiffs argue that they "allege CARES Northwest and Randall Children's Hospital, as part of the Clackamas County multidisciplinary team, offer false conclusions of abuse by shaking in cases county-wide." Pl. Resp. 7 (citing FAC ¶¶ 73-79). But as Hospital Defendants point out,

the cited paragraphs of the FAC do not allege this; they allege that Defendants CARES and RCH

form part of multidisciplinary teams to investigate child abuse. *See* Hospital Def. Reply 5.

Plaintiffs do not allege that Defendants CARES or RCH, or agents or employees of those

entities, have ever falsely concluded that a child was abused by shaking other than in this case.

The evidence of close collaboration between Defendant CARES and the State in the

investigations, and State funding of Hospital Defendants, supports a finding that Defendant

CARES is a state actor; it does not support a finding that Defendant CARES (or Defendant

RCH) has a custom or practice of misconduct in those investigations. Plaintiffs have not shown a

pattern or practice of fabrication of evidence of abuse or other misconduct. Rather, they have

alleged isolated instances of improper conduct by physicians working for Defendant CARES.

The Court dismisses Plaintiffs' *Monell* claim against Hospital Defendants to the extent it relies

on a policy, custom, or practice of action.

b.      Policy or Practice of Omission

Plaintiffs allege that Defendants CARES and RCH "failed to adopt adequate procedural

safeguards to guard against fabricated evidence and the suppression of favorable evidence" and

specify the alleged failures. FAC ¶¶ 289, 302. The FAC further alleges that Defendant CARES

> failed to train and supervise Adewusi and Rodriguez to thoroughly consider,
> identify, and test for medical causes of clinical findings that may mimic those seen
> in abuse cases, to prevent the fabrication of evidence, to prevent coercive interviews
> and interrogations, to insist on science-based medicine, and to ensure the disclosure
> of favorable evidence in compliance with *Brady* and Oregon's discovery statutes,
> including the true limits of their opinions.

FAC ¶ 290. The FAC also alleges that Defendant RCH failed in the same ways with respect to

the training of Defendants Abtin and Goodman. FAC ¶ 303.

Hospital Defendants argue that the claims (1) lack an adequate factual basis, (2) fail to

show that having the specified policies would have prevented the constitutional violations, and

(3) fail to show that Defendants CARES and RCH were on notice that the omissions would likely result in constitutional violations. Hospital Def. Mot. 6. The policies of omission are similar to the affirmative policies or practices, and the same analysis applies for Hospital Defendants' first argument. Plaintiffs have failed to plausibly allege that the policies or practices of omission exist. That alone is a basis to dismiss the claim, so the Court need not address Hospital Defendants' other arguments.

c.    Ratification

Hospital Defendants assert that Plaintiffs have failed to show that any acts committed by any Defendant were ratified by Defendant CARES or Defendant RCH. Hospital Def. Mot. 13. The FAC alleges that "[t]he violations of constitutional rights by Adewusi and Rodriguez were approved of and ratified by CARES Northwest. Adewusi is the Medical Director for CARES Northwest, a policymaker, and her actions, and those of Rodriguez, went through the process of 'peer review' within CARES Northwest." FAC ¶ 293. The FAC also alleges that "[t]he violations of constitutional rights by Abtin and Goodman were approved of and ratified by Randall Children's Hospital. Goodman is a member of Randall's Performance Improvement and Patient Safety ('PIPS') Committee, represents herself under oath as a member of Randall's 'medical staff,' and reports herself to the Oregon Medical Board as practicing at Randall's. In addition, in 2018, Randall's listed Goodman and Child Eye Care as its pediatric ophthalmology subspecialists." *Id.* ¶ 306. Hospital Defendants argue that these allegations do not show ratification. Hospital Def. Mot. 13-14.

Plaintiffs respond that the FAC alleges that Defendant Adewusi, a policymaker, agreed with Defendant Rodriguez's fabrications of evidence by joining in them during the interrogations of Nigel and Dayna Bliss. Pl. Resp. 14 (citing FAC ¶¶ 139-145, 291, 293). They state that the

FAC also alleges that Defendant Adewusi agreed with Defendant Goodman's actions by joining with fabrications of evidence during the forensic eye exam of E.B. *Id.* at 14-15 (citing FAC ¶¶ 162-170). The Court agrees with Plaintiffs that the ratification claim is sufficient as to Defendant CARES, which covers ratification of Defendant Rodriguez's conduct. The Ninth Circuit has indicated that evidence that the policymaker collaborated with the subordinate in the conduct at issue supports a finding of ratification. *Lytle v. Carl*, 382 F.3d 978, 988 (9th Cir. 2004). Plaintiffs also allege that the conduct went through peer review. Hospital Defendants argue that Defendant Adewusi was not the medical director at the relevant time, stating that she only received her license to practice medicine in March 2017. Hospital Def. Reply 12. The Court declines to resolve this factual issue on the current record.

Plaintiffs' ratification theory is insufficient as to Defendant RCH. Plaintiffs did not respond to Defendants' Motion with respect to Defendant RCH. They conclusorily pleaded that Defendant RCH ratified the actions of Defendants Abtin and Goodman. FAC ¶ 306. The allegations purportedly supporting this are insufficient, and Plaintiffs' response makes it clear that the claim hinges on Defendant Adewusi's alleged authority to ratify decisions. Defendant Adewusi is not alleged to have authority to act on behalf of Defendant RCH or ratify decisions of its employees and agents. The Court therefore allows Plaintiffs' ratification theory to proceed as to Defendant CARES only. The Court dismisses the claim as to Defendant RCH.

     iii.  Failure to Intervene Claim

Hospital Defendants argue that the FAC does not state a claim for failure to intervene against Defendant Abtin. Hospital Def. Mot. 24. The Court previously held that Plaintiffs failed to allege a failure to intervene claim against Defendant Abtin because the Complaint did not explain which constitutional violations Defendant Abtin had a duty to intervene to prevent. Op.

& Ord. 47-48. The FAC alleges that "Defendant Abtin failed to intervene to prevent Adewusi and Goodman from fabricating evidence of abuse and suppressing favorable evidence of a benign medical condition in violation of the 14th Amendment." FAC ¶ 385(a). It also alleges that Defendant Abtin initially diagnosed E.B. with BESS, a benign condition, but after speaking with Defendant Adewusi, he "agreed to conduct an evaluation for the multidisciplinary team, revise his prior opinion, and fabricate his medical records to support the false diagnosis of abusive head trauma based on shaking." FAC ¶¶ 63, 173-174.

Hospital Defendants assert that no facts allege that Defendant Abtin had a duty or opportunity to intercede. Hospital Def. Mot. 24. They state that "Plaintiffs fail to allege that he was ever even in the ***same room*** with ***either***" Defendant Goodman or Defendant Adewusi. *Id.* The FAC alleges that Defendant Abtin diagnosed E.B. with BESS, but that Defendant Adewusi spoke to him, and he agreed to falsify his medical records to support a diagnosis of abuse. If these allegations are taken as true, as they must be on a motion to dismiss, Defendant Abtin faced a request to falsify a diagnosis of abuse in support of a criminal investigation, and instead of refusing or reporting this request to an appropriate individual (such as his supervisor), he agreed to Defendant Adewusi's request. Plaintiffs point out that they allege facts supporting the inference that Defendant Abtin also had a basis to intervene with respect to other fabrications of evidence by Defendants Adewusi and Goodman because Defendant Abtin, as a neurosurgeon, would have the medical knowledge to see that the abusive head trauma diagnosis was inconsistent with the medical evidence. Pl. Resp. 25-26. Finally, the Court rejects Defendant Abtin's argument that he had no duty to intervene because he was a private individual. *See* Hospital Def. Reply 26-27. Plaintiffs have adequately pleaded that Defendant Abtin was a state

actor after he agreed to assist the multidisciplinary team. Plaintiffs have stated a failure to intervene claim against Defendant Abtin.

        iv.     Privacy Claims

Hospital Defendants argue that Plaintiffs fail to state a claim for violation of Nigel Bliss's privacy rights. Hospital Def. Mot. 25. The Court previously held that count 1 of Plaintiffs' § 1983 claim failed to clarify the basis of an alleged violation of Nigel Bliss's right to privacy. Op. & Ord. 43. The FAC alleges that Defendants violated Nigel's right to "privacy in his familial associations." FAC ¶ 334. Plaintiffs explain that the claim is based on the right to personal privacy under the Due Process Clause of the Fourteenth Amendment. Pl. Resp. 26. They state that the claim covers Defendants' interference with Nigel's right to make decisions for his children. *Id.* at 26-27.

"The Supreme Court has recognized that 'one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy."'" *Parents for Priv. v. Barr*, 949 F.3d 1210, 1222 (9th Cir. 2020) (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) (quoting *Roe v. Wade*, 410 U.S. 113, 152 (1973))). "This right includes at least two constitutionally protected privacy interests: the right to control the disclosure of sensitive information and the right to independence [in] making certain kinds of important decisions." *Id.* (internal quotations omitted). "The right to family association [protected by the Fourteenth Amendment Due Process Clause] includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018). *See also James v. Rowlands*, 606 F.3d 646, 648 (9th Cir. 2010) ("The Fourteenth Amendment protects parents' fundamental right to participate in the care,

custody, and management of their children.") (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)). In *Mann*, the Ninth Circuit held that San Diego County violated parents' Fourteenth Amendment substantive due process rights when it conducted medical examinations of their children without notice or the parents' consent. 907 F.3d at 1164.

Plaintiffs allege that Defendants subjected E.B. to forensic medical examinations without parental consent, seized E.B., obtained custody of E.B. and J.B., and restricted Nigel Bliss's right to see and live with his children and be updated on or control their medical care. FAC ¶¶ 128, 191, 195-196, 199, 203, 205, 210-213, 217, 236-237, 242-243, 247-248, 251. The FAC states a claim for violation of Nigel Bliss's Fourteenth Amendment right to the care, custody, and management of his children. Hospital Defendants argue that these alleged violations were committed by other Defendants. Hospital Def. Reply 27-28. But as explained below, Plaintiffs adequately allege a conspiracy, so they adequately allege that Hospital Defendants are liable for acts they did not commit themselves.

> B.    Conspiracy Allegations

The Court previously held that Plaintiffs failed to allege a conspiracy. Op. & Ord. 36-38. Hospital Defendants argue that the FAC still falls short. Hospital Def. Mot. 15-18. The FAC alleges the formation and objective of the conspiracy:

> While E.B. was still in surgery, Adewusi, Rodriguez, Bray, Leikem, and Fear met together to conduct a "CARES NW Inpatient Consultation," further the criminal investigation of Nigel and Dayna Bliss, and to discuss, agree upon, and begin to implement a joint strategy for taking custody of E.B. and J.B., for convincing the juvenile court to exercise its jurisdiction, and for ultimately prosecuting Nigel Bliss for the alleged abuse of E.B.

FAC ¶ 134. As evidence of a meeting of the minds, Plaintiffs allege:

> Defendants were part of a state-funded and county-operated multidisciplinary team, a team created for the sole purpose of pursuing child abuse prosecutions. As part of that team, the Defendants knew that state funding for the team is dependent upon

the number of successful prosecutions, which created an incentive to fabricate a perceived need for more services by "finding" and alleging more instances of child abuse. The Defendants also knew, and feared, that retracting a diagnosis of child abuse, or acknowledging a mistake, would undermine the multidisciplinary team's role and reputation, which created an incentive to insist that the diagnosis is correct despite medical evidence to the contrary.

*Id.* ¶ 272.

The FAC alleges that Defendants Adewusi, Rodriguez, Bray, Leikem, and Fear "set up a base of operations in a hospital conference room down the hall from where Nigel and Dayna stayed while in the hospital caring for E.B., where these Defendants met and discussed strategy, coordinated the interrogations of Nigel and Dayna, and compared notes." *Id.* ¶ 135. It alleges that a meeting between those Defendants on June 8, 2018, lasted more than six hours. *Id.* ¶ 273.

The FAC alleges that Defendants Adewusi and Rodriguez interrogated Nigel and Dayna, representing themselves as members of E.B.'s treatment team. *Id.* ¶ 139. It alleges that "Defendants Bray and Leikem debriefed with Adewusi and Rodriguez and used the information fabricated by Adewusi and Rodriguez to conduct follow-up interrogations." *Id.* ¶ 146. It alleges that Defendant Adewusi "told a nurse that she was bringing in 'my ophthalmologist,'" referring to Defendant Goodman. *Id.* ¶ 124. It alleges that "pursuant to the terms of their employment at Randall Children's Hospital, Goodman and Abtin agreed to work with the multidisciplinary team to bolster the fabricated opinion of child abuse." *Id.* ¶ 125.

Plaintiffs allege that "[p]ursuant to their agreement, Defendants Bray, Leikem, Adewusi, Rodriguez and Fear did not seek out exculpatory evidence, instead leaving assessments for medical causes to other health care providers." *Id.* ¶ 274. The FAC alleges various instances of cooperation in pursuit of the criminal and dependency investigation. It alleges that "Defendants met to discuss the type of evidence needed to support a search warrant, and Fear then fabricated notes indicating that Nigel was conducting internet research to explain away or find excuses for

E.B.'s medical condition. Bray used the notes to support his search warrant." FAC ¶ 276(a). It alleges that when Nigel refused to confess to abusing E.B., "Defendant Adewusi interrupted Nigel's interrogation to report to Bray and Leikem that Goodman would say that E.B. had been violently shaken and that the doctors could identify Nigel as the perpetrator. Bray and Leikem then used the fabricated evidence" to try to pressure Nigel to confess. *Id.* ¶ 276(b). The FAC alleges that Defendants met to discuss a way to reduce Dayna's time with E.B. and "fabricated a rule to prevent Nigel and Dayna from staying with E.B. in the hospital overnight in order to force E.B. to start bottle feeding so she could be separated from Dayna for longer periods of time." *Id.* ¶ 276(c).

The FAC alleges that after Dayna refused to implicate Nigel as an abuser, Defendant Fear "fabricated a report that J.B. had been physically abused, and Greene later recorded the same fabrication in her written reports." *Id.* ¶ 276(d). It alleges that "Defendants never examined J.B., but relied on the fabricated report to remove both children from Dayna's custody." *Id.* Defendants Fear and Greene then conditioned family reunification on an explanation from Nigel and Dayna that was consistent with the diagnoses in the record. *Id.* The FAC alleges that after Dayna was allowed to stay in the home with the Children, reports showed that Nigel and Dayna were following the safety plan ordered by Defendant DHS. *Id.* ¶ 276(e). Defendants met to prepare for a hearing on Nigel's request to remain in the home, and Defendant Greene falsely reported to the prosecutor that Nigel and Dayna had disobeyed the safety plan. *Id.* Plaintiffs allege that multiple Defendants knew that certain evidence was fabricated. FAC ¶ 278(a)-(f). It also alleges that many of the individual Defendants collaborated to fabricate particular evidence of abuse. *Id.* ¶¶ 178-188.

The FAC also alleges that E.B. had other episodes of vomiting and a second collection of fluid around her brain while she was in foster care. *Id.* ¶ 214. It alleges that E.B.'s only contact with Nigel and Dayna during that time was supervised by Defendant DHS and its designees. *Id.* ¶ 218. It alleges that despite these circumstances indicating that Nigel and Dayna could not have caused the harm, Defendants did not consider alternate diagnoses or reconsider the dependency proceedings. *Id.*

Finally, the FAC alleges that Defendants Adewusi, Rodriguez, Bray, Leikem, and Fear "recruited Goodman and Abtin to create or change their opinions in a way that would support the exclusive diagnosis of abuse." *Id.* ¶ 276(f). It alleges that Defendant Adewusi recruited Defendant Goodman "because she was a well-known proponent of the debunked 'shaken baby syndrome' or 'abusive head trauma' hypothesis." FAC ¶ 163. It alleges that Defendants Goodman and Adewusi worked together to fabricate a report of retinal hemorrhages that were "most consistent with non-accidental trauma" based on shaking. *Id.* ¶ 166. It alleges that Defendant Goodman fabricated evidence in support of Defendant Adewusi's diagnosis of abusive head trauma. *Id.* ¶¶ 168, 170. The FAC alleges that Defendant Adewusi "persuaded Abtin to change his opinion to match her own." *Id.* ¶ 173. It alleges that Defendant Abtin "agreed to conduct an evaluation for the multidisciplinary team, revise his prior opinion, and fabricate his medical records to support the false diagnosis of abusive head trauma based on shaking." *Id.* ¶ 174.

The Court found Plaintiffs' original Complaint deficient because it alleged that the various Defendants made different decisions in reliance on other Defendants' decisions. Op. & Ord. 38. It found some of Plaintiffs' allegations "conclusory and argumentative." *Id.* Hospital Defendants argue that these same problems remain. Hospital Def. Mot. 15-18. The Court

concludes that Plaintiffs have alleged a conspiracy. The FAC alleges that various Defendants collaborated to fabricate evidence of abuse: either the same evidence, or similar evidence that served a particular goal in the progress of the investigation. It also alleges that the Defendants knew there was no genuine evidence of abuse. It is unlikely that they would all independently take such action in the absence of an agreement. The FAC lays out ways in which Defendants' actions, although seeming independent, can plausibly be viewed as being taken in furtherance of the objectives alleged. The allegation of target numbers of abuse prosecutions supports an inference that Defendants were motivated to proceed with the case despite a lack of evidence. Assuming the truth of Plaintiffs' factual allegations and drawing all reasonable inferences in their favor, the Hospital Defendants were in a conspiracy with the other Defendants to further the prosecution of Nigel Bliss for child abuse and the initiation of dependency proceedings against Nigel and Dayna Bliss. Another district court found somewhat similar allegations, with a comparable level of specificity, sufficient. *See James v. Walker-Smith*, No. 4:19-CV-03485, 2020 WL 3266560, at *5 (S.D. Tex. June 17, 2020).

In arguing that Plaintiffs' allegations are insufficient, Hospital Defendants demand a level of detail that almost no plaintiff would be able to provide without discovery. For example, they demand that Plaintiffs give the exact dates of meetings and the specifics of notes that were fabricated. Hospital Def. Mot. 15. While *Iqbal* and *Twombly* imposed a heightened pleading standard, the cases cannot reasonably be interpreted to require plaintiffs to plead minute details of events from which they were excluded. And while Hospital Defendants are correct that many of Plaintiffs' allegations are similar to those they made in their original Complaint, which the Court found insufficient, Plaintiffs have made new allegations.

Finally, the Court notes that Hospital Defendants characterize the conspiracy as "a conspiracy to intentionally falsify evidence to destroy an innocent family." Hospital Def. Reply 22. The FAC alleges a less extreme conspiracy. The FAC plausibly alleges that Hospital Defendants initially investigated the potential of abuse based on a mandatory report, but when there was insufficient evidence of abuse, they and the other Defendants persisted in their investigation, fabricating evidence of abuse to bolster a finding of abuse and avoiding alternate explanations for E.B.'s injuries. The FAC does not allege that Defendants were motivated specifically by a desire to hurt Nigel and Dayna Bliss, but it does allege that they persisted in actions that—if Plaintiff's allegations are believed—they knew would necessarily result in violations of Plaintiffs' rights. The FAC adequately alleges that Defendants were in a conspiracy.

C.    Medical Malpractice Claim

Hospital Defendants argue that Plaintiffs still fail to state a claim for medical malpractice against Defendant Adewusi. Hospital Def. Mot. 26-29. "The elements of a claim for medical malpractice include: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) harm that is measurable in damages; and (4) a causal link between the breach and the harm." *Johnson v. Keiper*, 308 Or. App. 672, 678, 481 P.3d 994 (2021). The Court previously dismissed the claim against Defendant Adewusi as to E.B.'s loss of vision because the Complaint alleged that Defendant Goodman caused the loss of vision. Op. & Ord. 55. The Court also held that to the extent the claim was based on fabricated evidence of abusive head trauma, the Complaint failed to "allege facts indicating that this reporting was a but-for cause of the emotional distress and familial separation damage E.B. suffered." *Id.*

The FAC alleges that when Defendant Adewusi and Defendant Goodman fabricated a diagnosis of abusive head trauma, they

> knew or should have known that their fabricated diagnosis of shaken baby syndrome would result in an incomplete differential diagnosis that failed to consider the actual medical causes of E.B.'s clinical findings and that failing to reach a correct diagnosis would lead to further medical problems and emotional trauma caused by family separation.

FAC ¶ 426. The FAC alleges that Defendant Adewusi failed to consult appropriate specialists who would have identified the intervention needed "to prevent E.B. from suffering long-term vision complications and the psychological consequences of early separation from her parents." *Id.* ¶ 427. The FAC alleges that "[t]he misconduct of Adewusi and Goodman in fabricating an abuse diagnosis was a but-for cause of physical and emotional harm because DHS relied on the diagnosis as the sole and exclusive basis for taking custody of E.B., removing E.B. and J.B. from their parents, and initiating dependency proceedings." *Id.* ¶ 429.

Hospital Defendants argue that Plaintiffs again fail to allege facts showing that Defendant Adewusi was responsible for E.B.'s vision loss. Hospital Def. Mot. 26-27. Plaintiffs allege that after Defendant Adewusi and others fabricated evidence of abuse, "E.B.'s treatment and care changed." FAC ¶ 190. They allege that Defendant Adewusi and others "led E.B.'s treatment team to believe that her clinical findings were the result of abuse and could not be the result of a medical issue that needed further exploration and monitoring to prevent additional complications." *Id.* ¶ 194. They allege that Defendant Goodman "failed to conduct testing to determine why E.B. had retinal hemorrhages in one eye but not the other, and failed to schedule appropriate follow up care or monitor E.B.'s eye for potential vitrectomy," and that "[a] later eye examination revealed a 'residual' vitreous hemorrhage, which led to complications with E.B.'s vision because it had not been monitored or treated appropriately due to Goodman's misconduct." *Id.* ¶¶ 192-193. Plaintiffs argue that these allegations show that "the false conclusion of abuse led to a failure to consult appropriate specialists who could have identified

the medical causes for E.B.'s retinal hemorrhages and initiated appropriate medical intervention to prevent long-term vision complications." Pl. Resp. 28. They argue that both Defendant Goodman and Defendant Adewusi were causes of E.B.'s vision issues. *Id.*

Hospital Defendants argue that the FAC does not include "facts explaining ***how*** the alleged misdiagnosis caused or led to E.B.'s vision problems, or how a diagnosing E.B.'s clinical presentation as BESS would have somehow prevented the issues[.]" Hospital Def. Mot. 27. Plaintiffs respond that this level of detail is not required at the pleading stage and will be a subject of expert testimony later in the case. Pl. Resp. 28-29. The Court agrees with Plaintiffs that they need not plead that level of detail, though they will need to prove it to succeed on this claim. While the parties dispute whether expert discovery will help prove causation, *compare* Pl. Resp. 28 *with* Hospital Def. Reply 30, they do not address the role of fact discovery. Given the nature of the allegations in this case (that much of E.B.'s care involved fabricated evidence and that many acts were done without the knowledge or consent of E.B.'s parents), it is not reasonable to expect Plaintiffs to present a highly specific theory of causation at the pleading stage, before any fact discovery. The allegations of causation are sufficient to put Hospital Defendants on notice of the nature of the claim, and they contain more than a mere recitation of the elements of the cause of action.

Next, Hospital Defendants take issue with Plaintiffs' allegation that Defendant Adewusi failed to consult appropriate specialists. Hospital Def. Mot. 28 (citing FAC ¶ 427). They assert that Defendant Adewusi appropriately consulted Defendant Goodman and Defendant Abtin. *Id.* They also argue that Plaintiffs fail to specify what type of medical intervention could have prevented E.B. from suffering long-term vision complications or how a diagnosis of a benign cause for E.B.'s condition would have led to appropriate care. *Id.* Plaintiffs respond that the

Court cannot determine on a motion to dismiss whether Defendants Goodman and Abtin were appropriate specialists to consult. Pl. Resp. 29-30. The Court concludes that Defendants' arguments lack merit. Plaintiffs have given adequate notice of the basis of their claim. They need not specify the precise type of medical intervention needed. And it is not appropriate for the Court to conclude at this stage of the case that Defendant Adewusi's consultation with co-defendants was sufficient.

Finally, the Court notes that Hospital Defendants challenge Plaintiffs' use of "abusive head trauma" and "shaken baby syndrome" as synonymous terms. Hospital Def. Mot. 27 n.10. The Court declines to opine on this issue on a motion to dismiss. Plaintiffs have adequately alleged that Defendant Adewusi was a cause of E.B.'s vision issues, along with Defendant Goodman.

Hospital Defendants also argue that Plaintiffs fail to allege that Defendant Adewusi caused the psychological and emotional harm suffered by E.B. based on her removal from her parents' custody. Hospital Def. Mot. 28. They assert that under Plaintiffs' own theory of the case, Defendant DHS fabricated evidence against Nigel Bliss before knowing more than the report of potential abuse, so DHS did not rely on Defendant Adewusi. *Id.* at 29. The FAC alleges that Defendant Adewusi fabricated evidence of abuse and that DHS relied on the false evidence to remove E.B. and J.B. from their parents' custody. FAC ¶¶ 154-155, 158, 160-161, 172, 178-181, 184, 189, 195. In particular, the FAC alleges that Defendant Adewusi fabricated much of the medical evidence of abuse. Hospital Defendants argue that because other Defendants are alleged to have fabricated evidence, Plaintiffs cannot show that Defendant Adewusi's actions were a but-for cause of the dependency proceedings. Hospital Def. Reply 31. Under Hospital Defendants' logic, no Defendant could be liable because all of them fabricated evidence. The

Court rejects this argument, particularly as to Defendant Adewusi, who is alleged to be the primary moving force behind the fabrication of medical evidence. Hospital Defendants argue that "if one accepts Plaintiffs' allegations as true, it is clear that this conspiracy would have occurred with or without the diagnosis from Dr. Adewusi." *Id.* The Court disagrees. The FAC adequately alleges causation. In sum, E.B. has adequately alleged a medical malpractice claim against Hospital Defendants.

       D.     Negligent Training and Supervision Claim

Plaintiffs allege that Hospital Defendants' training and supervision was negligent based on the same policies, practices, and customs alleged for their *Monell* claims. FAC ¶ 438. The Court previously dismissed the claim because it did not adequately distinguish the Entity Defendants' deficient policies and practices or clarify what training and supervision should have been given to the individual Defendants. Op. & Ord. 59. Plaintiffs have since clarified those issues, as addressed above in discussing their *Monell* claims. Hospital Defendants argue that the claim still fails because it does not plead foreseeability or causation. Hospital Def. Mot. 30.

Plaintiffs assert that there is a special relationship between government officers and citizens. Pl. Resp. 31 (citing *House v. Hicks*, 218 Or. App. 348, 360, 179 P.3d 730 (2008)). In *House*, the Oregon Court of Appeals noted a prior decision finding a special relationship between a government employee and a disabled citizen. 218 Or. App. at 360 (citing *Williams v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 153 Or. App. 686, 958 P.2d 202 (1998)). *Williams* found a special relationship between a driver of public transit and a disabled individual, stating, "As a provider of public transportation, the relationship is a special one within our society, as evidenced by the extensive fabric of laws that seek to secure full and effective access to publicly available goods and services for disabled persons." 153 Or. App. at 693. The case does not hold

that there is a special relationship between government officials and citizens as a general matter. Plaintiffs have not adequately pleaded the existence of a special relationship. The Court therefore considers the claim under standard Oregon negligence principles.

As to foreseeability, both parties rely on the same arguments they did for Plaintiffs' *Monell* claims on a theory of omission. Hospital Def. Mot. 31-32; Pl. Resp. 32. The Court concludes that the standard for foreseeability in a negligence claim under Oregon law is less stringent than the standard for notice in a *Monell* claim. Another court in this district recently addressed the foreseeability standard in depth. *See Broadous v. Morales*, No. 3:21-CV-00771-AN, 2023 WL 6976516, at *8-*9 (D. Or. Oct. 20, 2023). In *Broadous*, the district court found that the plaintiff had adequately alleged the foreseeability element of his negligence claim despite failing to allege that the defendant was on notice of the constitutional violations for the *Monell* claim. *Id.* at *6, *8-*9. Plaintiffs need not establish a pattern of constitutional violations to show foreseeability; rather, they must show a reasonably foreseeable risk of harm. *Id.* at *7-*8. Foreseeability is usually a fact question for the jury. *Id.* at *8.

Under these standards, the Court concludes that it was reasonably foreseeable that some of the failures of training Plaintiffs allege, *see* FAC ¶¶ 289, 302, would cause the harms alleged. Plaintiffs allege that while the American Academy of Pediatrics ("AAP") increasingly warned about the risk of over-diagnosing abuse, Defendant CARES continued to send pediatricians to annual conferences promoting the shaken baby hypothesis. FAC ¶ 291. They also allege that Defendant Adewusi co-wrote a publication advocating for many of the policies Plaintiffs allege Defendant CARES failed to implement. *Id.* That establishes foreseeability for policies requiring doctors to consider "mimics" of shaken baby syndrome, preventing them from overstating the significance of their findings or reporting conclusions beyond the scope of their expertise, and

requiring them to remain aware of current medical research about the validity of the shaken baby hypothesis. *See* FAC ¶¶ 289(a), (c), (d), (e); 302(a), (c), (d), (e). Plaintiffs have also met the standard for policies addressing the need to disclose the true limit of medical opinions, avoid fabricating evidence, and disclose favorable evidence. *See* FAC ¶¶ 289(f), (g), (h); 302(f), (g), (h). But they have not adequately alleged foreseeability for policies requiring documentation in writing. *See* FAC ¶¶ 289(b), 302(b). To the extent Defendant RCH was acting in the same capacity as a collaborator with Defendant CARES, the analysis is the same.

As to causation, Hospital Defendants reiterate their argument that the training Plaintiffs advocate would only prevent negligence, not intentional acts. Hospital Def. Mot. 31. Plaintiffs counter that "employers routinely respond to employee misconduct—including conduct that can be characterized as intentional—by implementing better training and supervision." Pl. Resp. 32. The Court concludes that Plaintiffs have met the causation standard for the policies requiring doctors to consider "mimics" of shaken baby syndrome, preventing them from overstating the significance of their findings, and requiring them to remain aware of current medical research about the validity of the shaken baby hypothesis. *See* FAC ¶¶ 289(a), (c), (e); 302(a), (c), (e). Plaintiffs have also met the standard for policies addressing the need to disclose the true limit of medical opinions, avoid fabricating evidence, and disclose favorable evidence. *See* FAC ¶¶ 289(f), (g), (h); 302(f), (g), (h). Plaintiffs have not alleged causation for policies requiring physicians to document consultations in writing or preventing physicians from reporting conclusions beyond the scope of their expertise. *See* FAC ¶¶ 289(b), (d); 302(b), (d). The FAC does not allege that a failure to document consultations in writing or a doctor exceeding the scope of their expertise caused Plaintiffs' harm.

Hospital Defendants also argue that Plaintiffs' negligent training and supervision claim is time-barred to the extent it alleges negligence in the medical treatment of E.B. Hospital Def. Mot. 32 (citing Op. & Ord. 20, 23). The Court previously held that the claim was time-barred as to Nigel and Dayna for the medical treatment of E.B., but not for handling of evidence in an investigation. Op. & Ord. 20, 23. Plaintiffs confirm their understanding of the Court's ruling and note that E.B. can still bring a claim as to medical treatment. Pl. Resp. 32 (citing Op. & Ord. 25). The claim is timely to the extent the Court specified in its previous Opinion and Order. Finally, the Eye Care Defendants raise other challenges to this claim as asserted against them. The Court will not decide at this time whether those arguments apply equally to Hospital Defendants.

E.    Tortious Interference Claim

The Court previously held that Plaintiffs' claim for tortious interference with familial relations was cognizable only to the extent that it alleged harm to Nigel and Dayna based on interference with their right to the custody of their children. Op. & Ord. 30-31. Hospital Defendants assert that Plaintiffs' claim fails to the extent it is inconsistent with this ruling. Hospital Def. Mot. 32-33. They note that the claim is still titled "tortious interference with familial relationships" rather than "tortious interference with custodial relationships," and point to a reference to "Plaintiffs' custodial relationships." *Id.* (citing FAC ¶¶ 453-458). Plaintiffs respond that their claim is consistent with the Court's order because the claim is based on the parental custodial relationship. Pl. Resp. 33. The substance of the claim conforms to the Court's Opinion and Order, and Plaintiffs have expressed understanding of that Opinion and Order. The title of the claim is not a basis to dismiss or require amendment of the pleadings. The Court expects that the parties will refer to the claim as tortious interference with the right to custody of

a child or custodial interference going forward, and that Plaintiffs will conform their arguments to the scope delineated by the Court. Within those parameters, the claim may proceed.

F.    Claims against Defendant Abtin

The Court previously dismissed count 2 of Claim 1 (Plaintiffs' malicious prosecution claim under § 1983) as to Defendant Abtin because the Complaint failed to allege that charges were instituted by or at the insistence of Defendant Abtin. Op. & Ord. 44-46. The Court also dismissed Claim 2 (the state-law malicious prosecution claim) and Claim 3 (wrongful initiation of judicial proceedings) against Defendant Abtin for the same reason. *Id.* at 53-54. Hospital Defendants renew their motion to dismiss these claims against Defendant Abtin. Hospital Def. Mot. 33-34. They argue that Plaintiffs' new allegations that Defendant Abtin fabricated and suppressed evidence are insufficient, and suggest that they are implausible because Plaintiffs did not make them in the original Complaint. *Id.* (citing *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075-76 (E.D. Cal. 2011)).

The FAC alleges that Defendant Abtin initially diagnosed E.B. with BESS, a benign condition, but later "agreed to conduct an evaluation for the multidisciplinary team, revise his prior opinion, and fabricate his medical records to support the false diagnosis of abusive head trauma based on shaking." FAC ¶¶ 63, 174. It also alleges that when E.B. had a second round of health issues, "Abtin again diagnosed E.B. with BESS complicated by repeat bleeds, but, at the same time, left in place his prior false reports of findings caused by child abuse." *Id.* ¶ 215. It alleges that at the same time, Defendant Abtin continued to tell Nigel and Dayna that E.B.'s head issues were caused by BESS. *Id.* ¶ 278(b). The FAC adequately alleges that the criminal and dependency proceedings were instituted at the insistence of Defendant Abtin, consistent with the Court's holding as to the other Hospital Defendants. *See* Op. & Ord. 44. The Court rejects

Hospital Defendants' suggestion that it should find the allegations implausible because they were not in the original Complaint. The Court granted leave to amend for Plaintiffs to plead more facts, and Plaintiffs did so. The Court does not know what additional investigation Plaintiffs may have done before filing the FAC and declines to infer that the amendments were in bad faith. The just approach is to allow the claims to proceed. Rule 11 serves as a check on pleadings that are knowingly signed without an adequate factual foundation.

## III.    Eye Care Defendants' Motion to Dismiss

The Eye Care Defendants—Defendants Goodman and Child Eye Care Associates—challenge the adequacy of all of the claims as to Defendant Child Eye Care Associates and some of the claims as to Defendant Goodman. Eye Care Def. Mot., ECF 80.

### A.    Section 1983 Claim

#### i.    State Action

Eye Care Defendants argue that Plaintiffs fail to adequately allege that they were state actors. Eye Care Def. Mot. 7-11. The Court previously held that the Eye Care Defendants were not state actors because the Complaint alleged an agency relationship with the Hospital Defendants, who likewise were not plausibly alleged to be state actors. Op. & Ord. 41. The Court concludes that the FAC remedies the defects of the original Complaint as to Defendant Goodman, but not as to Defendant Child Eye Care Associates.

As discussed above, the FAC plausibly alleges that the Hospital Defendants were state actors under the governmental nexus test. The FAC alleges that Defendant Goodman was listed on the medical staff of Defendant RCH and that she agreed to assist the multidisciplinary team pursuant to that relationship. FAC ¶¶ 123, 125, 162, 306. It alleges that "in 2018, [Defendant RCH] listed Defendant Goodman and Defendant Child Eye Care as its pediatric ophthalmology

subspecialists." *Id.* ¶ 306. It alleges that Defendant Goodman "represents herself under oath as a member of Randall's 'medical staff,' and reports herself to the Oregon Medical Board as practicing at Randall's." *Id.* It alleges that Defendant Adewusi referred to Defendant Goodman as "my ophthalmologist" for work on the county multidisciplinary team. *Id.* ¶ 124. It alleges that Defendant Goodman works on child abuse investigations two to four times per year. *Id.* ¶ 164. In effect, Plaintiffs allege that Defendant Goodman was part of the Hospital Defendants for the conduct at issue.[2] The FAC adequately alleges that Defendant Goodman was a state actor based on either the governmental nexus test or conspiracy, as discussed in addressing Hospital Defendants' Motion.

However, the FAC does not adequately allege that Defendant Child Eye Care Associates was a state actor. It alleges that Defendant Goodman agreed to work with the multidisciplinary team pursuant to the terms of her employment with Defendant RCH. FAC ¶ 125. Plaintiffs also allege that Defendant Goodman uses her affiliation to RCH interchangeably with her affiliation to Child Eye Care. *Id.* ¶ 314(d). They allege that Defendant Goodman signs reports as an ophthalmologist for Child Eye Care but testifies in court that she is on the medical staff at RCH. *Id.* But no factual allegations in the FAC support a reasonable inference that Defendant Child Eye Care Associates was conspiring with the other Defendants, or that Defendant Goodman was acting on behalf of Defendant Child Eye Care Associates in working for the multidisciplinary

---

[2] Hospital Defendants assert that Defendant Goodman is not an employee or agent of Defendant RCH. Hospital Def. Mot. 12 n.4; Hospital Def. Reply 25-26. They state that they have conferred with Plaintiffs and that Plaintiffs are alleging that Defendant Goodman, although not formally employed by Defendant RCH, can be considered an employee by operation of law. Hospital Def. Mot. 12 n.4. They argue that this legal conclusion is not entitled to be taken as true. *Id.* The Court concludes that Plaintiffs have plausibly alleged that Defendant Goodman was an employee or agent of Defendant RCH based on the evidence discussed above. It is also plausible that Defendant Goodman was merely given staff privileges and was not an employee. *See* Hospital Def. Reply 25-26. This issue will be resolved at a later stage of the case.

team. Plaintiffs allege the opposite. The FAC does not even allege that Defendant Child Eye Care Associates was involved in the investigation. It is not enough to plead that Defendant Goodman is an agent or employee of Defendant Child Eye Care Associates, or even that she is the sole owner and exercises complete control over the entity. *See* FAC ¶ 316. Plaintiffs' response to Eye Care Defendants' Motion to Dismiss focuses almost entirely on Defendant Goodman. *See* Pl. Resp. 3-7, ECF 88. Because the FAC does not allege that Defendant Child Eye Care Associates was involved in the challenged conduct or that it had any agreements with the multidisciplinary team, Plaintiffs have not adequately alleged that it was a state actor. The Court therefore dismisses Plaintiffs' § 1983 claim as to Defendant Child Eye Care Associates and proceeds to evaluate it as to Defendant Goodman.

ii.    Count 1

Eye Care Defendants challenge the sufficiency of count 1, which alleges deprivation of Nigel Bliss's First and Fourteenth Amendment rights to familial association, privacy in his familial associations, and due process. Eye Care Def. Mot. 11 (citing FAC ¶ 334). The Court previously held that Plaintiffs stated a claim for fabrication of evidence and withholding of evidence and for violation of the First Amendment right to familial association. Op. & Ord. 42-43. The Court directed Plaintiffs to clarify the basis of their privacy claim. *Id.* at 43. As discussed above in addressing Hospital Defendants' Motion, Plaintiffs have clarified the basis of their privacy claim. Plaintiffs have stated a privacy claim against Defendant Goodman on count 1. To the extent count 1 addresses withholding of exculpatory evidence, it must be dismissed as to all Defendants for the reasons stated below in addressing count 3, Plaintiffs' *Brady* claim.

//

//

      iii.     Count 2

Count 2 alleges that all defendants other than DHS maliciously prosecuted Nigel Bliss.

FAC ¶¶ 344-349. The Court previously held that Plaintiffs had stated a claim as to the Eye Care

Defendants. Op. & Ord. 44-46. The Court adheres to its prior ruling as to Defendant Goodman.

      iv.     Count 3

Count 3 alleges failure to disclose exculpatory information in favor of Nigel Bliss. FAC

¶¶ 350-356. Eye Care Defendants argue that Plaintiffs fail to allege that any nondisclosure

prejudiced Nigel because he was not convicted. Eye Care Def. Mot. 13. Plaintiffs counter that

the Ninth Circuit has recently concluded that a plaintiff can state a cognizable *Brady* claim if it

affects the outcome of a judicial proceeding other than the final trial on the merits. Pl. Resp. 11

(citing *Parker v. Cnty. of Riverside*, 78 F.4th 1109 (9th Cir. 2023)). Plaintiffs misconstrue

*Parker*, which held that the plaintiff could not show prejudice because the charges against him

were dismissed before trial, and he was never convicted. 78 F.4th at 1114. That is exactly what

Plaintiffs allege happened to Nigel Bliss. FAC ¶¶ 244, 254-256. Plaintiffs argue that the

suppression of evidence affected the outcome of the following:

> [G]rand jury proceedings, the indictment of Nigel Bliss, the issuance of a warrant
> for the arrest of Nigel Bliss, the arraignment of Nigel Bliss, and subsequent bail
> and pre-trial release hearings, discovery hearings, status hearings, and hearings on
> requested continuances and the forced waiver of Nigel Bliss's right to speedy trial[]
> in the criminal prosecution, as well as judicial proceedings in the dependency case.

Pl. Resp. 11. But as the Ninth Circuit explained in *Parker*, a *Brady* claim "remedies the injustice

that results when a state has contrived a conviction through the pretense of a trial." 78 F.4th at

1114 (internal quotations omitted). Nigel Bliss was not convicted. *Parker* noted exceptions to the

requirement of a conviction: entry of a guilty plea and a hearing on a motion to suppress. *Id.* at

1113 (citing *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *United States v.*

*Gamez-Orduño*, 235 F.3d 453, 461 (9th Cir. 2000)). Plaintiffs do not allege that Nigel Bliss entered a guilty plea or lost a motion to suppress.

Further, the FAC alleges that the charges were dismissed before trial because Defendant Abtin admitted that E.B.'s clinical findings could be explained by the non-abusive condition of BESS. FAC ¶¶ 254-256. Even if *Brady* did apply, belated disclosure of the exculpatory evidence mitigated the violation. *See Gamez-Orduño*, 235 F.3d at 461 (citing *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992) (holding that failure to produce exculpatory evidence until after government witness had been cross-examined was mitigated because the district court gave the defendant a chance to recall the witness after receiving the evidence)). Nigel cannot state a *Brady* claim. Because the *Brady* claim is insufficient as a matter of law, the Court dismisses it with prejudice as to all Defendants.

> v.     Count 4

Count 4 alleges suppression and destruction of exculpatory evidence. FAC ¶¶ 357-361. The Court noted in its previous Opinion and Order that the Moving Defendants did not address this claim in detail and therefore declined to do so either. Op. & Ord. 47. Eye Care Defendants now address this claim substantively. They argue that the claim fails for the same reasons as count 3 to the extent it alleges suppression of exculpatory evidence. Eye Care Def. Mot. 14. They are correct. Eye Care Defendants argue that Plaintiffs have failed to state a claim for destruction of exculpatory evidence because it is implausible to allege "that the Eye Care Defendants destroyed all published medical literature debunking shaken baby syndrome." *Id.* The Court agrees that failure to disclose generally available information about the validity of a particular medical theory does not state a claim for suppression or destruction of evidence.

Next, Eye Care Defendants argue that Defendant Goodman's alleged failure to photograph E.B.'s retinal hemorrhages is not destruction of evidence. *Id.* Plaintiffs respond that failure to preserve evidence violates due process rights. Pl. Resp. 12 (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)). In *Trombetta*, the State of California failed to retain breath samples of individuals suspected of drunk driving. 467 U.S. at 489. Plaintiffs do not allege that Defendant Goodman took photographs of E.B.'s eyes and then deleted them or threw them away, which would be analogous to *Trombetta*. Rather, they allege that Defendant Goodman did not take any photographs. FAC ¶ 167. They allege a failure to document injury, not a failure to preserve evidence. As Eye Care Defendants point out, the Supreme Court has ruled that there is no constitutional duty to use a particular investigatory tool during a criminal investigation. *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988) (holding that police were not required to use a particular test to examine semen samples). The Court dismisses count 4 to the extent it relies on a failure to document evidence rather than failure to preserve evidence.

Finally, Eye Care Defendants challenge the claim to the extent it is based on destruction of evidence undermining the credibility of the investigation. Eye Care Def. Mot. 14. This basis for the claim is sufficient because the FAC adequately describes how the investigation was not credible. Plaintiffs have not specified the nature of the destroyed evidence, but they have alleged enough facts to put Defendants on notice of the claim. The Court therefore dismisses count 4 as to all Defendants to the extent it alleges the suppression of evidence, and as to the Eye Care Defendants to the extent the claim relies on the failure to photograph E.B.'s eyes or the failure to disclose publicly available medical research questioning the validity of the shaken baby syndrome hypothesis. The claim may otherwise proceed.

vi.    Count 5

Count 5 alleges violations of Dayna Bliss's Fourteenth Amendment due process rights, in particular, fabrication of evidence and withholding of exculpatory evidence. FAC ¶¶ 362-371. Eye Care Defendants challenge the sufficiency of count 5 for the same reasons they challenge count 1. Eye Care Def. Mot. 15. The Court has already held that Plaintiffs have stated a viable fabrication claim against the County Defendants, and that Plaintiffs have plausibly alleged liability based on conspiracy. In addition, the FAC adequately alleges that Defendant Goodman fabricated evidence of abuse and that this evidence caused the State to institute dependency proceedings against Dayna. Thus, Dayna has stated a claim against Defendant Goodman for fabrication of evidence.

As for withholding of exculpatory evidence, district courts have recognized that it is an "open question" whether *Brady*-like obligations apply in the civil context. *Patterson v. Miller,* 451 F. Supp. 3d 1125, 1152 (D. Ariz. 2020), *aff'd*, No. 20-15860, 2021 WL 3743863 (9th Cir. Aug. 24, 2021) (quoting *Kashem v. Barr,* 941 F.3d 358, 386 (9th Cir. 2019)). *Patterson*—a case that also involved dependency proceedings—concluded that it was unnecessary to decide the issue because the plaintiff's claim for deliberate fabrication of evidence encompassed the alleged conduct. 451 F. Supp. 3d at 1152-53. Assuming *Brady*-like obligations did apply, it is unclear whether Dayna can show the civil analogue of a conviction, as her parental rights were not terminated. Because the parties have not briefed these issues, the Court declines to dismiss Dayna's claims for withholding of evidence at this time.

vii.    Count 6

Count 6 alleges violations of E.B. and J.B.'s First, Fourth, and Fourteenth Amendment rights. FAC ¶¶ 372-383. The Court previously held that count 6 stated a claim for relief and

noted a lack of specific arguments to the contrary. Op. & Ord. 47. Eye Care Defendants now argue that the FAC fails to allege that they—rather than the State—seized E.B. and J.B. or were even aware of the seizure, or that Defendant Goodman examined E.B. without her parents' consent. Eye Care Def. Mot. 15. Nothing in the FAC indicates that Nigel and Dayna agreed to Defendant Goodman's examination, or indeed that they were aware that Defendant Goodman would be examining E.B. The reasonable inference is that Nigel and Dayna were not aware and thus did not consent. Further, because Plaintiffs plausibly allege a conspiracy, they plausibly allege that Defendant Goodman is liable for the acts of the State.

       viii.    Count 7

Count 7 alleges that certain Defendants failed to intervene to prevent the constitutional violations. FAC ¶¶ 384-391. The Court previously dismissed the claim because Plaintiffs failed to explain which violations each Defendant had a duty to intervene to prevent. Op. & Ord. 48. The FAC alleges that "Defendant Goodman failed to intervene to prevent Adewusi from fabricating evidence of abuse and suppressing favorable evidence of a benign medical condition in violation of the 14th Amendment[.]" FAC ¶ 385(b). It also alleges that Defendant Adewusi recruited Defendant Goodman to examine E.B., that Defendants Adewusi and Goodman worked together to fabricate evidence of abuse, and that Defendant Goodman fabricated evidence to support Defendant Adewusi's diagnosis of abuse. *Id.* ¶¶ 162, 166, 168, 170. The FAC adequately alleges which constitutional violations Defendant Goodman had a duty to prevent and that she had an opportunity to intervene to prevent them. In arguing otherwise, Eye Care Defendants first rely on the argument that neither they nor Defendant Adewusi were state actors. Eye Care Def. Mot. 16. The Court has already rejected this argument as to Defendants Goodman and Adewusi. Eye Care Defendants also argue that the FAC fails to allege that they had an opportunity to

intervene, pointing to the conclusory allegations in the FAC. *Id.* (citing FAC ¶ 386). Because the

FAC alleges that Defendants Adewusi and Goodman collaborated to fabricate evidence of abuse,

implying that they were in communication and that Defendant Goodman was aware of what

Defendant Adewusi was doing, it adequately alleges an opportunity to intervene.

    ix.  Count 8

  Count 8 alleges that Defendant Child Eye Care Associates is liable under *Monell*. FAC ¶¶

392-402. The Court previously dismissed Plaintiffs' *Monell* claim against the Eye Care

Defendants because it failed to plead state action and because it failed to allege which entities

had which policies or provide an adequate factual basis for those policies. Op. & Ord. 48-53. As

stated above, the FAC does not adequately allege that Defendant Child Eye Care Associates was

a state actor. For that reason alone, the *Monell* claim must be dismissed.

  B.  Medical Malpractice Claim

  Eye Care Defendants challenge Plaintiffs' medical malpractice claim to the extent it

alleges that Defendant Goodman's conduct caused E.B. to be "taken from her parents, subjected

to unnecessary medical interventions, and denied proper treatment and care, including treatment

for retinal hemorrhages that worsened into a vitreous hemorrhage leading to long-term

complications for E.B.'s vision." Eye Care Def. Mot. 22 (citing FAC ¶ 428). The Court

previously held that Plaintiffs failed to plausibly allege that Defendant Goodman's conduct

caused harm other than complications to E.B.'s vision. Op. & Ord. 56.

  Plaintiffs point to new allegations in the FAC. Pl. Resp. 19. The FAC alleges:

> Adewusi and Goodman knew or should have known that their fabricated diagnosis
> of shaken baby syndrome would result in an incomplete differential diagnosis that
> failed to consider the actual medical causes of E.B.'s clinical findings and that
> failing to reach a correct diagnosis would lead to further medical problems and
> emotional trauma caused by family separation.

FAC ¶ 426. It also alleges:

> Adewusi and Goodman specifically failed to consult appropriate specialists, including a neuroradiologist, to properly workup a differential diagnosis that included medical causes of the subdural hemorrhage and retinal hemorrhages, and would have alerted Adewusi and Goodman to the need for medical intervention to prevent E.B. from suffering long-term vision complications and the psychological consequences of early separation from her parents.

*Id.* ¶ 427. The FAC also alleges that "[t]he misconduct of Adewusi and Goodman in fabricating an abuse diagnosis was a but-for cause of physical and emotional harm because DHS relied on the diagnosis as the sole and exclusive basis for taking custody of E.B., removing E.B. and J.B. from their parents, and initiating dependency proceedings." *Id.* ¶ 429.

In short, the FAC alleges that Defendant Goodman was so fixated on diagnosing E.B. with abusive head trauma that she neglected other aspects of E.B.'s care, leading to worse outcomes, and that Defendant Goodman's fabricated diagnosis of abuse was used to initiate dependency proceedings against Nigel and Dayna and remove E.B. from the home. Plaintiffs have plausibly alleged that Defendant Goodman's conduct caused these injuries. But because the FAC alleges that Defendant Goodman was acting as an employee of Defendant RCH, not Defendant Child Eye Care Associates, the claim fails as to Defendant Child Eye Care Associates.

C.    Negligent Training and Supervision Claim

Eye Care Defendants argue that Plaintiffs' claim for negligent training and supervision fails for several reasons. Eye Care Def. Mot. 23-26. First, they argue that Defendant Child Eye Care Associates did not have a special relationship with Plaintiffs based on a relationship between government officers and citizens. *Id.* at 23-24. The Court has already held that the case Plaintiffs rely on for the proposition that Oregon law recognizes a special relationship between government officials and citizens does not stand for such a broad proposition. Further, the FAC does not adequately allege that Defendant Child Eye Care Associates was a government actor.

Eye Care Defendants correctly point out that to the extent Plaintiffs allege failures of training or supervision based on constitutional obligations imposed on government actors, such training is inapplicable to Defendant Child Eye Care Associates as a private actor. Eye Care Def. Mot. 24. And as discussed above, the FAC does not allege that Defendant Goodman was acting on behalf of Defendant Child Eye Care Associates when she examined E.B. As Eye Care Defendants state, it alleges that Defendant Goodman was acting based on her employment with Defendant RCH. Eye Care Def. Reply 17. The FAC adequately alleges a special relationship of doctor and patient between E.B. and Defendant Goodman, but it does not allege that Defendant Child Eye Care Associates was the entity supervising and training Defendant Goodman for the conduct at issue. On that basis, Plaintiffs' claim for negligent training and supervision against Defendant Child Eye Care Associates must be dismissed.

Eye Care Defendants argue that the claim also fails because Plaintiffs fail to allege that the negligent training and supervision caused physical injury to any of them. *Id.* at 24-26. The Court rejects this argument as to E.B., as the FAC alleges that Defendant Goodman's negligence caused injury to E.B.'s eyes. Nigel, Dayna, and J.B. argue that they can recover for emotional distress even if they did not suffer a physical injury. Pl. Resp. 21-22.

The Court previously recognized that a plaintiff who does not suffer a physical injury can still recover for emotional distress if the defendant's negligence "'causes foreseeable, serious emotional distress and also infringes some other legally protected interest.'" Op. & Ord. 58 (quoting *Philibert v. Kluser*, 360 Or. 698, 702, 385 P.3d 1038 (2016)). The Court also recognized that "under some circumstances, parents may have a claim against their child's physician even if they allege only emotional and economic harms." *Id.* (citing *Tomlinson v. Metro. Pediatrics, LLC*, 362 Or. 431, 443-47, 412 P.3d 133 (2018)).

In *Tomlinson*, the plaintiffs were parents and their younger son who sued a doctor for failing to timely diagnose the parents' older son's genetic disorder and inform the parents of that disorder. 362 Or. at 434. The parents alleged only economic and emotional injuries. *Id.* at 442. The Oregon Supreme Court held that the parents had adequately pleaded the existence of a limited duty to protect their interests by diagnosing the disorder and communicating the diagnosis to the parents. *Id.* at 447. The duty arose from the parents' status as "biological parents and primary caregivers." *Id.* The Oregon Supreme Court noted that "under the facts alleged in the parents' claim, there was no possibility that defendants would be required to divide their loyalties between [the older son] and the parents." *Id.* at 448. The parents were permitted to seek emotional distress damages. *Id.* at 454.

*Tomlinson* applies in that Nigel and Dayna were E.B.'s biological parents and primary caregivers, and thus they would ordinarily be entitled to information about E.B.'s medical diagnoses. However, this case is different from *Tomlinson* because here there was a chance that Defendant Goodman might have been required to divide her loyalties between E.B. and her parents, as, respectively, a possible victim of abuse and possible abusers or enablers of abuse. That circumstance counsels against finding that Nigel and Dayna can recover. Recognizing a claim for negligent infliction of emotional distress in cases of potential child abuse where the parents are suspected would, as Eye Care Defendants argue, "put physicians in an untenable position: either protect the child's interest and risk potential liability or protect themselves from liability at the expense of their patient." Eye Care Def. Reply 18, ECF 99. The Court does not believe that the Oregon Supreme Court would recognize a claim for negligent infliction of emotional abuse under the circumstances presented here and therefore declines to do so.

As for J.B., *Tomlinson* does not provide a basis to infer a special relationship. Plaintiffs provide no argument or authority in favor of a special relationship between Defendant Goodman and J.B. or a legally protected interest for J.B. relevant to this claim. Their response focuses on the claim as to Nigel, Dayna, and E.B. *See* Pl. Resp. 21-23. In sum, the claim must be dismissed as to all Plaintiffs because Plaintiffs have alleged that Defendant RCH, not Defendant Child Eye Care Associates, was responsible for Defendant Goodman. The dismissal must be with prejudice as to claims by Nigel, Dayna, and J.B. because there is no legal basis for them to recover.

       D.      Remaining Claims against Defendant Child Eye Care Associates

Eye Care Defendants argue that all of Plaintiffs' remaining claims against Defendant Child Eye Care Associates (the state-law claims for malicious prosecution, wrongful initiation of judicial proceedings, medical malpractice, intentional infliction of emotional distress, and tortious interference with familial relationships) should be dismissed. Eye Care Def. Mot. 26-28. They assert that the claims are based on a theory of *respondeat superior*, and the FAC fails to allege that Defendant Goodman was acting within the scope of her employment. *Id.* at 27.

"Under the doctrine of *respondeat superior,* an employer is liable for an employee's torts, including intentional torts, if the employee was acting within the scope of employment." *Fearing v. Bucher*, 328 Or. 367, 372, 977 P.2d 1163 (1999). To establish that conduct was within the scope of employment, the plaintiff must show: (1) that it "occurred substantially within the time and space limits authorized by the employment"; (2) that the employee was "motivated, at least partially, by a purpose to serve the employer"; and (3) that the act was "of a kind that the employee was hired to perform." *Id.* at 373. Eye Care Defendants challenge the second and third elements. Eye Care Def. Mot. 27.

As to the second element, Eye Care Defendants argue that the FAC does not allege that Defendant Goodman was motivated to serve Child Eye Care Associates; it alleges that she acted pursuant to her employment with Defendant RCH to assist Defendant Adewusi and the County and State. *Id.* (citing FAC ¶¶ 125, 162, 166, 170, 276(f)). Eye Care Defendants also note a lack of allegations that Defendant Child Eye Care Associates received money or other benefits from the County or the State. *Id.* Plaintiffs counter that the FAC alleges that Defendants Child Eye Care Associates and RCH "have agreements that require subspecialists such as Defendant Goodman to support the law enforcement-led investigative team." Pl. Resp. 23 (citing FAC ¶¶ 101, 123, 125, 162). The FAC also alleges that in 2018, RCH "listed Goodman and Child Eye Care as its pediatric ophthalmology subspecialists." FAC ¶ 306. The allegations Plaintiffs cite in support of their argument state that Defendant Goodman acted pursuant to her relationship with Defendant RCH. As discussed above, the FAC does not plead that Defendant Child Eye Care Associates was involved in the challenged conduct. There are no allegations from which the Court can reasonably infer that Defendant Goodman was motivated to serve Defendant Child Eye Care Associates. Contrary to Plaintiffs' assertion, the FAC does not allege that Defendant Child Eye Care Associates had an agreement with the multidisciplinary team. Nor does it allege that Defendant Child Eye Care Associates received or expected to receive payment, recognition, or any other benefit as a result of Defendant Goodman's work for the multidisciplinary team.

As to the third element, Eye Care Defendants argue that Plaintiffs "failed to allege facts indicating that working with the multidisciplinary team was the kind of act that Child Eye Care Associates, LLC, hired Dr. Goodman to perform." Eye Care Def. Mot. 27. Plaintiffs respond that the FAC alleges that Defendant Goodman is an ophthalmologist, that she was hired to perform eye examinations, and that "part of her work specifically includes supporting prosecutions

through the county multidisciplinary team." Pl. Resp. 24 (citing FAC ¶¶ 20, 24, 25, 101, 123, 125, 162-164). The analysis here is similar to the analysis for the second element. The FAC alleges that Defendant Goodman assisted the multidisciplinary team based on her affiliation with Defendant RCH. It does not allege facts supporting a reasonable inference that Defendant Child Eye Care Associates hired Defendant Goodman to perform eye examinations as part of child abuse investigations. The allegations support the contrary inference—that Defendant Goodman did *not* perform such acts pursuant to her employment with Defendant Child Eye Care Associates, and thus she used her affiliation with Defendant RCH as the basis to assist the multidisciplinary team. Because the FAC does not adequately allege that Defendant Child Eye Care Associates is liable on a theory of *respondeat superior*, Plaintiffs' state-law claims against it must be dismissed.

**IV.    Leave to Amend**

Hospital Defendants and Eye Care Defendants ask that to the extent their Motions are granted, the Court dismiss Plaintiffs' claims with prejudice. Hospital Def. Mot. 34-35; Eye Care Def. Mot. 22, 26, 28. Plaintiffs argue that any dismissal should not be with prejudice. Pl. Resp. Hospital Def. 34. A party may amend its pleading once as a matter of course or, thereafter, "only with the opposing party's written consent or with the court's leave." Fed. R. Civ. P. 15(a)(1)-(2). "The court should freely give leave when justice so requires." *Id.* However, the court need not grant leave to amend if the amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citations omitted). If "the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly

broad.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (quoting *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 845 (9th Cir. 2003)).

The Court is dismissing Plaintiffs' *Monell* claims against the County Defendants in part. The Court is dismissing Plaintiffs' *Monell* claims in full against Defendant RCH and in part against Defendant CARES, and is dismissing in part Plaintiffs' negligent supervision and training claims against Defendants RCH and CARES. As for Eye Care Defendants, the Court is dismissing Plaintiffs' § 1983 claim against Defendant Child Eye Care Associates and is dismissing count 4 in part as asserted against Defendant Goodman. The Court is also dismissing Plaintiffs' state-law claims against Defendant Child Eye Care Associates. Finally, the Court is dismissing count 3 of Plaintiffs' § 1983 claim (Nigel Bliss's *Brady* claim), and count 1 to the extent it alleges a *Brady* claim, as asserted against all Defendants.

Amendment of Nigel's *Brady* claims would be futile, so the Court declines to grant leave to amend. The same is true of Plaintiffs' claim for destruction of evidence to the extent it relies on failure to document evidence. Amendment of Plaintiffs' claim for negligent training and supervision against Defendant Child Eye Care Associates would be futile as to Nigel, Dayna, and J.B. because there is no basis for them to recover for purely emotional distress. Those claims must be dismissed with prejudice.

As for the other claims, it is conceivable that Plaintiffs could allege additional facts that would state a claim. However, the Court already permitted Plaintiffs to amend their Complaint with the benefit of the legal standards and the Court's analysis, and Plaintiffs have again fallen short on some of their claims. Plaintiffs' responses to Defendants' Motions say nothing about how Plaintiffs might amend the FAC to state viable claims. In addition, this case was filed in

May 2023, and granting further leave to amend would unduly delay the case. The Court therefore denies leave to amend.

## CONCLUSION

County Defendants' Motion to Dismiss [74] is GRANTED IN PART AND DENIED IN PART. Hospital Defendants' Motion to Dismiss [79] is GRANTED IN PART AND DENIED IN PART. Eye Care Defendants' Motion to Dismiss [80] is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.


DATED:_____April 27, 2024____.



_____
MARCO A. HERNANDEZ
United States District Judge